IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Case No. _____

| | | |
|---|---|---|
| ANITA S. EARLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORTH CAROLINA JUDICIAL | ) | |
| STANDARDS COMMISSION; | ) | |
| THE HONORABLE CHRIS | ) | |
| DILLON, in his official capacity | ) | |
| as Chair of the North Carolina Judicial | ) | |
| Standards Commission; THE HONORABLE | ) | |
| JEFFERY K. CARPENTER, in his official | ) | **COMPLAINT FOR** |
| capacity as Vice Chair of the North Carolina | ) | **DECLARATORY JUDGMENT** |
| Judicial Standards Commission; and the | ) | **AND INJUNCTIVE RELIEF** |
| following Members of the North Carolina | ) | |
| Judicial Standards Commission, each in his | ) | |
| or her official capacity:  THE HONORABLE | ) | |
| JEFFERY B. FOSTER; THE HONORABLE | ) | |
| DAWN M. LAYTON; THE HONORABLE | ) | |
| JAMES H. FAISON III; THE HONORABLE | ) | |
| TERESA VINCENT; MICHAEL CROWELL; | ) | |
| MICHAEL T. GRACE; ALLISON MULLINS; | ) | |
| LONNIE M. PLAYER JR.; JOHN M. CHECK; | ) | |
| TALECE Y. HUNTER; DONALD L. | ) | |
| PORTER; and RONALD L. SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

_____

Plaintiff Anita S. Earls ("Earls"), by her undersigned counsel and pursuant to 28

U.S.C. §§ 2201 *et seq.*, and the First and Fourteenth Amendments to the United States

Constitution, alleges as follows:

## SUMMARY OF THIS ACTION

1. This is an action for declaratory judgment and injunction by Plaintiff, Anita S. Earls, Associate Justice of the North Carolina Supreme Court, who is being investigated and will potentially be punished for exercising her First Amendment rights to speak on the subject of lack of diversity in our State's courts, a matter of substantial public concern.

2. Justice Earls has been subjected to a series of months-long intrusive investigations, initiated by one or more anonymous informers, concerning her comments regarding operation of the North Carolina judicial system. Those comments, including those concerning diversity in the North Carolina judicial system, are fully protected by the First Amendment of the United States Constitution as core political speech.

3. The North Carolina Code of Judicial Conduct ("Code") which provides ethical guidance to judges in this State expressly permits judges to speak concerning the legal system and the administration of justice. This case concerns an on-going campaign on the part of the North Carolina Judicial Standards Commission (the "Commission"), which administers the Code, to stifle the First Amendment free-speech rights of Justice Earls and expose her to punishment that ranges from a letter of caution that becomes part of a permanent file available to any entity conducting a background check to removal from the bench.

4. As more fully described below, over the course of this year, the Commission has initiated two investigations into public comments made by Justice Earls on the subject of the legal system and the administration of justice. Most recently, on

August 15, 2023, the Commission indicated its intent to investigate and potentially punish Justice Earls for an interview in a legal news publication in which she discussed the North Carolina Supreme Court's recent record on issues relating to diversity. The interview was prompted by a published study of the race and gender of advocates who argue before the Court. In that interview, Justice Earls discussed matters such as the decision by the North Carolina Supreme Court to disband the Commission on Fairness and Equity, the Court's lack of judicial clerks from racial minority groups, the implicit bias associated with the interrupting of female advocates (and even herself as an African-American female justice) during oral argument, and the discontinuance of racial equity and implicit bias training in the North Carolina courts.

5. The Commission has indicated that it believes that Justice Earls' comments on these issues of legitimate public concern potentially violate a provision of the Code which requires judges to conduct themselves "in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

6. It is Justice Earls' position that public confidence in the judiciary is compromised when the court system does not reflect the population it serves and is not promoted, as one court striking down a sanction levied against a judge who criticized the court system put it, "by casting a cloak of secrecy around the operations of the courts."[1]

7. More importantly, though, the First Amendment of the United States Constitution prohibits the Commission, as an arm of the State, from stifling or even chilling free speech, especially core political speech from an elected Justice of the North

---

[1] *Scott v Flowers*, 910 F.2d 201, 213 (5th Cir. 1990).

Case 1:23-cv-00734   Document 1   Filed 08/29/23   Page 3 of 29

Carolina Supreme Court. The First Amendment allows Justice Earls to use her right to free speech to bring to light imperfections and unfairness in the judicial system. At the same time, the First Amendment prohibits the Commission from investigating and punishing her for doing so.

