# EXHIBIT D



womblebonddickinson.com

May 4, 2023

*By Email and First-Class Mail*
Patricia A. Flood, Esq., Commission Counsel
Judicial Standards Commission
P.O. Box 1122
Raleigh, NC 27602

Re:     Inquiry No. 23-081

Womble Bond Dickinson (US) LLP

555 Fayetteville Street
Suite 1100
Raleigh, NC 27601

t:   919.755.2100
f:   919.755.2150

Press Millen
Partner
Direct Dial: 919-755-2135
Direct Fax: 919-755-6067
E-mail: Press.Millen@wbd-us.com

Ms. Flood:

I am writing concerning the above-referenced Inquiry on behalf of our client, North Carolina Supreme Court Associate Justice Anita Earls ("Justice Earls"). As I understood from our discussion at Justice Earls' interview, we have the opportunity to provide information pertinent to the Inquiry to be shared with the Panel conducting the Inquiry. We appreciate that opportunity and this letter and its attachments constitute additional supplemental information to that provided by Justice Earls at her interview.

We are attaching the following:

Annex A –     Statement of former Chief Justice, Cheri L. Beasley, dated May 3, 2023;

Annex B –     Statement of former Associate Justice Samuel James Ervin, IV, dated May 4, 2023;

Annex C –     Statement of Justice Robin E. Hudson (Retired), dated May 3, 2023;

Annex D –     Statement of Representative Marcia Morey, dated April 30, 2023; and

Annex E –     Statement of Retired Associate Justice Robert F. Orr, dated April 27, 2023.

*Initiation of the Inquiry*

We understand from discussions with the Commission's Investigator that this inquiry was initiated by the Commission *sua sponte* as a result of an online article published on the website of WRAL-News with the headline "Leaked document shows big changes could be underway at

Womble Bond Dickinson (US) LLP is a member of Womble Bond Dickinson (International) Limited, which consists of independent and autonomous law firms providing services in the US, the UK, and elsewhere around the world. Each Womble Bond Dickinson entity is a separate legal entity and is not responsible for the acts or omissions of, nor can bind or obligate, another Womble Bond Dickinson entity. Womble Bond Dickinson (International) Limited does not practice law. Please see www.womblebonddickinson.com/us/legal-notice for further details.



GOP-majority NC Supreme Court," first published on February 12, 2023.[1]  As described by the Investigator, the initial concern was that a confidential court document had been "leaked" in a manner similar to the leaking at the U.S. Supreme Court last year of a draft of the majority opinion in *Dobbs v. Jackson Women's Health Organization*.

Notably, the article published by WRAL-News uses the word "leaked" solely in the headline.[2]  In the body of the article there are simply references to "notes…taken from a North Carolina Bar Association Meeting last month," which were "obtained by WRAL News" and which "were taken by a meeting attendee."  In other words, it appears that the decision to investigate Justice Earls may have been made based upon a misleading disparity between a headline and the more accurate and responsible account found in the body of the story.

This particularly lamentable phenomenon has been discussed in the academic literature. *See* Ecker, U. K. H., & Lewandowsky, S. (2014), "The effects of subtle misinformation in news headlines," *Journal of Experimental Psychology: Applied*, 20(4).  That article described how misleading headlines "constrain further information processing, biasing readers towards a specific interpretation" of the body of the story.  In less academic settings, the phenomenon is often referred to as "clickbait" which is defined by Merriam-Webster's on-line dictionary as "something (such as a headline) designed to make readers want to click on a hyperlink especially when the link leads to content of dubious value or interest."

Thus, given the fact that there is no purportedly "leaked" document from the Court (or from anywhere else for that matter) actually described in the article, it appears that this investigation may have arisen as a result of clickbait.  In our view, the investigation should never have begun in the first place.

*The Canons at Issue*

As described in the original March 20, 2023 letter informing Justice Earls of the investigation, the four Canons at issue with respect to the investigation are Canons 1, 2(A), 3(A)(1), and 3(B)(1).  None of those Canons purports to set forth any explicit requirement regarding confidentiality or to constrain a judge's speech concerning administrative responsibilities of the judge as discussed below.

Thus, at the outset, it is important to note the explicit dichotomy recognized in Canon 3 between "Adjudicative Responsibilities" (found in Canon 3(A)(1)-(7)), on the one hand, and "Administrative Responsibilities" (found in Canon 3(B)(1)-(4)), on the other.

---

[1] It is unclear how that representation is consistent with the notice letter dated March 20, 2023 that was provided to Justice Earls which indicates that "the Commission has ordered a formal investigation into allegations raised against you in a written complaint filed with the Commission."

