IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:23-CV-734

ANITA S. EARLS,                                    )
                                                   )
        Plaintiff,                                 )
                                                   )
        v.                                         )
                                                   )
NORTH CAROLINA JUDICIAL                            )
STANDARDS COMMISSION; THE                          )
HONORABLE CHRIS DILLON, in his official            )
capacity as Chair of the North Carolina Judicial   )
Standards Commission; THE HONORABLE                )
JEFFERY CARPENTER, in his official                 )
capacity as Vice Chair of the North Carolina       )   **MEMORANDUM OF LAW IN**
Judicial Standards Commission, and the             )   **SUPPORT OF MOTION FOR**
following Members of the North Carolina            )   **PRELIMINARY INJUNCTION**
Judicial Standards Commission, each in his or      )
her official capacity:  THE HONORABLE              )
JEFFERY B. FOSTER; THE HONORABLE                   )
DAWN M. LAYTON; THE HONORABLE                      )
JAMES H. FAISON, III; THE HONORABLE                )
TERESA VINCENT; MICHAEL CROWELL;                   )
MICHAEL T. GRACE; ALLISON MULLINS;                 )
LONNIE M. PLAYER JR.; JOHN M. CHECK;               )
TALECE Y. HUNTER; DONALD L.                         )
PORTER; and RONALD L. SMITH,                        )
                                                   )
        Defendants.                                )

        Plaintiff Anita S. Earls – an Associate Justice of the North Carolina Supreme Court

and candidate for reelection – seeks to enjoin Defendants, the North Carolina Judicial

Standards Commission and its members (collectively, "Commission"), from further efforts

to investigate, punish, and otherwise retaliate against Justice Earls for exercising her core

First Amendment right to speak and inform voters about matters of public concern,

including the issue of diversity in our judicial system.

# STATEMENT OF FACTS

## I. The Parties.

Plaintiff Anita S. Earls is a citizen and resident of Durham, North Carolina. (Declaration of Anita S. Earls (Aug. 29, 2023) ¶ 1.) In 2018, she was elected an Associate Justice of the North Carolina Supreme Court. (*Id.*) She is a candidate for reelection, having filed a letter in November 2022 declaring her intention to seek reelection. (*Id.*)

Defendants are the North Carolina Judicial Standards Commission and its constituent members in their official capacities. (Compl. ¶¶ 12-27.) The General Assembly established the Commission "to provide for the investigation and resolution of inquiries concerning the . . . conduct of any judge or justice of the General Court of Justice," including through the imposition of various forms of "discipline" founded on violations of the North Carolina Code of Judicial Conduct ("Code"). N.C. Gen. Stat. § 7A-374.1. The disciplinary measures available to the Commission range from a private "letter of caution," *id.* § 7A-377(a3), to a "recommendation [to the Supreme Court] to issue a public reprimand, censure, suspend, or remove any judge," *id.* § 7A-377(a5). The penalty of removal includes not only removal of the judge from her current position, but also "disqualif[ication] from holding further judicial office." *Id.* § 7A-376(b). (The powers and operation of the Commission are more fully described in ¶¶ 12-13 & 28-38 of the Complaint.)

## II. The Speech of Justice Earls Under Threat.

The events at issue arise out of a May 2023 article by North Carolina Solicitor General Ryan Park and two co-authors published in the magazine of the North Carolina

Bar Association, *North Carolina Lawyer*, titled "Diversity and the North Carolina Supreme Court: A Look at the Advocates," which found that in the "rarefied space" of Supreme Court oral arguments, "opportunities remain scarce for attorneys from certain backgrounds," *i.e.*, female and non-white.

Following up on the issues raised in that article, on June 20, 2023, *Law360*, an on-line publication directed to the legal profession, published an interview with Justice Earls which it titled "North Carolina Justice Anita Earls Opens Up About Diversity" ("Interview"). (Earls Decl. ¶ 6.)

In response to the question raised by the article, namely, "[w]hy are oral advocates that come before the North Carolina Supreme Court overwhelmingly male and white, despite a diverse state population and state bar membership," Justice Earls referred to several factors, including the minimal number of judicial clerks from minority populations and implicit bias, which Justice Earls described as "not uniform" and "not in every case." (Interview at 2, Exhibit B to Complaint.)

