# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
# CIVIL ACTION No. 1:23-cv-00734-WO-JEP

| | |
|---|---|
| ANITA S. EARLS, <br><br> Plaintiff, <br><br> v. <br><br> NORTH CAROLINA JUDICIAL STANDARDS COMMISSION, *et al.*, <br><br> Defendants. | **DECLARATION OF BRITTANY PINKHAM** |

I, Brittany Pinkham, declare as follows:

1. I am the Executive Director of the North Carolina Judicial Standards Commission (the "Commission"). I have held my position since January 1, 2023. As Executive Director, I am responsible for managing the Commission's four-person staff, issuing informal advisory opinions (subject to the Commission's review), initially reviewing complaints upon receipt, providing training to judges on the North Carolina Code of Judicial Conduct (the "Code"), and serving as clerk for the Commission's meetings.

2. Prior to my appointment as Executive Director, I served as the Commission Counsel. I was hired as Commission Counsel in August of 2021. As Commission Counsel, I assisted the Executive Director with providing advisory opinions and conducting training for judges and was responsible for, if ordered by the Commission, working with the

Commission Investigator to conduct informal and formal investigations into allegations concerning judges and prosecuting disciplinary proceedings before the Commission.

### A. The Commission

3. The current Chair of the Commission is North Carolina Court of Appeals Judge Chris Dillon, who was appointed Chair in December 2020, by former Chief Justice Cheri Beasley and reappointed in January 2021, by current Chief Justice Paul Newby.

4. The Commission is a nonpartisan body. We do not track the party affiliation of Commission members. However, for purposes of this pending matter, I was asked to research the party affiliation of our members from the State Board of Elections website, based on my knowledge of their respective places of residence. My review of that website shows that six Commission members are registered as Democrats, five as Republicans, and three as unaffiliated.

5. Pursuant to Rule adopted by the Supreme Court, the Commission is divided into two panels, Panel A and Panel B. The composition of the two panels changes only upon a vacancy and reappointment.

### B. Commission Advisory Opinions

6. The bulk of the Commission's time and efforts are focused on providing guidance and education to judges on how the Code applies to certain situations. (The Code is promulgated by our Supreme Court and consists of seven Canons.) I, along with our Commission Counsel and occasionally our Chair, issue dozens of informal advisory opinions to judges across our State each month. (In 2022, for example, we issued 283

confidential, written informal advisory opinions to judges.) We view providing advice as a core component of our mission and our day-to-day operations.

7. Pursuant to Rule 8 of the Commission's Rules (promulgated by our Supreme Court), an informal advisory opinion offers a safe harbor for a judge, who can rely on the opinion until and unless notified that the Commission has withdrawn or modified the opinion. The Commission will not recommend to the Supreme Court that a judge be sanctioned based on conduct consistent with an advisory opinion.

8. The Commission often receives requests from judges who are currently the subject of a Commission proceeding, and the Commission issues advisory opinions to those judges to assist them in complying with the Code without regard to the pending proceeding.

9. Judges often seek advice on political conduct (Canon 7) and on speaking about our legal system and the administration of justice (Canons 4 and 5).

10. The Commission also provides training to judges on the Code, including its application to speech. As part of that training, the Commission provides a memorandum to all judges titled "Political Conduct and the Code of Judicial Conduct" (the "Political Conduct Memorandum"). The memorandum addresses many instances in which the Code guides a judge's political conduct. One instruction states that, although Canon 7 permits a judge to engage in a variety of political activity, such activity might also implicate other Canons that would limit the scope of appropriate political activity in a certain context:

> Beyond Canon 7, campaign and political conduct of judges also implicates the following provisions of the Code: Canon 1 (duty to maintain the integrity and independence of the judiciary); Canon 2 (duty to avoid impropriety in all activities); Canon 3A (duty to remain "unswayed by partisan interests"

and prohibition on comments about pending cases); Canon 3C (disqualification rules). As always, a judge's core duty is to consistently ensure the integrity, impartiality and independence of the judiciary.

11. The Political Conduct Memorandum also notes that the Commission receives numerous inquiries regarding judicial campaign advertisements. The Commission recognizes that judicial candidates have "broad latitude in the content of their campaign advertising," but reminds judges that the advertisements cannot "suggest a judge's bias or predisposition for or against certain litigants, or that would create a reasonable suggestion that a judge would show favor toward a particular side in a legal dispute."

12. I have reviewed recent advisory opinions offered by the Commission since 2019. In those years, judges have asked for guidance on a variety of political and extra-judicial speech and conduct. Those inquiries have requested guidance concerning public statements the judge can make, speaking at a political party meeting, serving as an officer of local a political party, serving as an officer in a political club, moderating a political candidate forum, a statement regarding legislation that would impact the judicial system, and speaking publicly about the removal of Confederate statues from courthouse grounds.