8. In this action, Justice Earls seeks a judicial declaration that any attempt to investigate her and potentially punish her for speaking out on matters of public concern violates the First Amendment. She seeks an injunction, preliminary and permanent, to stop the Commission from continuing to chill her right to speak on matters of public concern.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this case under (i) 28 U.S.C. §§ 1341 & 1343, in that it seeks to secure equitable relief to redress the deprivation, under color of any state law or statute, of any right, privilege, or immunity secured by the Constitution or by any Act of Congress, specifically 42 U.S.C. 1983, (ii) under 28 U.S.C. § 2201(a) to secure declaratory relief, and (iii) under 28 U.S.C. § 2202 to secure preliminary and permanent injunctive relief.

10. Venue of this action is proper within this judicial district pursuant to 28 U.S.C. § 1391(b) because Justice Earls resides in this district.

## PARTIES

11. Justice Earls is a citizen and resident of Durham, North Carolina. In 2018, she was elected to the position of Associate Justice of the North Carolina Supreme Court. In that election, Justice Earls received the votes of over 1.8 million North Carolinians,

nearly one-third more than the votes received by the next-highest vote getter, the incumbent who was running for re-election. Justice Earls duly received a certificate of election from the State Board of Elections, a commission from the Attorney General as provided by law, and was sworn into office in January 2019 for a term of eight years – through December 2026 – as established by Art. IV, § 16 of the North Carolina Constitution. She is currently a candidate for reelection, having filed a letter in November 2022 declaring her intention to seek reelection to her office of Associate Justice.

12.     The Defendant Commission was established by Article 30 of Chapter 7A of the North Carolina General Statutes, §§ 7A-374.1, *et seq.*, "to provide for the investigation and resolution of inquiries concerning the. . .conduct of any judge or justice of the General Court of Justice," including the imposition of various forms of "discipline," short of impeachment. *Id*. Such discipline is founded on violation of the Code, *i.e.*, the North Carolina Code of Judicial Conduct. *See* N.C. Gen. Stat. § 7A-374.2. The Commission is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

13.     The Commission is composed of 16 members. Under the current law, six are judges appointed by the North Carolina Chief Justice, two each from the North Carolina Court of Appeals, the Superior Court bench, and the District Court bench. N.C. Gen. Stat. § 7A-375(a). Four are lawyers appointed by the North Carolina State Bar Council, and four are lay citizens, two appointed by the Governor and one each appointed

5

by the President Pro Tempore of the North Carolina Senate and the Speaker of the North Carolina House of Representatives.  *Id.*

14.    Defendant Judge Chris Dillon is sued in his official capacity as the Chair of the Commission.   In his official capacity, it is his responsibility to oversee the administration of the Commission, including overseeing investigations and potential discipline by the Commission.  Judge Dillon is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

15.    Defendant Jeffery K. Carpenter is sued in his official capacity as the Vice Chair of the Commission.   In his official capacity, it is his responsibility to assist in overseeing the administration of the Commission, including overseeing investigations and potential discipline by the Commission.   Judge Carpenter is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

16.    Defendant Judge Jeffery B. Foster is sued in his official capacity as a member of the Commission.  In his official capacity, it is his responsibility to participate in the work of the Commission, including investigations and potential discipline by the Commission.  Judge Foster is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

17.    Defendant Judge Dawn M. Layton is sued in her official capacity as a member of the Commission.  In her official capacity, it is her responsibility to participate in the work of the Commission, including investigations and potential discipline by the

6

Commission. Judge Layton is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

18.    Defendant Judge James H. Faison is sued in his official capacity as a member of the Commission. In his official capacity, it is his responsibility to participate in the work of the Commission, including investigations and potential discipline by the Commission. Judge Faison is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

19.    Defendant Judge Teresa Vincent is sued in her official capacity as a member of the Commission. In her official capacity, it is her responsibility to participate in the work of the Commission, including investigations and potential discipline by the Commission. Judge Vincent is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

20.    Defendant Michael Crowell is sued in his official capacity as a member of the Commission. In his official capacity, it is his responsibility to participate in the work of the Commission, including investigations and potential discipline by the Commission. Mr. Crowell is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

21.    Defendant Michael T. Grace is sued in his official capacity as a member of the Commission. In his official capacity, it is his responsibility to participate in the work of the Commission, including investigations and potential discipline by the Commission. Mr. Grace is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

7

22.     Defendant Allison Mullins is sued in her official capacity as a member of the Commission.  In her official capacity, it is her responsibility to participate in the work of the Commission, including investigations and potential discipline by the Commission.  Ms. Mullins is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

23.     Defendant Lonnie M. Player, Jr. is sued in his official capacity as a member of the Commission.  In his official capacity, it is his responsibility to participate in the work of the Commission, including investigations and potential discipline by the Commission.  Mr. Player is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

24.     Defendant John M. Check is sued in his official capacity as a member of the Commission.  In his official capacity, it is his responsibility to participate in the work of the Commission, including investigations and potential discipline by the Commission.  Mr. Check is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