[2] Found at https://www.wral.com/story/leaked-document-shows-big-changes-could-be-underway-at-gop-majority-nc-supreme-court/20716857/).



Here the information disclosed – relating to two possible rule changes and a possible legislative change for consideration by the General Assembly – are in no way "adjudicative" and thus clearly fall within the category of performance of the Justice's administrative responsibilities as covered by Canon 3(B). As Justice Earls described, moreover, those issues can *only* have concerned administrative responsibilities because the Court's January 11, 2023 Retreat at which those items were discussed occurred at a time when there were no pending cases before the Court, two new members had just joined the Court, and the Court had heard no cases yet.

For that reason in our view, the provisions of Canon 3(A)(1) are simply inapplicable to the circumstances here.[3] With respect to the three other Canons mentioned in the March 20 letter – Canons 1, 2(A) and 3(B)(1) – as discussed more fully below, we do not believe that the circumstances here can fit within their proscriptions, no matter how broadly interpreted. Equally importantly, we are of the view that the conduct of Justice Earls was consistent with the requirements of other applicable Canons.

*The Lack of a Written Confidentiality Rule*

Pursuant to § 13 of Article IV of the North Carolina Constitution, the Supreme Court has exclusive authority to make rules for the appellate division, including itself. As Justice Earls indicated, she was not aware of any rule promulgated by the Court concerning confidentiality of the Conference. We have now confirmed that with four former Justices with tenures dating back to 1995 and continuing forward to the end of 2022. (*See* Orr Statement ¶ 4; Ervin Statement ¶ 6; Hudson Statement ¶ 8; Beasley Statement ¶ 5.)

Lacking any Rule or any specifically applicable Canon proscribing the statements made by Justice Earls, it is our view that there is simply no basis for any discipline in this circumstance. Any assertion of disciplinary authority pursuant to an opaque "unwritten rule" or some amorphous concept of the "traditions" of the Court would violate due process since the subject judge is given no fair notice of what conduct is prohibited. *See Chicago v. Morales*, 527 U.S. 41, 56 (1999).

---

[3] Even if those provisions were somehow found to be broadly applicable in spirit, they do not appear to have any relevance to these facts since we do not understand that there is any issue regarding Justice Earls' being less than "faithful to the law and unswayed by partisan interests, public clamor, or fear of criticism" (Canon 3(A)(1)), in the course of performing her adjudicative responsibilities. Similarly, the June 30, 2021 letter from Chief Justice Newby to Philip Feagan (which Justice Earls was not copied on and which she had not previously seen) and the excerpt from briefs submitted in federal court litigation that were provided with the March 20, 2023 notice letter are both irrelevant to the issues here because they clearly concern only adjudicative matters, that is, cases that come before the Court, as opposed to administrative responsibilities, including rulemaking.



*The Standard Practice of the Justices has been to Discuss Rule Changes with Pertinent Stakeholders Prior to Adoption*

Any resort to the "traditions" of the Court fares no better. The Statement of Retired Justice Orr – given without knowledge of the subject of this inquiry (Orr Statement ¶ 8) – makes it clear that during his time on the Court (from 1995 through 2004), he and other members of the Court would informally consult with other knowledgeable persons outside the Court "with regard to administrative matters relevant to the practice of law and the function of the judiciary of the State." (*Id*. ¶ 5.) The examples he gives of persons so consulted include "practitioners, retired or active Court of Appeals or trial judges, law professors and others." (*Id*.) Justice Orr stated his view that such consultations were appropriate in order that he be better informed in his decision making regarding those administrative matters. (*Id*.)

Retired Justice Ervin has provided a Statement to the same effect regarding the more recent practices of the Court. He identifies a number of specific examples of individual justices' consultations with stakeholders on issues such as the Uniform Bar Examination (Ervin Statement ¶ 9), the creation of a specialty in utilities law (*id*. at ¶ 10), and the adoption of the rule concerning the Universal Citation format (*id*. at ¶ 11) in which he and other Justices consulted with persons outside of the Court during the consideration of a rule change by the Court, but prior to its adoption. Justice Ervin even recalls that he had discussions with the staff of the Judicial Standards Commission indicating that his proposed discussions were permissible under the Code of Judicial Conduct. (*Id*. at ¶ 12.)[4]

Former Chief Justice Beasley has also provided a Statement indicating, among other things, that "it was a regular practice for members of the Court to consult with as many relevant stakeholders as possible regarding, for example, rule changes" and that these consultations were, in her view, "necessary for individual justices to understand the nature of given rule changes and the implications of those changes." (Beasley Statement ¶ 8.) She, too, provided a number of examples in which such consultations occurred with respect to specific rules proposals, including universal citation (*id*. at ¶ 10), adoption of a new general rule of practice concerning the ability of a trial court judge to assess a defendant's ability to pay before imposition or waiver of discretionary fines or fees (*id*. at ¶ 11), and the establishment of the Chief Justice's Commission on Fairness and Equity (*id*. at ¶ 12.) She stated that she even sought input from outside the Conference for exigent rules established during the Covid-19 pandemic as to which she had plenary authority to impose. (*See id*. at ¶ 13.)