Asked about efforts to "diversify the appellate bench," Justice Earls noted that an internal equity committee set up "to look at just the North Carolina Supreme Court and our hiring practices" was "disbanded at the beginning of this year." (*Id.*) She also mentioned that the Supreme Court, as previously constituted, had "issued an order appointing a Commission on Fairness and Equity in the North Carolina judicial system," which "dealt with gender as well as race." (*Id.*) She noted that although that Commission on Fairness and Equity "was established by order of the court in October of 2020," in "January of 2023, the chief justice refused to reappoint members of that committee." (*Id.*) In her view,

Justice Earls continued, the "new majority on the court didn't issue a new court order saying we're superseding the old order. … It's in line with the values of the current party in power in our court." (*Id*. (ellipsis in original).) She continued, "[t]he new members of our court very much see themselves as a conservative bloc. They talk about themselves as 'the conservatives.' Their allegiance is to their ideology, not to the institution." (*Id*.)

In response to a question about the obstacles attributable to gender or race that Justice Earls had personally faced as an advocate or judge, Justice Earls stated that she believed that she was "interrupted by more junior colleagues" and sometimes even advocates "who won't let me get my question out." (Interview at 4.) She also stated that "[t]here were two times when one of my colleagues publicly tried to embarrass me . . . in the context of the case and the oral argument." (*Id*.)

Another question asked about implicit bias trainings offered to North Carolina judges, to which Justice Earls replied that a curriculum had been developed and offered, but that the newly elected Chief Justice had ended the program, which she described as "part of the general antipathy towards seeing that racial issues matter in our justice system." (*Id*.) In explaining her position, Justice Earls noted that the current Chief Justice had actually dissented to the earlier Supreme Court order establishing the Commission on Fairness and Equity, based on his view that the timing of the order was political, and that it prejudged issues of racial discrimination, and improperly inserted the judiciary into the policymaking arena. (*Id*.)

It is for this speech – core political speech concerning important public policy questions regarding the justice system and administration of the courts – that the

4

Commission seeks to investigate Justice Earls to determine whether she has violated the Code, and potentially sanction her for a violation.

### III. The Commission's Investigation of Justice Earls.

On August 15, 2023, the Commission sent a letter ("August 2023 Notice") to Justice Earls informing her that the Commission had reopened a formal investigation into her "based on an interview" given "to the media in which you appear to allege that your Supreme Court colleagues are acting out of racial, gender, and/or political bias in some of their decision making." (Earls Decl. ¶ 5.)

The August 2023 Notice references two Code provides, Canons 2(A) and 3(A)(1). (August 2023 Notice at 1, Exhibit A to Complaint.) Neither of those two Code provisions under which Commission seeks to investigate Justice Earls' speech explicitly references speech. The first, a part of Canon 2 – headed "[a] judge should avoid impropriety in all the judge's activities" – sets out a standard that a "judge should respect and comply with the law and should conduct himself/herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

The August 2023 Notice also refers to Canon 3(A)(1) which, under the rubric "Adjudicative Responsibilities," states that "judges should be unswayed by partisan interests, public clamor, or fear of criticism." This reference is out of place because Justice Earls' comments, which do not relate to any adjudicative case, cannot fairly be portrayed as "swayed" by "partisan interests, public clamor, or fear of criticism" as described in that Canon. Rather, her statements addressed a matter raised by an article written by the North Carolina Solicitor General and of sufficient public concern to merit publication by the

5

North Carolina State Bar Association. Her statements are core political speech protected by the First Amendment.

The August 2023 Notice letter makes no mention of a further Code provision – Canon 4(A) – which explicitly provides that a "judge may speak, write . . . or otherwise engage in activities concerning the economic, educational, legal, or governmental system, or the administration of justice."

According to the August 2023 Notice, Justice Earls' comments "appear to allege that your Supreme Court colleagues are acting out of racial, gender, and/or political bias in some of their decision-making." Yet, as shown above, *none* of Justice Earls' statements related to a "decision" in any case (or the "decision-making" in arriving at such a decision), but concern, at most, only "decisions" to interrupt advocates or fellow justices at oral argument, or to discontinue various court commissions and activities.