13. In response to each of these inquiries, the Commission has consistently advised judges, among other things, that they must avoid making unsubstantiated statements questioning the integrity and impartiality of members of the judicial system. Consistent with the Commission's confidentiality rules, I can share that the Commission has interpreted Canon 2A to counsel judges against making statements that:

a. "will reflect adversely upon [a judge's] impartiality moving forward or will lead the public to question the integrity and impartiality of the judiciary";

b. "would call into question the integrity of the judiciary or [a judge's] ability to be fair and impartial in any cases that come before [the judge]";

c. "would undermine public confidence in the independence, impartiality, and integrity of the judiciary";

d. "suggest a bias in favor of certain parties or undermine public confidence in the integrity and impartiality of the courts";

e. "reasonably suggest[] that cases are decided based upon partisan interests or pressures rather than dispassionate review of the law and facts"; or

f. suggest "judicial decisions are made for partisan reasons rather than based on law and fact."

14. The Commission received numerous inquiries in 2020 from judges asking to speak publicly about issues of racial justice and equity in the court system. The Commission advised that judges could speak to these issues so long as the statements do not "cast 'substantial doubt' on your ability to be fair and impartial in hearing."

15. Similarly, when the Commission received an inquiry in 2020 from a judge who wanted to participate in a working group that would "address problems of both implicit and explicit bias within the law enforcement community," the Commission advised that the judge could not make a statements that would "cast 'substantial doubt' on [the judge's] ability to be fair and impartial in hearing cases that come before you." The Commission explained that while the judge "could indicate that racism (express and

implicit) is a persistent problem that obviously needs to be addressed and offer feedback on specific proposals to address these issues" (*e.g.*, implicit-bias training), "making direct and public accusations of racism about certain people could be used as a basis to seek your disqualification later and should be avoided."

16. In the summer of 2023, the Commission discussed whether the Code would permit a judicial candidate to make statements similar to those reportedly made by a Wisconsin judicial candidate. In response to a request from a North Carolina judge, the Chair observed, in an informal advisory opinion, that it was permissible for the judge to criticize the judicial philosophy of the sitting judge but to characterize a sitting judge as an "activist Democrat" or "true threat to democracy" suggests that the sitting judge is "swayed in [his or her] decision[s] by 'partisan interests.'" Consistent with its previous advice, our Chair informally advised the judge that

> unless a judge who is a candidate has specific facts that a judicial candidate ruled in a particular way based on an inappropriate basis, a judge should refrain from suggesting such about a sitting judge, as such comment would go against a judge's duty to "promote[] public confidence in the integrity and impartiality of the judiciary."

### C. Commission Investigative Proceedings

17. In 2022, 560 complaints were pending against judges; 361 of the complaints pending with the Commission were dismissed after an initial review; and 28 reached the formal investigation stage.

18. In 2022, an overwhelming majority of formal investigations ended with the complaint being dismissed; that is, in most instances, the investigating panel did not refer

6

the complaint to the other panel for a hearing. In some of the instances where charges were dismissed, the investigating panel dismissed the charge with a private letter of caution to the judge, in accordance with Commission Rules.

19. In 2022, 12 complaints were considered which resulted in statements of charges being issued and/or disciplinary hearings being held.

20. In 2022, the Commission did not make any recommendations for discipline to the Supreme Court.

21. The Commission publishes an annual report on its activities. A true and accurate copy of the Commission's *Annual Report 2022* is attached as **Exhibit A** to my declaration.

### D. The Commission's Proceedings Concerning Justice Earls

22. The Commission received a complaint involving Justice Anita Earls in March 2023, alleging that she had publicly discussed confidential deliberation matters.

23. On or about May 12, 2023, the Commission informed Justice Earls of its decision to dismiss the complaint and asked her counsel to remind Justice Earls "of the language in Canon 2(A), that a Judge should respect and comply with the law and should conduct himself/herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

24. On August 11, 2023, an investigative panel voted to initiate a formal investigation into statements Justice Earls reportedly made in a Law360 article titled "North Carolina Justice Anita Earls Opens Up About Diversity," published on June 20, 2023.

25. The subject of that investigation does not concern any of her statements regarding her concerns about diversity in our judicial system. Rather, the investigation is limited to statements she reportedly made that appear to accuse her Supreme Court colleagues of acting out of racial, gender, and/or political bias in some of their decision making.

26. The Commission's formal investigation is ongoing.

27. The Commission's next step in the investigation of Justice Earls would be to interview her about the alleged statements, after which the investigative panel would determine what further action, if any, was warranted.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 6TH, 2023.

_____
Brittany Pinkham