25.     Defendant Talece Y. Hunter is sued in her official capacity as a member of the Commission.  In her official capacity, it is her responsibility to participate in the work of the Commission, including investigations and potential discipline by the Commission.  Ms. Hunter is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

26.     Defendant Donald L. Porter is sued in his official capacity as a member of the Commission.  In his official capacity, it is his responsibility to participate in the work

8

of the Commission, including investigations and potential discipline by the Commission. Mr. Porter is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

27. Defendant Ronald L. Smith is sued in his official capacity as a member of the Commission. In his official capacity, it is his responsibility to participate in the work of the Commission, including investigations and potential discipline by the Commission. Mr. Smith is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this Complaint.

## THE OPERATION OF THE COMMISSION

28. The disciplinary measures available to the Commission to apply to North Carolina judges and justices range from a private "letter of caution," N.C. Gen. Stat § 7A-374.2(6), which the Commission is authorized to issue on its own authority, *id*., to a "public reprimand," *id*. at § 7A-374.2(7), "censure," *id*. at § 7A-374.2(1), "suspension," *id*. § 7A-374.2(9), or "removal," *id*. at § 7A-374.2(8), each of which ultimately requires a "finding by the Supreme Court." The penalty of removal includes not only removal of the judge from her current position, but also "disqualif[ication] from holding further judicial office." *Id*.

29. The Chair of the Commission, by statute one of the appointed Court of Appeals judges (and here Judge Dillon), N.C. Gen. Stat § 7A-375(a1), is authorized to employ – and currently does employ – an executive director, Commission counsel, investigator, and other support staff. *Id*. at § 7A-375(f).

30.     The Commission is also empowered, subject to approval by the Supreme Court, to adopt and amend "its own rules of procedure for the performance of the duties and responsibilities" under Article 30.  N.C. Gen. Stat § 7A-375(g).

31.     By statute, "[a]ny citizen of the State may file a written complaint with the Commission concerning the. . .conduct of any justice or judge of the General Court of Justice, and thereupon the Commission shall make such investigation as it deems necessary."   N.C. Gen. Stat § 7A-377(a).   The Commission may also "make an investigation on its own motion."  *Id*.  The investigation is defined as "the gathering of information with respect to alleged misconduct or disability."  N.C. Gen. Stat § 7A-374.2(4).

32.     Under the Rules promulgated by the Commission, the Chair is charged with dividing the Commission into two panels, designated Panel A and Panel B.  Rule 2(b)(1), Rules of the Judicial Standards Commission ("Rules").   The Chair serves as Chair of each Panel while the other Commission members are assigned equally according to their status – as judges, lawyers, or lay citizens – to one Panel or the other.  Rule 2(b)(2).  Each panel serves either as an "investigative panel" or a "hearing panel," in a given matter.  Rule 2(b)(4).

33.     Complaints, including the name of the person who lodges the Complaint, are kept confidential by the Commission.  Rule 6.  Rule 10(c)(1) specifically provides that the notice letter to the accused judge "shall not identify the name of the complainant" (unless necessary to determine whether the judge must be disqualified from continued

involvement in cases involving the complainant). Thus, the judge's accuser is generally anonymous.

34. If a written complaint is not summarily dismissed by the Executive Director and Commission Counsel on the grounds that it fails to disclose facts which, if true, indicate that a judge has engaged in conduct in violation of the Code, the complaint is "considered by an investigative panel" which, by an affirmative vote of at least five members "may dismiss the complaint or authorize an investigation pursuant to Rule 10." Rule 9(b).

35. Rule 10, titled "Investigations," provides for both a "preliminary investigation" for "the purpose of verifying the credibility of or ascertaining additional facts necessary to evaluate the allegations," Rule 10(b), and a "formal investigation" made "for the purpose of determining whether a judge has engaged in actual misconduct in violation of the Code." Rule 10(c).

36. The Commission Rules provide that an accused judge is "given a general description of the subject matter of the investigation," as well as a "reasonable opportunity to respond to the notice letter and provide relevant information to the Commission relating to the subject matter of the investigation." Rule 10(c).

37. Upon "the affirmative vote of at least 5 members," the investigative panel may authorize the initiation of a disciplinary proceeding. . .against the judge." Rule 12(a). That proceeding is instituted by a Statement of Charges, Rule 12(b), followed by an Answer, Rule 13, opportunities for discovery, Rule 16, and a hearing with witnesses. Rules 19 & 20. At the conclusion of the hearing, the hearing panel, by an affirmative

11

vote of at least five members, may recommend discipline, up to and including removal of the judge, to the North Carolina Supreme Court. Rule 21.