In her view, "[t]raditionally and necessarily, it has fallen to each justice to determine what level of consultation each deems appropriate for the purposes of fulfilling their role in diligently discharging the justice's administrative responsibilities." (Beasley Statement ¶ 14.)

---

[4] Justice Ervin indicated in that regard his "understanding … that the staff of the Judicial Standards Commission felt that different standards applied to conversations involving matters that the Court was deciding in its adjudicative capacity and to matters that the Court was deciding in its administrative authority." (Ervin Statement ¶ 12.)



Most pertinently, perhaps, the long-standing practices of the Appellate Rules Committee of the North Carolina Bar Association best exemplify the open communications between Justices and practitioners concerning administrative matters thus demonstrating that Justice Earls' communications were well within the norms of past practice of Justices of the Court.

Justice Hudson, whose decades-long service on the Appellate Rules Committee (Hudson Statement ¶ 2), makes her a unique resource regarding its historical practice (*id.* at ¶ 3), states that in her experience "[d]iscussions concerning administrative matters" have "typically been frank, open, and cordial between Bench and Bar," and that "[s]uch administrative matters include rule changes considered by the Court, as well as wide-ranging issues affecting appellate practice more broadly." (*Id.* at ¶ 5.) Those discussion, in Justice Hudson's words, typically included serving Justices "express[ing] their own views regarding potential rule changes and related issues," including providing "assessments about how the Court as a whole might view a specific rule proposal." (*Id.* at ¶ 6.) Other practitioner-members of the Committee have confirmed the accuracy of this account to me.

In her view, "such discussions facilitate the administration of justice." (Hudson Statement ¶ 7.) She indicated, moreover, that she has "not understood that any confidentiality rules or practices of the Court prohibited members of the Court from engaging in such discussions with members of groups like the Appellate Rules Committee." (*Id.*) Rather, "[d]uring [her] time on the Court" – some 16 years in all and concluding only months ago (*id.* at 1) – it was her understanding that she and "other members of the Court could consult with knowledgeable persons outside the Court concerning administrative matters, including, for example, rule changes and related issues." (*Id.* at ¶ 9.)

Justice Ervin, in his Statement, also indicates that the Appellate Rules Committee played a particularly important role in the rule-making process receiving regular updates about rules under consideration by the Conference, some recommended by practitioners and others originating within the Court. (Ervin Statement ¶¶ 13-14.) As he put it, "[i]n those meetings, it was typical for members of the Committee and members of the judiciary to have frank and open discussions, including expressions of opinion by one or more members of the appellate courts concerning the level of interest in or advisability of potential rule changes." (*Id.* at ¶ 14.) He did not, moreover, "understand that confidentiality considerations precluded members of the appellate courts from participating in such discussions." (*Id.*)

In our view, there is no principled reason to distinguish between the Appellate Rules Committee, the North Carolina Bar Association Board of Governors, and the North Carolina General Assembly Courts Commission in terms of whether they are appropriate professional bodies to inform and consult regarding potential changes to the Rules of Appellate procedure and similar matters of judicial administration.

In summary, the retired Justices are in general agreement that members of the Court have recognized a distinction between confidentiality with respect to their adjudicative responsibilities and a different standard for administrative responsibilities. That distinction, explicitly recognized in the Code of Judicial Conduct, is borne out by the long-standing practices of the Justices reflected in specific examples occurring over many years up to and including 2022, most



especially at the Appellate Rules Committee. Any attempt to discipline Justice Earls based on her communications at the Bar Association's Board of Governors meeting or the meeting of the Courts Commission would be inconsistent with the long-standing practice of Justices of the Court and would be a wrongful application of the Code of Judicial Conduct.