## IV. The Commission's Continuing Campaign to Stifle Justice Earls' Free Speech Rights.

This is not the first effort of the Commission to thwart the free-speech rights of Justice Earls. In fact, it is part of a continuing effort to stifle Justice Earls. Specifically, earlier this year, on March 20, 2023, the Commission issued a letter ("March 2023 Notice") to Justice Earls indicating that "a written complaint [had been] filed with the Commission" and that it was initiating a formal investigation – dubbed "Inquiry No. 23-081" – concerning comments made by Justice Earls regarding "matters being currently deliberated in conference by the Supreme Court" and discussed by her at "two public events," and in a subsequent media inquiry. (March 2023 Notice at 1, Exhibit C to Complaint.)

As a result of the institution of that investigation, Justice Earls had to retain a lawyer, to submit to a lengthy and probing interview by Commission staff, and to devote substantial time to defending herself, taking away time from the position to which she had been elected, that of Associate Justice of the North Carolina Supreme Court. (*See* Earls Decl. ¶ 11.)

Ultimately, Justice Earls' counsel submitted a substantial letter explaining why her conduct not only did not violate any of the Canons of the Code, but was actually consistent with Canon 4(A)'s endorsement of judges engaging in activities "concerning the legal . . . or governmental system or the administration of justice." (Response to March 2023 Notice at 9, Exhibit D to Complaint.) The letter also explained to the Commission the potential First Amendment problems with seeking to investigate judges with regard to speech, referring to the U.S. Supreme Court's decision in *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), striking down a Canon of that state's judicial code. (*Id*. at 9.)

On May 16, 2023, counsel for the Commission reported to Justice Earls' counsel that a Commission panel had met on May 12, 2023 and voted to dismiss the complaint against Justice Earls without any further action. (Earls Decl. ¶ 14.) Later, on June 12, 2023, Justice Earls, through counsel, informed Commission Counsel that she was waiving her right to confidentiality regarding the investigation pursuant to Commission Rule 6(b)(2). (*Id*. at ¶ 15.)[1]

---

[1] Justice Earls, on August 28, 2023, also waived confidentiality with respect to the August investigation. (Earls Decl. ¶ 15 & n.1.)

Despite the dismissal, Commission Counsel informed Justice Earls' counsel "to be mindful of your public comments in light of the language of Canon 2A," (August 2023 Notice at 1), which provides that a "judge should respect and comply with the law and should conduct himself/herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Justice Earls took that "reminder" as a "warning." (Earls Decl. ¶¶ 17-18.)

Even though the earlier investigation concerning Justice Earls was reported as "dismissed," and the fact that the Commission's Rules have no procedure for "reopening" a case in which a Panel votes to dismiss, the August 2023 Notice announcing the Commission's new inquiry states that it represents a "reopen[ing]" of its earlier-dismissed formal investigation, utilizing the same inquiry number, No. 23-081.

## QUESTION PRESENTED

Should the Commission be enjoined from further efforts to investigate, punish, and otherwise retaliate against Justice Earls for exercising her core First Amendment right to speak and inform voters about matters of public concern, including about diversity in our judicial system?

## ARGUMENT

The Commission's unconstitutional actions here justify the "extraordinary remedy" of a preliminary injunction. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (en banc). The Court should issue that injunction because Justice Earls establishes that (1) she is "likely to succeed on the merits," (2) she is "likely

to suffer irreparable harm absent preliminary relief," (3) "the balance of the equities favors relief," and (4) "the relief is in the public interest." *Id.*[2]

## I. Justice Earls is Likely to Succeed on the Merits.

The Commission's continuing efforts to investigate and potentially discipline Justice Earls are an attempt to chill her First Amendment rights. That the Commission is doing so under Canon 2(A), with its vague standard when applied to speech that somehow fails to "promote[] public confidence" in the judiciary, makes the actions of the Commission even more unconstitutional and discourages both Justice Earls and other judges and candidates from making statements critical of the judicial system. In fact, the