38.     While the Commission "has the same power as a trial court. . .to punish for contempt, or for refusal to obey lawful orders or process issued" by it, N.C. Gen. Stat § 7A-377(d), the Commission, by statute, "is limited to reviewing judicial conduct, not matters of law." *Id*. at § 7A-377(a). For that reason, the Commission does not provide a forum for Justice Earls to raise her constitutional claims against its actions.

## THE OPERATIVE PROVISIONS OF THE
## NORTH CAROLINA CODE OF JUDICIAL CONDUCT

39.     As more fully described below, this action concerns statements made by Justice Earls in an interview with a legal publication.

40.     On August 15, 2023, Justice Earls was provided with a Notice Letter (the "Notice") from the Commission stating that the Commission had reopened a formal investigation into her "based on an interview" given "to the media in which you appear to allege that your Supreme Court colleagues are acting out of racial, gender, and/or political bias in some of their decision making." (A true and complete copy of the Notice is attached to this Complaint as Exhibit A.)

41.     The Code pursuant to which the Commission seeks to investigate Justice Earls was first promulgated by the North Carolina Supreme Court in 1973, 283 N.C. 771 (1973), and has been amended many times in the years since. *See* A Publication Record of the Code of Judicial Conduct at 15. The current version was adopted in 2006, 360 N.C. 676 (2006), and amended in 2015. 368 N.C. 1029 (2015).

12

42.     As stated in its Preamble, "[a]n independent and honorable judiciary is indispensable to justice in our society, and to this end and in furtherance thereof, this Code of Judicial Conduct is hereby established." Code, Preamble. The Preamble further states that "[a] violation of this Code of Judicial Conduct may be deemed conduct prejudicial to the administration of justice that brings the judicial office into disrepute, or willful misconduct in office, or otherwise as grounds for disciplinary proceedings pursuant to Article 30 of Chapter 7A of the General Statutes of North Carolina." *Id*. The Code is comprised of seven Canons, each with multiple subparts.

43.     Of the seven Canons, only one, Canon 7, explicitly deals with speech. That Canon states that a "judge may engage in political activity consistent with the judge's status as a public official," and is explicitly "designed to strike a balance between two important but competing considerations: (1) the need for an impartial and independent judiciary and (2) in light of the continued requirement that judicial candidates run in public elections as mandated by the Constitution and laws of North Carolina, the right of judicial candidates to engage in constitutionally protected political activity." Code, Canon 7.[2]

44.     North Carolina's Canon 7 was significantly revised to provide for fewer restrictions on speech after the United States Supreme Court, in *Republican Party of Minn. v. White*, 536 U.S. 765, 788 (2002), struck down a similar code provision in

---

[2] Part of Canon 3 (not at issue here), specifically Canon 3(A)(6), also provides that a "judge should abstain from public comment about the merits of a pending proceeding in any state or federal court dealing with a case or controversy arising in North Carolina or addressing North Carolina law."

Case 1:23-cv-00734   Document 1   Filed 08/29/23   Page 13 of 29

Minnesota prohibiting candidates for judicial elections (including judges) from announcing their views on disputed legal and political issues on the grounds that it violated the First Amendment.

45.     The Notice to Justice Earls references two Code provisions, Canons 2(A) and 3(A)(1). (Notice at 1.) Neither of those two Code provisions under which the Commission seeks to investigate Justice Earls' speech explicitly references speech. The first, a part of Canon 2 – headed "[a] judge should avoid impropriety in all the judge's activities" – sets out a standard that a "judge should respect and comply with the law and should conduct himself/herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

46.     The Commission's Notice announcing the investigation also refers to Canon 3(A)(1) which, under the rubric "Adjudicative Responsibilities," states that a "judge should be unswayed by partisan interests, public clamor, or fear of criticism."

47.     The Commission Notice letter makes no mention of a further Code provision – Canon 4(A) – which explicitly provides in pertinent part that a "judge may speak, write. . .or otherwise engage in activities concerning the economic, educational, legal, or governmental system, or the administration of justice."

**JUSTICE EARLS' INTERVIEW COMMENTS CONCERNING DIVERSITY**

48.     The events at issue in this case arise out of a May 17, 2023 article by North Carolina Solicitor General Ryan Park and two co-authors published in the magazine of the North Carolina Bar Association, *North Carolina Lawyer*, titled "Diversity and the North Carolina Supreme Court: A Look at the Advocates."

14

49.     In that article, Solicitor General Park using "a dataset painstakingly compiled over the last two years," concluded that "over ninety percent of oral advocates in the North Carolina Supreme Court identified as white and over seventy percent as male." Those statistics were contrasted with North Carolina's overall population which is only 70% white and less than half male. The analysis concluded that in the "rarefied space" of Supreme Court oral arguments, "opportunities remain scarce for attorneys from certain backgrounds," *i.e.*, female and non-white.