> *The Matters in this Inquiry were Already the Subject of Open Discussion Prior to Justice Earls Raising the Issues*

As has been explained to us, there are three rule changes publicly identified by Justice Earls at those two professional meetings that are the subject of this inquiry: (1) the Court's decision to rescind its 2019 Rule adopting the universal citation format, (2) the Court's decision to adopt a rule permitting published opinions of the court of appeals to be deemed "unpublished" by the Court (and thus without precedential effect), and (3) consideration of a possible legislative change that would eliminate the right of appeal to the Supreme Court based on a dissent in the Court of Appeals (pursuant to N.C. Gen. Stat. § 7A-30(2)). Justice Earls, as she described at her interview, discussed those issues at a meeting of the Board of Governors of the North Carolina Bar Association (of which she is a member) on January 19, 2023, and at a meeting of the North Carolina Courts Commission (of which she is a member) on January 27, 2023.

In the case of all three appellate rule changes, there had already been discussion outside of the Conference prior to the dates of the two meetings at which Justice Earls spoke.

First, the Court's Order rescinding the universal citation format – including the noted dissents of Justices Morgan and Earls – was actually published on January 13, 2023, nearly a week before the first meeting at which Justice Earls discussed the rule change. The Order was publicly announced with a press release stating the purported rational for the rule change.[5] To the extent that there was any confidentiality issue regarding that rule change, it necessarily evaporated upon publication of the new rule.

Second, with respect to the possible rule change concerning the unpublishing of Court of Appeals' opinions, it was represented *at the Conference itself* that the issue had already been discussed outside the Conference, namely, with one or more judges of the Court of Appeals who – it was represented – preferred that their decisions be unpublished rather than reversed. To the extent that the issue had already been discussed outside of the Conference, there can have been no putative breach of confidentiality. It simply cannot be the case that some members of the Court ethically can discuss a proposed rule change outside of conference while other members are prohibited from doing so.

---

[5] The press release states that "[t]he paragraph numbering has imposed significant administrative burdens on court staff responsible for preparing opinions for filing and physical publication." Available at https://www.nccourts.gov/news/tag/press-release/supreme-court-of-north-carolina-withdraws-order-implementing-universal-citation-system.



Third, the legislative change to eliminate of the right to appeal based on a dissent, has been the subject of much discussion outside the Conference for a long period of time.[6] For example, the Appellate Rules Committee – comprised, as described above, of both practitioners and judges, including current and former Supreme Court Justices – had been considering for some time the issue of the right to appeal based on a dissent in connection with attempts to harmonize Rules 16 and 28 of the Rules of Appellate Procedure.[7] In that connection, the Appellate Rules Committee sought to keep abreast of the Court's views regarding the statutory provision because, if the statutory right were to be repealed, there would be no need to continue to discuss clarification of the interaction between the two appellate rules.

Indeed, a discussion of a subset of the issue – on the subject of the right of appeal based on a dissent in cases concerning termination of parental rights – had come before the General Assembly as early as 2021. This circumstance is documented in the Statement in which Representative Morey describes the General Assembly's debate of Senate Bill 113 during which one Justice (not Justice Earls) conveyed to Representative Morey the positions on the provision at issue held by other Justices on the Court. (Morey Statement at 1.) Representative Morey describes that after later confirming that the particular Justices in question, in fact, were against ending the right to appeal based on a dissent in these cases, she sponsored an amendment to the pending bill which passed 77 to 39 on April 21, 2021. Senate Bill 113 was ultimately approved without the provision removing the right of appeal. (*Id.*)

If one Justice is able to convey the views of other Justices concerning legislation outside of the Conference in 2021, it cannot be a violation of some unwritten rule of confidentiality or in any other way improper for Justice Earls to do something similar in 2023, particularly with regard to substantially the same subject matter.

*Justice Earls Conducted Herself in Accordance with the Code of Judicial Conduct and the Regular Practices of the Court*

The specific activities of Justice Earls at issue here fit well within the actions deemed acceptable – and rightfully encouraged – under Canon 4's endorsement of judges engaging in activities "concerning the legal . . . or governmental system or the administration of justice," including:

---

[6] Unlike a rule change which, as a matter of both constitutional and statutory law, can be effected by the Court unilaterally, a legislative change, by definition, requires action by a separate and co-equal branch of government. As a result, any determination to seek a legislative change, by definition, requires discussion outside of Conference, at a minimum with legislators. For that reason, any claim concerning the confidentiality of the legislative desires of one or more Justices, or the Court as a whole, is a logical *non sequitur*.

[7] Since at least January, 2020, there had been discussion in the Appellate Rules Committee concerning how Rule 16's definition of the scope of review when appeal is taken based on a dissent can be in tension with Rule 28(c)'s discussion of the contents of the Appellee's brief. Obviously that tension would disappear if parties no longer could take an appeal based on a dissent.