---

[2] This Court "can properly entertain [its] federal-question jurisdiction without worrying about stepping on state toes" because the Commission's investigation fits none of the "three settled categories" that might justify *Younger* abstention. *Jonathan R. by Dixon v. Justice*, 41 F.4th 316, 329 (4th Cir. 2022). A Commission investigation is not a criminal prosecution. Nor is it a "case[] 'brought by the State in its sovereign capacity' following an 'investigation' and upon 'the filing of a formal complaint or charges.'" *Id.* (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 79–80 (2013)). Finally, it is not a civil proceeding necessary to ensure that "court orders will be obeyed." *Id.* at 331. If that were not enough, abstention would still be inappropriate for at least three more reasons. First, the Commission cannot show that its investigation – previously "dismiss[ed]" but now ostensibly "reopen[ed]," *** – is an "ongoing state judicial proceeding." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). Second, there would be no "adequate opportunity in the [investigation] to raise constitutional challenges," *id.*, since the "Commission is limited to reviewing judicial conduct, not matters of law," N.C. Gen. Stat. § 7A-377(a). Third, the Commission's actions here present the type of "extraordinary circumstances [that] render[] *Younger* abstention inappropriate." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 93 (4th Cir. 2022). The Commission is attempting to silence Justice Earls – a sitting Associate Justice running for reelection – by using repeated, targeted, and unjustified investigations as a tool to dissuade her from speaking out about matters of utmost importance to the North Carolina judiciary. Fourth Circuit precedent is clear that plaintiffs in this situation "need not live under a cloud of 'prolonged uncertainty' as to their rights." *United States v. South Carolina*, 720 F.3d 518, 528 (4th Cir. 2013) (quoting *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1229 (4th Cir. 1989)).

series of investigations into Justice Earls has led to a chilling of her First Amendment rights as fully described in ¶¶ 19-24 of her Declaration.

### A. The Commission Is Violating the First Amendment.

The First Amendment prohibits the State from "abridging the freedom of speech." That freedom is integral to our democratic system of governance. *See Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 339 (2010) ("[s]peech is an essential mechanism of democracy" because "it is the means to hold officials accountable to the people"); *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964) (noting "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open").

The right to speak freely is as indispensable to elected officials as it is to their constituents. *See Bond v. Floyd* 385 U.S. 116, 135–36 (1966) (rejecting the idea that the First Amendment "only applies to the citizen-critic of his government" and concluding that "[t]he manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy"). The same is true of elected judges, who do not abandon their First Amendment rights upon assuming office. *See Republican Party of Minn*, 536 U.S. at 781–82.

As the Supreme Court put it in *New York Times v. Sullivan*:

> The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity

10

essential to the security of the Republic, is a fundamental principle of our
constitutional system.  It is a prized American privilege to speak one's mind,
although not always with perfect good taste, on all public institutions, and
this opportunity is to be afforded for vigorous advocacy no less than abstract
discussion.

376 U.S. at 269 (internal quotations and citations omitted).  Justice Earls' comments, like

the communication at issue in *New York Times v. Sullivan*, "communicated information,

expressed opinion, recited grievances, [and] protested claimed abuses."  *Id*. at 266.  As

such, those comments – and her right to make them – are protected by the First

Amendment.  The Supreme Court has held and "frequently reaffirmed that speech on

political views and public issues occupies the highest rung of the hierarchy of First

Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138,

145 (1983) (internal quotation marks omitted).

The seriatim investigations of Justice Earls, coupled with the Commission's explicit

threats of punishment, chill her First Amendment rights.  *See Bantam Books, Inc. v.*

*Sullivan,* 372 U.S. 58, 67–68 (1963) (observing that "[p]eople do not lightly disregard

public officers' thinly veiled threats . . . against them if they do not come around"). "Where

comments of a government official can reasonably be interpreted as intimating that some

form of punishment or adverse regulatory action will follow the failure to accede to the

official's request, a valid claim can be stated."  *Hammerhead Enters., Inc. v. Brezenoff*,

707 F.2d 33, 39 (2d Cir.1983).  The Fourth Circuit too has held that "[g]overnment action

[is] sufficiently chilling when it is 'likely [to] deter a person of ordinary firmness from the

exercise of First Amendment rights.'"  *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th

11

Cir. 2011) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)).