50.     Following up on the issues raised in that article, on June 20, 2023, *Law360*, an on-line publication directed to the legal profession, published an interview with Justice Earls, the only non-white female serving on the North Carolina Supreme Court, which it titled "North Carolina Justice Anita Earls Opens Up About Diversity" (the "Interview"). (A true and complete copy of the Interview is attached to this Complaint as Exhibit B.)

51.     In the preface of the Interview, *Law360* described Justice Earls as "a former civil rights attorney elected as a justice of the North Carolina Supreme Court" who "shared her perspective on being a Black female Democrat on a state Supreme Court that is largely white, male and, after last year's elections, Republican." (Interview at 1.)

52.     In response to the question raised by the article, namely, "[w]hy are oral advocates that come before the North Carolina Supreme Court overwhelmingly male and white, despite a diverse state population and state bar membership," Justice Earls referred to several factors, including:

- That the current Supreme Court was "lacking" on "racial diversity" with "14 or 15 law clerks serving in our court and no African Americans. One Latina. (Interview, at 2.)

- "Implicit bias" as evidenced by a circumstance where Justice Earls felt "like my colleagues are unfairly cutting off a female advocate" and she was "unfairly, not allowed to answer the question, interrupted." (*Id.*) This, while "not uniform" and "not in every case," Justice Earls said, could have been a factor "in the politics of the particular case that's being argued." (*Id.*)

Justice Earls took pains to point out that she was "not suggesting that any of this is conscious, intentional, racial animus," but that "our court system, like any other court system, is made up of human beings and I believe the research that shows that we all have implicit biases."

53.     Asked about efforts to "diversify the appellate bench," Justice Earls noted that an internal equity committee set up "to look at just the North Carolina Supreme Court and our hiring practices" was "disbanded at the beginning of this year." (Interview at 2.)

54.     She also mentioned that the Supreme Court, as previously constituted, had "issued an order appointing a Commission on Fairness and Equity in the North Carolina judicial system," which "dealt with gender as well as race." (Interview at 2.) Although that Commission "was established by order of the court in October of 2020," in "January of 2023, the chief justice refused to reappoint members of that committee." (*Id.*) In her view, Justice Earls continued, the "new majority on the court didn't issue a new court order saying we're superseding the old order. …It's in line with the values of the current party in power in our court." (*Id.*, ellipsis in original.) She continued, "[t]he new members of our court very much see themselves as a conservative bloc. They talk about

themselves as 'the conservatives.' Their allegiance is to their ideology, not to the institution."

55.    As an example of that point, the Interview contained an "illustration hung in the North Carolina Supreme Court" depicting the elected Republican appellate justices and judges as cartoon superheroes, called the "North Carolina Justice League." (Interview at 3.)

56.    In response to a third question about the obstacles attributable to gender or race that Justice Earls had personally faced as an appellate advocate or judge, Justice Earls stated that she believed that she was "interrupted by more junior colleagues" and sometimes even advocates "who won't let me get my question out." (Interview at 4.) In seeing "ways in which I'm treated differently by my colleagues and during oral argument," Justice Earls stated it was sometimes "hard to separate out: Is this race or is this gender or is this because of my political views." (*Id*.) She went on to state that "[a]ny one of those three or the combination of all three might be the explanation." (*Id*.) She also stated that "[t]here were two times when one of my colleagues publicly tried to embarrass me. . .in the context of the case and the oral argument." (*Id*.)

57.    A fourth question asked Justice Earls about implicit bias trainings offered to North Carolina judges, to which Justice Earls replied that a curriculum had been developed and offered, but that the newly elected Chief Justice had ended the program (Interview at 4), which she described as "part of the general antipathy towards seeing that racial issues matter in our justice." (*Id*.) In explaining her position, Justice Earls noted that the current Chief Justice had actually dissented to the earlier Supreme Court order

17

establishing the Commission on Fairness and Equity, based on his view that the timing of the order was political, and that it prejudged issues of racial discrimination, and improperly inserted the judiciary into the policymaking arena. (*Id*.)

58.     In response to a question about increasing diversity on the bench, Justice Earls mentioned the financial difficulties associated with running for office and the removal of public financing in North Carolina. (Interview at 4-5.) Finally, in response to the question "[w]hat would you tell women and people of color hoping to join North Carolina's appellate bench or appellate bar," Justice Earls said "I think the message I would give is: It's twice as important that you do this. You can find resources to help you surmount the hurdles." (*Id*. at 5.)

59.     It is for this speech – core political speech concerning important public policy questions regarding the justice system and administration of the courts – that the Commission seeks to investigate Justice Earls to determine whether she has violated the Code, and potentially sanction her for a violation.