- "Speak[ing]" concerning "the legal . . . or governmental system or the administration of justice" (Canon 4(A));

- Appearing at a "public hearing before an executive or legislative body" (clearly applicable with respect to Justice Earls' role at the Courts Commission (Canon 4(B)); and

- "Serv[ing]" as a member, officer, or director of an organization or governmental agency" (with respect to both the Bar Association Board of Governors and the Courts Commission) (Canon 4(C).)

Any attempt to impose discipline based on a judge's discussion of administrative matters at a meeting of the Board of Governors of the North Carolina Bar Association or the General Assembly's Courts Commission would squarely run afoul of the Code's endorsement of activities in which judges are explicitly permitted to participate in accordance with Canon 4. Any attempt to assert some vague construction of the largely generic provisions of Canons 1 and 2 against Justice Earls cannot prevail against the more specific provisions permitted under Canon 4. And, as noted below, such an attempt would potentially run afoul of the First Amendment rights of judges.

Importantly, this interpretation is consistent with the Statements made by the four former Justices as well as that of Representative Morey, herself a long-time member of the judiciary. Thus, former Chief Justice Beasley stated that consultations outside the Conference are "necessary for individual justices to understand the nature of given rule changes and the implications of those changes." (Beasley Statement ¶ 8.) Former Justice Ervin offered his opinion that "it is helpful for individual justices of the Supreme Court to be able to consult with persons outside the Court concerning proposed rule changes and the manner in which other administrative responsibilities should be carried in order to permit the members of the Court to properly perform their administrative responsibilities." (Ervin Statement ¶ 15.) Justice Orr stated that given the breadth of the rule-making authority of the Court, "it is useful to be able to discuss such matters with experts in the field." (Orr Statement ¶ 5.) Indeed, in his view, "as elected officials," Justices "have a right to discuss administrative matters being considered by the Court that would potentially impact practice before the Court or the practice of law generally." (*Id*. at ¶ 7.) Justice Hudson underscored, specifically with respect to the Appellate Rules Committee, that such "discussions are important for the purposes of informing members of the Court with respect to administrative issues under consideration, as well as to assist Committee members in providing constructive proposals and information to the Court." (Hudson Statement ¶ 10.)

Representative Morey indicated that "[a]s a member of the General Assembly," she "would consider any effort to apply judicial discipline in a manner that would impinge on the rights of any judge, including especially a Supreme Court Justice, to consult concerning court administration with members of the General Assembly to raise serious separation-of-powers issues, as well as substantial First Amendment concerns." (Morey Statement at 2.)



*Other Prudential Considerations*

The Code of Judicial Conduct, like all governmental pronouncements, is subject to the First Amendment of the U.S. Constitution and its proscription against the abridgment of free speech. The U.S. Supreme Court, for example, in *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), ruled that the "Minnesota Supreme Court's canon of judicial conduct prohibiting candidates for judicial election from announcing their views on disputed legal and political issues violates the First Amendment" and struck down that particular canon. *Id*. at 788.

An attempt to impose discipline of any type in this circumstance could be an appropriate subject of a First Amendment as-applied challenge in federal court to the putative authority of the Commission to proscribe and/or punish speech by judges concerning administrative matters. The lack of any written authority, coupled with the necessary reliance on opaque court traditions whose existence is disclaimed by multiple retired Justices, counsels against proceeding in this matter.

Our research of ethics violations and discipline in state and federal courts has found no other instance where a judge or Justice was disciplined in any matter for speaking publicly about potential rule changes impacting the administration of justice. In this case, Justice Earls was diligently performing her duties under the Code of Judicial Conduct and should not be subject to any form of warning, censure, or discipline whatsoever.

\*        \*        \*        \*

In the event that this matter proceeds to hearing, Justice Earls' current intention is to waive confidentiality of the hearing so that the matter can proceed in public. In addition, if we are required to proceed in that context, it is our intention to assert her full rights under the Commission's Rules with respect to both discovery and the subpoenaing of witnesses (including those who have already provided witness statements to us). Our inquiry will need to delve into the understanding of current and former Justices regarding the Court's rules, procedures, and practices regarding confidentiality, and could even require further inquiry into the actions of current and former Justices with respect to similar administrative responsibilities and their communications with various stakeholders outside the Court.

Thank you for your attention to this matter. Please let me know if you have any questions concerning the foregoing or any further questions for Justice Earls.

Sincerely,
WOMBLE BOND DICKINSON (US) LLP

Pressly M. Millen

cc:     Justice Anita Earls