**B.      The Commission Cannot Justify Its Abridgement of Core Political Speech.**

Justice Earls' speech here – by an elected official who is also a political candidate on a matter of public concern – is "core political speech" for which the First Amendment's protection is "at its zenith." *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 186-87 (1999). The Commission thus bears the burden of demonstrating that its restrictions on that speech are "(1) narrowly tailored to serve (2) a compelling state interest." *Republican Party of Minn.*, 536 U.S. at 774–75 (emphasis added). Even In *Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015), where the Court approved a restriction on judicial candidates' "personal solicitation of campaign funds," *id.* at 437, the Court still applied strict scrutiny to the restriction, *id.* at 444, and held that judicial candidates remained "free to discuss any issue with any person at any time," *id.* at 452. The Commission cannot satisfy the strict-scrutiny test here.

In *Republican Party of Minnesota*, the Supreme Court made clear that judges do not occupy some hinterland outside the scope of otherwise applicable First Amendment protections. There, the Court considered a challenge by state judicial candidates to Canon 7 of the Minnesota Code of Judicial Conduct that prohibited judicial candidates, including "[i]ncumbent judges who violate it," 536 U.S. at 768, from "announc[ing] his or her views on disputed legal or political issues," *id.* at 769. The Court ultimately ruled that the Canon "violates the First Amendment" and struck it down. *Id.* at 788. In doing so, the Court

12

Case 1:23-cv-00734   Document 4   Filed 08/29/23   Page 12 of 23

noted that "judges often state their views on disputed legal issues outside the context of adjudication – in classes that they conduct, and in books and speeches." *Id*. at 779. In fact, as in North Carolina, Canon 4 of the Code "not only permits, but encourages this." *Id*. In reaching its ruling, the Court recognized that the "role that elected officials," including elected judges, "play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance." *Id*. at 781–82.

Other cases, both before and after *Republican Party of Minnesota*, make it clear that judges are entitled to First Amendment protections, even for – indeed especially for – criticisms of the judicial system. Thus, for example, in *Scott v. Flowers*, 910 F.2d 201 (5th Cir. 1990), the court expunged a reprimand by the Texas Commission on Judicial Conduct on an elected justice of the peace who wrote an "open letter" circulated to the local press which "attacked the district attorney's office and the county court-at-law" (to which appeals of the justice's rulings went) for its shoddy appellate practices. *Id*. at 204-05. As the Commission in this case contends, the attacks of the justice of the peace "served only to 'cast public discredit upon the judiciary'" and the Texas Commission advised the subject "to be 'more restrained and temperate in written and oral communications in the future.'" *Id*. at 204.

As Justice Earls has done here, the justice of the peace brought an action under 42 U.S.C. § 1983 and "sought a declaration that portions of the reprimand violated his first amendment rights." 901 F.2d at 205. In considering those claims, the court had "no difficulty in concluding that. . . the open letter, and the comments he made in connection with it, address matters of legitimate public concern." *Id*. at 211. That was because the

comments "dealt with the administration of the county justice system by county officials, a matter about which [the justice], as an elected judge from that county was likely to have well-informed opinions." *Id*. The court, moreover, found that "the state's interest in suppressing [the justice's] criticism" was "much weaker" because "he was an elected official, chosen directly by the voters of his justice precinct, and, at least in ordinary circumstances, removable only by them." *Id*. at 211–12.

The Fifth Circuit ultimately held that the Texas Commission could not carry the "very difficult burden" of justifying its actions in abridging "core first amendment values." 901 F.2d at 212. The court also gave short-shrift to the rationale also put forward by the Commission here, namely, "promoting an efficient and impartial judiciary," holding "we believe that those interests are ill served by casting a cloak of secrecy around the operations of the courts, and that *by bringing to light an alleged unfairness in the judicial system, [the justice] in fact furthered the very goals that the Commission wishes to promote*." *Id*. at 213 (emphasis added). That reasoning is consistent with the Supreme Court's observation in *Bridges v. California*, 314 U.S. 252, 270 (1941), that the "assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion." Therefore, "an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect." *Id*. at 271.