60.     According to the Commission's Notice, Justice Earls' comments "appear to allege that your Supreme Court colleagues are acting out of racial, gender, and/or political bias in some of their decision-making." Yet, as shown above, none of Justice Earls' statements related to a "decision" in case (or the "decision-making" in arriving at such a decision), but concern, at most, only "decisions" to interrupt advocates or fellow justices at oral argument.

61.     The other "decisions" – *i.e.*, whether to hire minority law clerks and to continue the work of committees dedicated to equity or court-based implicit bias trainings

18

– also do not relate to decision-making in any particular case, but instead to the public-policy implications of different aspects of court administration.

62.     In fact, nowhere in the interview does Justice Earls discuss a single case that has come before the Supreme Court or its decision in such a case.  Given that clear context, the Commission's statement (Notice at 2), that "publicly alleging that another judge makes decisions based on a motivation not allowed under the Canons without some quantum of definitive proof runs contrary to a judge's duty to promote public confidence in the impartiality of the judiciary," is obtuse, if not nonsensical.

63.     Even on that point, the Commission pays minimal obeisance to the constitutional primacy of free speech, noting that "there are circumstances where a judge may publicly criticize another judge's judicial philosophy and decision-making process (see *GOP v. White*)" (Notice at 1-2), referencing the decision in which the U.S. Supreme Court struck down speech restrictions on judges.  The Notice, moreover, entirely fails to reference Canon 4(A) which, consistent with the First Amendment, permits judges to "speak" concerning the "legal, or governmental system, or the administration of justice." Instead, the Commission's Notice indicates that it would read that Canon entirely out of the Code in favor of squelching free speech.

64.     Indeed, the entire tenor of the Notice, and, more importantly, its decision to initiate an investigation based on a judge's speech, bespeaks a callous disregard for the principles of the First Amendment.  The Commission's actions in instituting the investigation indicate that it believes that "promot[ing] public confidence in the impartiality of the judiciary" (Notice at 2), is best accomplished by threatening judges

who speak out about what they view as imperfections or defects in the judicial system and who do so in a measured and nuanced manner. Nothing could be more inimical to the First Amendment.

## THE COMMISSION'S NOTICE IS PART OF A CONTINUING EFFORT TO THWART JUSTICE EARLS' RIGHT TO FREE SPEECH

65.     If this were the first effort of the Commission to thwart the free-speech rights of Justice Earls, it might charitably be viewed as an over-zealous aberration. The fact that it is part of a continuing effort to stifle Justice Earls, however, makes such a conclusion impossible.

66.     Earlier this year, on March 20, 2023, the Commission issued a Notice to Justice Earls indicating that "a written complaint [had been] filed with the Commission" and that it was initiating a formal investigation – dubbed "Inquiry No. 23-081" – concerning comments made by Justice Earls regarding "matters being currently deliberated in conference by the Supreme Court" and discussed by her at "two public events," and subsequently in a media inquiry. (A true and complete of the March 20, 2023 letter initiating the investigation ("Notice No. 1") is attached to this Complaint as Exhibit C.)

67.     As with the Commission's more recent Notice, Notice No. 1 did not accuse Justice Earls of discussing any specific case being considered in the Supreme Court's conference, but instead only three administrative matters:  (1) the Court's decision to rescind its 2019 Rule adopting the universal citation format, (2) the Court's decision to adopt a rule permitting published opinions of the court of appeals to be deemed

"unpublished" by the Court (and thus without precedential effect), and (3) consideration of a possible legislative change that would eliminate the right of appeal to the Supreme Court based on a dissent in the Court of Appeals. Each of these three issues was the subject of substantial earlier public discussion by members of the Court and others. The first issue, in fact, was already decided and the subject of a published order before Justice Earls even publicly addressed it. In other words, the Commission was investigating Justice Earls for publicly reporting on an already-public order on a technical administrative issue, *i.e.*, changing the manner in which cases would be cited by the courts.

68.     Those matters, moreover, were discussed in forums at which a Supreme Court Justice's right to speak could hardly be questioned, namely, the North Carolina General Assembly Courts Commission (a commission made up of legislators and judges of which Justice Earls was a member), and the North Carolina Bar Association Board of Governors (of which Justice Earls was a vice president).

69.     Nevertheless, as a result of the institution of the investigation, Justice Earls was required to retain a lawyer, to submit to a lengthy and probing interview by Commission staff, and to devote a substantial amount of time to defending herself, taking away time from the role to which she had been elected, that of Associate Justice of the North Carolina Supreme Court.