That principle is equally if not more compelling here. Justice Earls is not an elected official to the lowest county court; she is an elected Associate Justice of North Carolina's

highest court.  Her views on the subject of diversity in the North Carolina judicial system could not possibly be claimed to fall outside the category of "matters of legitimate public concern."  To the extent that her statements might be considered to somehow undermine "public confidence" in the courts, it would only be by removing the "cloak of secrecy around the operations of the courts," which can hardly be considered an "impropriety" as described in Canon 2.[3]

In a later Fifth Circuit case post-dating *Republican Party of Minnesota*, the court considered a sanction by the same Texas commission of a judge who held a press conference critical of some judicial tactics. *Jenevein v. Willing*, 493 F.3d 551, 554-55 (5th Cir. 2007).  The court rejected discipline based on "appearance of impropriety," holding that "[s]uch invocations…seductively take the state into content-based regulation of political speech," and "leave judges speechless, throttled for publicly addressing abuse of the judicial process" which "ill serves the laudable goal of promoting judicial efficiency and impartiality."  *Id*. at 560.  A commission censure "shutting down all communication between the Judge and his constituents" could not stand since "application of this canon to [the judge] is not narrowly tailored to [the commission's] interests in preserving the public's faith in the judiciary."  *Id*.

---

[3] The only cases found by counsel in which Canon 2 was applied to the "speech" of judges provide a marked contrast to the circumstances here.  Both, in fact, concerned racist rants by the subject judge, in one case, directed at a parking lot attendant. *In re Lowery*, 999 S.W.2d 639, 646 (Tex. Rev. Trib. 1998) (subject admitted "using a racial slur" directed at parking lot attendant); *see also Mississippi Com'n on Jud. Performance v. Boland*, 975 So.2d 882, 885 (Miss. 2008) (subject judge, at out-of-state conference, "went on a 'tirade,'" telling attendees "all you African-Americans can go to hell").

In its ruling, the court held that it would apply "strict scrutiny of the government's regulation of the elected official's speech to his constituency, requiring such regulations to be narrowly tailored to address a compelling government interest." 493 F.3d at 558. The court finally ruled that "the narrow tailoring of strict scrutiny is not met by deploying an elusive and overly-broad interest in avoiding the 'appearance of impropriety.'" *Id*. at 560.

Other courts have similarly found that judicial discipline based on political speech and matters of public interest cannot survive First Amendment scrutiny. *See*, *e.g.*, *Mississippi Com'n on Jud. Performance v. Wilkerson*, 876 So.2d 1006, 1013 (Miss. 2004) ("Judge Wilkerson expressed his views on a political/public interest issue – the rights of gays and lesbians" and "therefore we may not impose sanctions" once strict scrutiny is applied); *In re Disciplinary Proceeding Against Sanders*, 135 Wash.2d 175, 190 (1998) (state could not establish a narrowly tailored compelling interest (including under Canon 2(A)) that would allow judicial conduct commission's reprimand arising from state supreme court justice's speech at pro-life rally to stand); *In re Brown*, 879 S.W.2d 801, 806 (Tenn. 1994) (citing *Flowers* and overturning sanction under Canon 2(A) for judge's "comments found offensive" which were "directed at the perceived inadequacies and improprieties in the structure and operation of the Juvenile Court system.").

## C. The Commission's Reliance on Canon 2(A) is Unconstitutionally Vague.

Seeking to investigate and potentially punish a judge for speech allegedly in violation of Canon 2(A) that might undermine "public confidence" in the "integrity and impartiality of the judiciary" is hopelessly vague. As early as 1979, the Fourth Circuit struck down a portion of a Virginia State Bar rule which restricted pretrial publicity on

16

vagueness grounds. *Hirschkop v. Snead*, 594 F.2d 356, 370-71 (4th Cir. 1979) (en banc). The rule in that case, among other things, prohibited "a lawyer participating in a criminal trial from making any statements about 'other matters that are reasonably likely to interfere with a fair trial.'" *Id.* at 371.