70.     Ultimately, Justice Earls' counsel submitted a substantial letter explaining why her conduct not only did not violate any of the Canons of the Code, but was actually consistent with Canon 4(A)'s endorsement of judges engaging in activities "concerning

the legal. . .or governmental system or the administration of justice."  (A true and complete copy of Justice Earls' counsel's response Notice No 1 is attached to this Complaint as Exhibit D.)

71.     The letter sent to the Commission on behalf of Justice Earls attempted to explain to the Commission the potential problems with seeking to investigate judges with regard to speech, stating:

> The Code of Judicial Conduct, like all governmental pronouncements, is subject to the First Amendment of the U.S. Constitution and its proscription against the abridgment of free speech. The U.S. Supreme Court, for example, in *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), ruled that the "Minnesota Supreme Court's canon of judicial conduct prohibiting candidates for judicial election from announcing their views on disputed legal and political issues violates the First Amendment" and struck down that particular canon.  *Id*. at 788.

> An attempt to impose discipline of any type in this circumstance could be an appropriate subject of a First Amendment as-applied challenge in federal court to the putative authority of the Commission to proscribe and/or punish speech by judges concerning administrative matters.  The lack of any written authority, coupled with the necessary reliance on opaque court traditions whose existence is disclaimed by multiple retired Justices, counsels against proceeding in this matter.

(Exhibit D, at 9.)

72.     In addition to the response letter, Justice Earls submitted statements supporting her position from four retired Supreme Court Justices and a member of the North Carolina General Assembly.

73.     On May 16, 2023, counsel for the Commission reported to Justice Earls' counsel that a Commission Panel had met on May 12, 2023 and voted to dismiss the complaint against Justice Earls without any further action.

74.     Later, on June 12, 2023, Justice Earls, through counsel, informed Commission Counsel that she was waiving her right to confidentiality regarding the investigation pursuant to Commission Rule 6(b)(2).[3]

75.     Despite the dismissal, Commission Counsel informed Justice Earls' counsel that Justice Earls should be reminded "of the language in Canon 2(A), that a Judge should respect and comply with the law and should conduct himself/herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

76.     Justice Earls took that "reminder" as a caution to be certain that her public comments do not reveal any confidential matters, as that is what is required to comply with the law; and to carry out her duties to uphold the fair and equitable administration of justice, as that is what the Code contemplates will promote public confidence in the judiciary. She did not perceive this to be a warning that if she continued to speak out on issues of public concern, she would again be subject to investigation and discipline for exercising her First Amendment rights.

77.     However, it now appears that the warning was also intended to stop her from speaking on issues of public concern more broadly. Even though the earlier investigation concerning Justice Earls was reported as "dismissed," and the fact that the Commission's Rules have no procedure for "reopening" a case in which a Panel votes to dismiss, the Notice announcing the Commission's new inquiry states that it represents a

---

[3] Justice Earls, on August 28, 2023, also waived confidentiality with respect to the new investigation.

"reopen[ing]" of the earlier-dismissed formal investigation, utilizing the same inquiry number, No. 23-081. The Commission's failure to adhere to its own Rules is a further example of the irregularities surrounding its continuing harassment of Justice Earls concerning her right to speak out.

78. The Commission's continuing efforts to investigate and potentially discipline Justice Earls are a blatant attempt to chill her First Amendment rights. The fact that the Commission is doing so under Canon 2(A) with its vague standard when applied to speech that somehow fails to "promote[] public confidence" in the judiciary, makes the actions of the Commission even more unconstitutional and discourages both Justice Earls and other judges and candidates from making statements critical of the judicial system. Some members of the public will lose confidence in the judiciary if issues of race and gender bias are not addressed, especially if those issues are not addressed because the Commission is using its powers to stifle the discussion.

79. The Commission's reference to a second Canon – Canon 3(A)(1) – which concerns only a judge's "adjudicative responsibilities," is entirely without basis. Justice Earls' comments, which do not relate to any adjudicative case, cannot fairly be portrayed as "swayed" by "partisan interests, public clamor, or fear of criticism" as described in that Canon. Rather, her statements addressed a matter raised by an article written by the North Carolina Solicitor General and of sufficient public concern to merit publication by the North Carolina State Bar Association, and a follow-up article by the legal periodical, *Law360*. Her statements are core political speech protected by the First Amendment.

80.     The series of investigations into Justice Earls has, in fact, led to a chilling of her First Amendment rights.  As a result of the actions of the Commission, Justice Earls turned down an invitation to write an article for a national publication, and decided not to discuss the issue of the racial and gender composition of state courts in response to a request to contribute an essay to the Yale Law Review forum about state courts because of concerns that it could lead to further investigation by the Commission.  In addition, Justice Earls refrained from speaking publicly at a meeting of the Equal Access to Justice Commission concerning a proposal to extend a court rule that broadens the pool of advocates available to indigent litigants for fear that she could not speak without running the risk of discipline from the Commission.  She also declined to provide her personal views on the merits of the proposal when directly asked to do so in a private conversation with a person with a professional stake in the issue.  Justice Earls has further considered whether any statement she makes in the opinions she issues might likewise subject her to discipline.