In finding that the rule was "too vague and too broad to survive the scrutiny we have given to restraints on First Amendment rights," 594 F.2d at 371, the court set out the problems with "vague rules," each of which is present here. First, the court noted that vague rules "offend the due process clause because they deny a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* at 370. Here, a judge seeking to speak out on some perceived problem within the judiciary is asked to assess whether a comment will be viewed as failing to "promote public confidence," *id.*, an essentially standardless formulation in this circumstance. Second, a "vague disciplinary rule," like Canon 2(A) as sought to be applied here, also "impermissibly delegates basic policy matters to . . . officials charged with its enforcement for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 370-71 (cleaned up). Here, the Commission appears to be proceeding in an irregular process. *See also Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051 (1991) (striking down bar rule prohibiting pretrial publicity, in part, because "history shows that speech is suppressed when either the speaker or the message is critical of those who enforce the law."). A rule, for that reason, can be "so imprecise that discriminatory enforcement is a real possibility." *Id.*

Third, "[v]ague rules that restrict expression also offend the first amendment because they chill freedom of speech" since "[t]heir uncertain meanings require those persons who are subject to the rule to steer far wider of the unlawful zone, than if the boundaries of the forbidden areas were clearly marked." 594 F.2d at 371 (cleaned up). Justice Earls has provided specific examples of how her free-speech rights have been chilled for fear that comments she might make could fall into a broad reading of Canon 2(A). (Earls Decl. ¶¶ 20-21.) As the Sixth Circuit put it in a recent case concerning speech by judicial candidates, "[w]hen a judicial commission sends vague and threatening letters to [judicial] candidates" it "puts the candidates to a choice between self-censorship and uncertain sanctions." *Fischer v. Thomas*, 52 F.4th 303, 313 (6th Cir. 2022) (enjoining Kentucky Judicial Conduct Commission "from taking any action, including initiating formal proceedings, against the candidates"); *see also Brooks v. N.C. State Bar*, No. 2:96-cv-00857, 1996 U.S. Dist. LEXIS 16099, at *5 (M.D.N.C. Oct. 18, 1996) (enjoining State Bar from bringing enforcement action against a judicial candidate and recognizing that "an overly broad and vague restriction of voter information, applied in an uneven and inconsistent manner, frustrates this interest and causes candidates to refrain from expressing constitutionally protected ideas").[4]

---

[4] The district court later dissolved the restraining order because "the North Carolina Judicial Standards Commission ha[d] not been joined." *Brooks v. N.C. State Bar*, No. 2:96-cv-00857, 1996 U.S. Dist. LEXIS 16447, at *3 (M.D.N.C. Oct. 28, 1996). At the court's direction, *see id.* at *5 n.1, the plaintiff added the Commission as a defendant and the parties then settled the case, *see* Michael Dayton, *Bar Actions: Bar, JSC Pay $10,000 To Settle Gag Rule Lawsuit*, N.C. LAW. WKLY. (Nov. 3, 1997).

In rejecting the vague Virginia Bar Rule, the Fourth Circuit in *Hirschkop* held that the rule's formulation was "so imprecise that it can be a trap for the unwary," such that "[i]t fosters discipline on a subjective basis depending entirely on what statements the disciplinary authority believes reasonably endangers a fair trial." 594 F.2d at 371. Thus "neither the speaker nor the disciplinarian is instructed where to draw the line between what is permissible and what is forbidden." *Id.*[5] The same is true here.

\*     \*     \*

Justice Earls has demonstrated a likelihood of success on her claim that application of the Code to her for the comments in the Interview cannot survive strict scrutiny under the First Amendment or the prohibition on unconstitutionally vague application of rules.