81.     The effects have not only chilled the free-speech rights of Justice Earls, but have also interrupted her ability to do her work as a Justice of the North Carolina Supreme Court and have understandably taken a substantial emotional toll as she has tried to negotiate the Commission's capricious line on what judges can and cannot say about important public issues affecting the justice system.  Part of the capriciousness of the Commission is based on the fact that other judges appear able to comment publicly on similar issues without challenge.  Any discipline from the Commission has the potential

25

to derail Justice Earls from seeking or being considered for any future professional opportunities, which causes her considerable stress and anxiety.

## FIRST CAUSE OF ACTION
## DECLARATORY JUDGMENT

82.    Paragraphs 1 through 81 of the Complaint are realleged as if fully set forth herein and reincorporated by reference.

83.    The First Amendment of the U.S. Constitution prohibits the "abridging the freedom of speech" of persons by the government and those acting under color of its laws.  Justice Earls is entitled to a declaration that any attempt to investigate or discipline her under the Code for speech concerning matters of public concern, including, without limitation, the statements in the Interview, is unconstitutional as applied to her.  Justice Earls is currently under the cloud of yet another burdensome and protracted investigation with the prospect of discipline, up to and including her removal from the North Carolina Supreme Court as described above.   Justice Earls, both as a judge and a judicial candidate, also intends to continue to engage in the core political speech described above in a manner that potentially subjects her to further investigations by the Commission backed by the additional threat of other discipline under the Code.

84.    As applied to Justice Earls, the actions of the Commission seek to wield the Code as a content-based restriction in order to regulate, as well as punish, core political speech.  As such, it is both subject to strict scrutiny and presumptively unconstitutional.

85.    The fact that virtually any speech critical of the judicial system could be construed to undermine "public confidence" in the judiciary, renders Canon 2(A) in this

26

context unconstitutionally vague.  In fact, nothing will undermine public confidence in our courts more than serial burdensome disciplinary investigations into speech designed to inform the public about problems perceived in the judicial system by one of its elected Supreme Court Justices.  The actions of the Commission in this circumstance necessarily serve only to chill free speech.

86.  In short, the actions of the Commission in wielding the Code against Justice Earls accomplishes no compelling state interest, let alone does so in a "narrowly tailored" fashion as otherwise required by the Constitution.  The fact that the Commission has forced Justice Earls to engage with these invasive and expensive investigations for months shows that the Commission is acting primarily to chill protected political speech and, in fact, has achieved that improper goal.

88.  Justice Earls has no adequate remedy at law.  The Commission should be enjoined from purporting to reopen its earlier-dismissed investigation and its investigation of Justice Earls' statements on matters of public concern, including statements in the Interview, should be declared unconstitutional, and any further investigation or enforcement proceeding under the Code against Justice Earls for her speech on matters of public concern should be preliminarily and permanently enjoined.

## SECOND CAUSE OF ACTION
## FIRST AMENDMENT & 42 U.S.C. § 1983

89.  Paragraphs 1 through 88 of the Complaint are realleged as if fully set forth herein and reincorporated by reference.

27

90.     The actions of the Commission as alleged above violate the freedom of speech clause of the First Amendment of the United Stated Constitution by purporting to regulate – through the investigative powers of the Commission and the sanctions against judges provided for in the Code – speech at the absolute core of the First Amendment, namely protected political speech, all in violation of 42 U.S.C. § 1983.

WHEREFORE, Plaintiff prays the Court that:

A.     The Court declare pursuant to 28 U.S.C. § 2201(a) that the investigation and potential punishment of Plaintiff for her statements on matters of public concern, including, without limitation, the statements in the Interview, is unconstitutional;

B.     The Court grant preliminary injunctive relief as well as a permanent injunction in favor of Plaintiff barring further investigation or punishment of her for statements on matters of public concern;

C.     That Plaintiff be granted her attorneys' fees under 42 U.S.C. § 1988; and

D.     The Court grant Plaintiff such further relief as it may deem appropriate.

This the 29th day of August, 2023.


By:     /s/ Pressly M. Millen
        Pressly M. Millen
        State Bar No. 16178
        Raymond M. Bennett
        State Bar No. 36341
        Samuel B. Hartzell
        State Bar No. 49256

OF COUNSEL:

WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100

Raleigh, North Carolina 27601
(919) 755-2100

Attorneys for Plaintiff
Anita S. Earls