## II. The Remaining Preliminary Injunction Factors Favor An Injunction.

In this First Amendment context, analysis of the remaining preliminary injunction factors is straightforward. "Because there is a likely constitutional violation, the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle*, 2 F.4th at 346. "Likewise, the balance of the equities favors preliminary relief because '[Fourth Circuit] precedent counsels that a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.'" *Id*. (quoting *Centro Tepeyac v. Montgomery C'nty.*, 722 F.3d 184, 191 (4th Cir. 2013) (en

---

[5] The continuing vitality of the vagueness standards announced in *Hirschkop* was reaffirmed as recently as 2018 in the court's decision striking down a gag order on vagueness grounds in *In re Murphy-Brown, LLC*, 907 F.3d 788, 800 (4th Cir. 2018), which cited *Hirschkop* as support for its holding that "[t]his gag order was unconstitutionally vague because it forced individuals to guess at its contours." *Id.* (internal quotation marks omitted).

banc)). "Finally, it is well-established that the public interest favors protecting constitutional rights." *Id*.

### A. The First Amendment Losses Here Are Irreparable.

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Justice Earls is losing those freedoms by enduring retaliation for her past speech – answering a reporter's questions about a "glaring lack of diversity on the state's appellate bench and among advocates who argue before her court," (Compl. Ex. B, at 1) – and by limiting her future speech.

The Commission's effort to reopen the closed investigation is a "'direct penalization, as opposed to incidental inhibition' of First Amendment rights, thus making it the sort that could not be remedied absent an injunction constituted." *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011). This type of "retaliation by the state for having exercised First Amendment freedoms in the past is particularly proscribed by the First Amendment" because if First Amendment rights are "not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983).

The Commission's efforts are having their intended effect. Justice Earls "has turned down an invitation to write an article for a national publication" and she has "decided not to discuss the issue of the racial and gender composition of state courts in response to a request to contribute an essay to a Yale Law Review forum about state courts." (Earls Decl. ¶¶ 20-21.) Whenever Justice Earls considers speaking – whether in public, private,

20

or even judicial opinions – she must consider the possibility that the Commission will seek to punish her for exercising her First Amendment rights. Justice Earls is thus suffering "repeated and irreparable abridgments of [her] First Amendment rights." *In re Murphy-Brown, LLC*, 907 F.3d 788, 796 (4th Cir. 2018). And the public is being "depriv[ed] of robust discussion on an issue that affect[s] so many in the community": diversity in our judicial system. *Id*. These losses are "per se irreparable." *Id*. at 801 (quoting *Johnson v. Bergland*, 586 F.2d 993 (4th Cir. 1978)).

**B.     The Balance of Equities and Public Interest Favor the Protection of First Amendment Rights.**

The third and fourth preliminary injunction factors are "established when there is a likely First Amendment violation." *Centro Tepeyac*., 722 F.3d at 191 (quotation marks omitted); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) (third and fourth factors merge when the Government is the opposing party). A "state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (quotation marks omitted). And "upholding constitutional rights serves the public interest." *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).

Justice Earls has the right to speak about important issues affecting the judiciary, and the public has the right to benefit from that speech. While the Commission may disagree with Justice Earls' viewpoint on those issues, it cannot respond to her speech by seeking to silence her. That effort contradicts "our law and our tradition that more speech,

21

not less, is the governing rule." *Grimmett v. Freeman*, No. 22-1844, 2022 WL 3696689, at \*2 (4th Cir. Aug. 25, 2022) (per curiam Order granting injunction pending appeal) (quoting *Citizens United*, 558 U.S. at 361).  The balance of equities and public interest favor an injunction protecting that law and tradition from the Commission's efforts to undermine both.

## <u>CONCLUSION</u>

For the reasons stated herein, Plaintiff respectfully requests that the Commission be preliminarily enjoined from further efforts to investigate, punish, and otherwise retaliate against Justice Earls for exercising her core First Amendment right to speak and inform voters about matters of public concern.

This the 29th day of August, 2023.

By:  /s/ Pressly M. Millen
Pressly M. Millen
State Bar No. 16178
Raymond M. Bennett
State Bar No. 36341
Samuel B. Hartzell
State Bar No. 49256

OF COUNSEL:

WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601
(919) 755-2100

Attorneys for Plaintiff
Anita S. Earls

## CERTIFICATION OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), I hereby certify that this memorandum, including headings and footnotes, contains fewer than 6,250 based on the word count feature of Microsoft Word, and therefore complies with the Rule.


August 29, 2023                                         /s/ Pressly M. Millen