IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
No. 1:23-cv-00734-WO-JEP

|  |  |  |
|---|---|---|
| ANITA S. EARLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S RESPONSE IN** |
| v. | ) | **OPPOSITION TO DEFENDANT'S** |
| | ) | **MOTION TO DISMISS** |
| NORTH CAROLINA JUDICIAL | ) | |
| STANDARDS COMMISSION *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Anita S. Earls ("Earls") files this Response to the Motion to Dismiss (ECF No. 20) filed by Defendants (collectively, "Commission").

## INTRODUCTION

In just six months, the Commission subjected Justice Earls to two rarely invoked formal ethics investigations,[1] both concerning her core political speech. The Commission purported to conduct both investigations under Inquiry Number 23-081, which the Commission "voted to dismiss" but then "reopened" even though the Commission has no procedure for reopening a dismissed case.

That unprecedented "reopening" occurred after the Commission concluded that Earls engaged in no improper actions and issued her no letter of caution, the standard

---

[1] In 2022, the Commission received "470 new complaints" but opened just "16 new formal investigations." N.C. Judicial Standards Commission, Annual Report at 7–8 (2022), available at https://www.nccourts.gov/assets/documents/publications/NCJSC-Annual-Report-2022.pdf.

procedure for advising a judge to engage in remedial action. Instead, the Commission gave Earls a "verbal warning" through counsel. Apparently unsatisfied with Earls' public statements following that warning, the Commission is investigating her once again *because of* those statements. Earls alleges that this investigation is chilling her First Amendment right to engage in core political speech, the "heartland" of that constitutional right. Those allegations state a First Amendment claim that this Court should resolve.

## STATEMENT OF FACTS

The voters elected Earls in 2018 as an Associate Justice of the North Carolina Supreme Court. (Compl. ¶ 11, ECF No. 8.) She is a candidate for reelection. (*Id.*)

The Commission was established "to provide for the investigation and resolution of inquiries concerning the . . . conduct of any judge or justice of the General Court of Justice." (*Id.* ¶ 12 (alteration in original) (quoting N.C. Gen. Stat. § 7A-374.1).) When the Commission receives a complaint about a judge, the first step is for the Executive Director and Commission Counsel to review the complaint to determine whether it "discloses facts that, if true, indicate that a judge has engaged in conduct in violation of the [N.C.] Code [of Judicial Conduct]." Commission Rule 9(a). If the complaint does not disclose such facts, "then the Chairperson shall summarily dismiss the complaint." *Id.* Otherwise, the complaint is referred to an investigative panel of Commission, which may "dismiss the complaint or authorize an investigation pursuant to Rule 10." *Id.* at 9(b).

The investigation under Rule 10 comprises both a preliminary investigation, *id.* at 10(b), and, potentially, a formal investigation, *id.* at 10(c). Following the formal investigation, the panel "may authorize the initiation of a disciplinary . . . proceeding

against the judge." *Id*. at 12(a). A disciplinary proceeding "is initiated through the filing of a Statement of Charges," *id*. at 12(b), and it is conducted by a separate hearing panel. *Id*. at 2(b)(4). At the end of the disciplinary proceeding, the hearing panel may recommend "to the Supreme Court that the Respondent either be publicly reprimanded, censured, suspended, or removed from office for misconduct or suspended or removed for disability." *Id*. at 21(a).

## A. Justice Earls Responds to an Interview Request About Diversity.

In May 2023, the N.C. Solicitor General published an article entitled "Diversity and the North Carolina Supreme Court: A Look at the Advocates," which found that in the "rarefied space" of Supreme Court oral arguments, "opportunities remain scarce for attorneys from certain backgrounds," *i.e.*, female and non-white. (Compl. ¶ 49.)

*Law360* followed up on that article by seeking an interview ("Interview") with Earls, the only non-white female serving on the Court, which it published in June 2023. (*Id*. ¶ 50.) The Interview comprises six questions. The first reads: "Why are oral advocates that come before the North Carolina Supreme Court overwhelmingly male and white, despite a diverse state population and state bar membership?" (Interview at 2, ECF No. 1-2.) Other questions address efforts to increase diversity, obstacles Earls has faced, implicit bias training, and advice to other women and people of color. (*Id*. at 2–5.)

## B. The Commission Responds to the Interview.

On August 15, 2023, the Commission sent Earls a notice ("August 2023 Notice") stating that the Commission "has reopened the formal investigation into allegations raised against you in 23-081." (August 2023 Notice at 1, ECF No. 1-1.) The August 2023 Notice

states the "original subject matter" of Inquiry Number 23-081 involved allegations that Earls "disclosed confidential information concerning matters being deliberated in conference by the Supreme Court" which "led to media coverage of the subject matter." (*Id.* ¶ 1.)  The Commission dismissed that complaint in May 2023, (*see* Compl. ¶ 73), but issued a "warning" to Earls that she should "mindful of [her] public comments," (August 2023 Notice ¶ 1).

Despite that dismissal – and even though the "Commission's Rules have no procedure for 'reopening' a case in which a Panel votes to dismiss," (Compl. ¶ 77) – the August 2023 Notice states that the "Commission voted to reopen this investigation based on an interview you since gave to the media in which you appear to allege that your Supreme Court colleagues are acting out of racial, gender, and/or political bias in some of their decision-making," (August 2023 Notice ¶ 2).  According to the Notice, Earls' statements in the Interview "potentially violate[] Canon 2A of the Code of Judicial Conduct which requires a judge to conduct herself 'at all times in a manner which promotes public confidence in the integrity and impartiality of the judiciary.'"  (August 2023 Notice ¶ 2.)

**C.  Justice Earls Sues the Commission and Seeks a Preliminary Injunction.**

On August 29, 2023, Earls filed this lawsuit.  She alleges that the Commission is engaged in an ongoing campaign to investigate, punish, and otherwise retaliate against her for exercising her core First Amendment right to speak and inform voters about matters of public concern.  Earls "seeks a judicial declaration that any attempt to investigate her and potentially punish her for speaking out on matters of public concern violates the First

4

Amendment" and "an injunction, preliminary and permanent, to stop the Commission from continuing to chill her right to speak on matters of public concern." (Compl. ¶ 8.)

Earls alleges that the Commission's actions have chilled her First Amendment rights by putting her in a position where she must either curtail her speech or incur further proceedings from the Commission. Among other things, the Commission's actions have caused her to "turn[] down an invitation to write an article for a national publication" and "not to discuss the issue of the racial and gender composition of state courts in response to a request to contribute an essay to the Yale Law Review forum about state courts because of concerns that it could lead to further investigation by the Commission." (*Id*. ¶ 80.)

### D. The Commission Moves to Dismiss.

On October 6, 2023, the Commission moved under "Rules 12(b)(1) and 12(b)(6)" to dismiss the Complaint. (Mot. Dismiss at 1, ECF No. 20.) The Commission first argues that this Court lacks subject matter jurisdiction "based on the doctrine of judicial abstention first established in *Younger v. Harris*, 401 U.S. 37 (1971)." (*Id*.) The Commission maintains that it is appropriate to consider documents outside the pleadings when resolving a motion under *Younger*, and it submits a declaration from Commission Executive Director Brittany Pinkham in support of its motion. (MTD Br. at 3 & n.1, ECF No. 21.) The Commission's second argument is that "the Complaint fails to state a legally cognizable claim." (Mot. Dismiss at 2.)

### STANDARD OF REVIEW

The Court's review of a Rule 12(b)(6) motion is limited to "the allegations set forth in the complaint and the documents attached or incorporated into the complaint." *Megaro*

*v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023) (cleaned up).  The review is more expansive when a motion challenges a court's subject matter jurisdiction, but "*Younger* abstention 'does not arise from lack of jurisdiction in the District Court.'" *Nivens v. Gilchrist*, 444 F.3d 237, 247 n.7 (4th Cir. 2006) (quoting *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 626 (1986)).

While this "distinction is not material" when the movant "does not rely on matters outside the pleadings in support of his motion," *Briggman v. Martin*, No. 5:21-CV-00074, 2022 WL 1203822, at *1 (W.D. Va. Apr. 22, 2022), here the Commission relies on "Plaintiff's factual allegations" as "supplemented by the facts set forth in the Declaration of Brittany Pinkham," (MTD Br. at 3).  The Court should exclude this declaration as a matter outside the pleadings.  If the Court does not exclude the declaration, "the motion must be treated as one for summary judgment under Rule 56" and Earls "must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).

## ARGUMENT

### I. *Younger* Abstention Is Inappropriate.

*Younger* abstention is "exceptional" because "federal courts are obliged to decide cases within the scope of federal jurisdiction."  *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72–73 (2013).  Indeed, the Fourth Circuit has recently acknowledged that the Supreme Court's unanimous decision in *Sprint* "recast the earlier cases" decided under *Younger*, *Jonathan R. by Dixon v. Justice*, 41 F.4th 316, 329 (4th Cir. 2022), including many of the pre-*Sprint* authorities relied on by the Commission.  After *Sprint*, there are three steps "to

determine whether *Younger* abstention applies." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 96 (4th Cir. 2022).

First, the Court should determine whether the case falls within any of the "three 'exceptional' categories" of cases potentially justifying *Younger* abstention. *Sprint*, 571 U.S. at 78. Those three categories are "(1) 'ongoing state criminal prosecutions,' (2) 'certain civil enforcement proceedings' that are 'akin to a criminal prosecution in important respects' (commonly referred to as 'quasi-criminal' proceedings), and (3) 'pending civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Air Evac EMS*, 37 F.4th at 96 (alteration in original) (quoting *Sprint*, 571 U.S. at 78–79, 81). Falling within one of these three exceptional categories is necessary but not sufficient for abstention. *Jonathan R.*, 41 F.4th at 329.

Second, "if the case falls into one of the three settled categories, courts should go on to determine if federal involvement will in fact put comity at risk." *Id*. Three additional "*Middlesex* factors" guide this inquiry: "(1) whether there is 'an ongoing state judicial proceeding'; (2) whether that state proceeding 'implicate[s] important state interests'; and (3) whether that state proceeding provides 'an adequate opportunity . . . to raise constitutional challenges.'" *Air Evac EMS*, 37 F.4th at 96 (alterations in original) (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)).

Third, if the first two steps are satisfied, the Court considers whether any of "three exceptions" applies: "(1) 'bad faith or harassment' by state officials responsible for the prosecution; (2) a statute that is 'flagrantly and patently violative of express constitutional

prohibitions'; and (3) other 'extraordinary circumstances' or 'unusual situations.'" *Id*. at 96 (quoting *Younger*, 401 U.S. at 49–54).

### A. The Investigation Does Not Fit the Three Settled Categories.

At the first step, the Commission argues that its investigation fits the second category: a "civil enforcement proceeding." (MTD Br. at 12.) It does not. As the North Carolina Supreme Court explained, "a proceeding begun before the Commission is neither a civil nor a criminal action." *In re Nowell*, 293 N.C. 235, 241 (1977). That is because "[s]uch a proceeding is merely an inquiry into the conduct of one exercising judicial power to determine whether he is unfit to hold a judgeship" without any corresponding power to punish the judge. *Id*.

Nor is the investigation an "enforcement proceeding" within the meaning of *Younger*: a "case[] 'brought by the State in its sovereign capacity' following an 'investigation' and upon 'the filing of a formal complaint or charges.'" *Jonathan R.*, 41 F.4th at 329 (quoting *Sprint*, 571 U.S. at 79–80). The Commission reports that it has "merely initiated a confidential investigation designed to determine whether a violation of the Code has occurred," and that "investigation has not reached any kind of disposition." (PI Opp'n at 13, 19–20, ECF No. 22.) The proceedings against Earls thus remain at an early stage and have not yet been transferred, as they might later be, to a hearing panel for a full disciplinary hearing.

Under the Commission's procedures, those two functions – investigation and hearing – are bifurcated to allow one of the Commission's two Panels to conduct the investigative phase (and potentially recommend a disciplinary hearing), while the second

8

Panel then conducts the hearing (which might then lead to a recommendation of discipline to be imposed by the Supreme Court). *See* Commission Rule 2(b)(4). Seeking an injunction at the investigative phase does not implicate *Younger*.

The Commission's actions thus far against Earls fall into the interstitial period, where the Fourth Circuit draws a "distinction" between "the commencement of 'formal enforcement proceedings,' at which point *Younger* applies, versus the period of time when there is only a 'threat of enforcement,' when *Younger* does not apply." *United States v. South Carolina*, 720 F.3d 518, 527 (4th Cir. 2013) (quoting *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1229 (4th Cir. 1989)).

In *South Carolina*, the state sought to extend *Younger*'s criminal-proceedings application to "*threatened or anticipated* state criminal proceedings." 720 F.3d at 527 (emphasis in original). The Fourth Circuit refused, holding that "*Younger* does *not* bar the granting of federal injunctive relief when a state criminal prosecution is expected and imminent." *Id*. (emphasis in original). The court held that the state's contention "that abstention is required whenever enforcement is threatened," would necessarily "leave a party's constitutional rights in limbo while an agency contemplates enforcement but does not undertake it." *Id*. That is precisely the position Earls finds herself in today with one Commission panel investigating whether it should recommend that a second Commission panel undertake a disciplinary proceeding.

During that limbo period, moreover, "if *Younger* abstention were to apply," the "federal plaintiff would be placed 'between the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believes to be constitutionally protected activity in

order to avoid becoming enmeshed in enforcement proceedings.'" *Id*. at 527–28 (quoting *Steffel v. Thompson*, 415 U.S. 452, 462 (1974) (alteration in original)). In those circumstances, federal plaintiffs such as Earls "need not live under a cloud of prolonged uncertainty' as to their rights," and a "district court [is] correct to decline to abstain." *Id*. at 528 (quoting *Telco*, 885 F.2d at 1229).

The Fourth Circuit's reasoning in *Telco* also rejects the application of *Younger* to the facts here. In that case, Virginia asserted *Younger* abstention in a case, like this one, where the state "assert[ed] that administrative proceedings had been instituted against" the plaintiff "by a letter to [its] attorneys specifying violations of state law and inviting them to attend a fact-finding conference." 885 F.2d at 1227. The Fourth Circuit held that "the district court did not err in declining to abstain where state proceedings were in a preliminary stage and where the state had imposed a prior restraint upon protected speech." *Id*. at 1228. The Fourth Circuit explained "that the period between the threat of enforcement and the onset of formal enforcement proceedings may be an appropriate time for a litigant to bring its First Amendment challenges in federal court," since otherwise the "opportunity for federal adjudication of federal rights will be lost." *Id*. at 1229. Thus, the Fourth Circuit "decline[d] to hold that *Younger* abstention is required whenever a state bureaucracy has initiated contact with a putative federal plaintiff." *Id*.

Following *Telco*, the District of Montana declined to abstain under *Younger* from hearing a First Amendment challenge to the Montana Code of Judicial Conduct as administered by the Montana Supreme Court's Office of Disciplinary Counsel (ODC). *Myers v. Thompson*, 192 F. Supp. 3d 1129, 1137 (D. Mont. 2016). The court found that

the "ODC's investigation into this case has not progressed beyond the investigation stage," agreeing with the holdings of "[o]ther courts [which] have determined that investigation proceedings, without more, do not trigger *Younger*." *Id.* (citing *Telco*, 885 F.2d at 1228–29 & *Mulholland v. Marion Cnty. Election Bd.*, 746 F.3d 811, 817 (7th Cir. 2014)).

The Seventh Circuit's ruling in *Mulholland* reinforces the distinction between a preliminary investigative phase (with no *Younger* applicability) and the institution of formal proceedings in which sanctions could be levied (when *Younger* might apply). In *Mulholland*, the court held that the defendant Election Board's limited authority to sanction offenders did not meet the required level for "state proceedings that have warranted *Younger* abstention in other cases." 746 F.3d at 817. As with the Commission here, the Election Board hearing "could lead only to a recommendation" of further prosecution by a different state actor. *Id.* Thus, the court held that "a federal court need not decline to hear a constitutional case within its jurisdiction merely because a state investigation has begun." *Id.*

Each of these authorities – *Telco*, *Mulholland*, and *Myers* – distinguished the Commission's primary authority, *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423 (1982), on grounds that are just as applicable here. These authorities show why the Commission is wrong to claim that "*Middlesex* forecloses any debate whether the Commission's proceedings fit within *Younger*." (MTD Br. at 13.) *Middlesex* concerned a state bar proceeding against a lawyer who had been both investigated *and* sent "a formal statement of charges." 457 U.S. at 428. The Commission's description of the state proceeding in *Middlesex* omits that critical fact. (*See* MTD Br. at 13–14.)

11

*Telco* likewise recognized the limits of *Middlesex*, distinguishing it on the grounds that *Middlesex* concerned not only the "existence of an ongoing state proceeding," 885 F.2d at 1228, but also that the subject "attorney, prior to the commencement of the federal action, had received a *formal statement of charges* from the ethics committee and was required to file an answer within ten days," *id*. at 1229 (emphasis added). In *Telco*, by contrast, the state proceeding sought to be enjoined – an investigation short of "formal proceedings" with the "safeguards of subpoenas of witnesses, cross-examination, and an impartial hearing officer," *id*. – had not yet reached the stage for which *Middlesex* counseled abstention.

Similarly in *Mulholland*, the Seventh Circuit found that the hearing at issue there could not "result in professional sanctions" like the "attorney disciplinary hearing" in *Middlesex*. 746 F.3d at 817. Here, too, the Commission has no authority to issue sanctions itself and is limited to making a recommendation. Commission Rule 21(a).

The district court in *Myers* also explicitly contrasted the stage of the proceedings in *Telco*, where the state "agency notified plaintiff of specific charges" but the "investigation was still unfolding," with *Middlesex*, where the "disciplinary authority had filed formal charges against the plaintiff." 192 F. Supp. 3d at 1137–38. The *Myers* court recognized that while *Younger* abstention was appropriate after the filing of formal charges, it was not appropriate when the state court proceeding had "not progressed beyond the investigation stage." *Id*. at 1137.

As these authorities all demonstrate, there is no "civil enforcement proceeding" here that could support *Younger* abstention until, at the earliest, the Commission brings a

12

disciplinary proceeding against Earls following "completion of [the] formal investigation," Commission Rule 12(a), and upon "the filing of a Statement of Charges by the Commission Counsel at the Commission offices," *id*. at 12(b). *See Jonathan R.*, 41 F.4th at 329 ("*Sprint* has characterized civil enforcement proceedings as cases 'brought by the State in its sovereign capacity' following an 'investigation' and upon 'the filing of a formal complaint or charges.'" (quoting *Sprint*, 571 U.S. at 79–80)).

### B. Justice Earls Alleges Additional Reasons for Not Abstaining.

The lack of a "civil enforcement proceeding" within the meaning of *Younger* means that the Court need not consider whether there are other reasons why abstention is inappropriate here. *See Jonathan R*, 41 F.4th at 329 ("if the case does not [fall into one of the three settled *Younger* categories], courts need go no further"). Yet proceeding past the first step in the *Younger* analysis only bolsters the case against abstention.

In *Middlesex*, the Court recognized that "bad faith, harassment, or some other extraordinary circumstance . . . would make abstention inappropriate." 457 U.S. at 435. Neither the Supreme Court nor Fourth Circuit "has delineated an exhaustive list of situations that rise to the level of extraordinary circumstances." *Air Evac EMS*, 37 F.4th at 99. Indeed, the "very nature of extraordinary circumstances makes it impossible to anticipate and define every situation that might create a sufficient threat of such great, immediate, and irreparable injury as to warrant intervention." *Id*. (cleaned up). In *Air Evac EMS*, for example, the court affirmed the district court's denial of *Younger* abstention based on the court's conclusion that although the defendant state agency "claimed to have received numerous complaints about [the plaintiff], the only record of any complaint" was

from a local competitive business with whom the agency had multiple email communications, the timing of which the district court found "problematic." *Id*. at 101–02. Based on those statements, the Fourth Circuit affirmed the district court's conclusion that the agency's "actions were to favor a local business over out-of-state competition" as represented by the plaintiff, and thus the case was not appropriate for abstention. *Id*. at 102.

A particularly salient example of the extraordinary-circumstances exception is found in *Fink v. Supreme Court of Pa.*, 651 F. Supp. 1238 (M.D. Pa. 1987), a case in which the court refused to accept *Younger* abstention in a judicial discipline case. In *Fink*, a state court judge went to federal court to challenge his "reassignment" which the court found was "in essence a suspension from performing judicial duties." *Id*. at 1240. As here, in *Fink*, the defendants contended that since the judge's "lawsuit is to obtain injunctive relief against an arm of the state," *Younger* abstention applied. *Id*. at 1241.

The court rejected abstention, accepting the plaintiff-judge's allegations of "bad faith and extraordinary circumstances" based on the failure of the defendant Judicial Inquiry and Review Board to "adhere[] to its own procedures and the procedures outlined in" the Pennsylvania Constitution. *Id*. at 1243. In ruling that "[a]bstention should not be applied when a complainant alleges bad faith, harassment or extraordinary circumstances," *id*., the court held that "[f]or the purposes of a motion to dismiss," the judge's allegations of "bad faith and extraordinary circumstances" and "every inference fairly deducible therefrom must be accepted as true." *Id*. In so ruling, the court also distinguished *Middlesex*, rejecting defendants' argument that "the Supreme Court's pronouncement in

14

*Middlesex* prevents our acting" on the ground that *Middlesex* expressly recognized bad faith and extraordinary circumstances "are exceptions to the *Younger* doctrine." *Id*.

As in *Fink*, the alleged procedural irregularities here are rife. Although the Commission contends that Earls' allegations amount to only "unsubstantiated accusation," (MTD Br. at 19), it does not deny that it has twice within six months made formal investigations into Earls regarding her speech. And Earls plausibly alleges that the Commission "has singled [her] out." (*Id*. at 20.) While the Commission argues that Earls "is one of many judges with whom the Commission has engaged regarding their public statements," (*id*.), there is no allegation (or, indeed, extra-record evidence) that it has ever brought an investigation against another judge for her political speech. Likewise, to claim that the "Commission's investigation[s]" into Earls "is consistent with advice it has consistently offered other judges," (*id*.), is to draw a false parallel when that putatively consistent advice was offered only confidentially and to judges voluntarily seeking it, unlike a formal investigation.

In addition, although the initial formal investigation vindicated Earls and was dismissed, the Commission took the unprecedented step of providing her with a "verbal warning" to be careful about her speech. (August 2023 Notice ¶ 1.) When the Commission found later political speech by Earls to be not to its liking, it purported to "reopen" the earlier-dismissed investigation, (*id*. ¶ 2), a procedure alien to the Commission's rules. That "reopening" also appears to have been undertaken on the Commission's own motion, an exceeding rare practice on its part. To call the Commission's treatment of Earls "unremarkable," (MTD Br. at 20), does not hold up to scrutiny. The Commission cannot

15

shelter its investigation from federal scrutiny by claiming that "[t]wo routine investigations regarding a judge's public statements are far from exceptional," (*id*.), even though there is no indication of even a single other investigation into political speech.

All told, the allegations here show a Commission determined to control – and ultimately squelch – core political speech of an elected Supreme Court Justice by invoking serial investigations into her speech in a manner that violates its own rules and practices. As in *Fink*, the allegations of the failure of the Commission to "adhere[] to its own procedures" makes application of *Younger* inappropriate. 651 F. Supp. at 1243. Fourth Circuit precedent is clear that federal plaintiffs such as Earls "need not live under a cloud of 'prolonged uncertainty' as to their rights." *South Carolina*, 720 F.3d at 528 (quoting *Telco*, 885 F.2d at 1229).

## II. Justice Earls States a Claim.

### A. The Threat of Enforcement Implicates the First Amendment.

The Commission contends that Earls is unlikely to succeed on the merits because she cannot "state a claim of First Amendment retaliation" based on "adverse action" taken in retaliation for protected activity. (MTD Br. at 8.) But Earls did not bring a standalone retaliation claim. Instead, her complaint is a "pre-enforcement challenge," *South Carolina*, 720 F.3d at 523, seeking declaratory and injunctive relief to bar further investigation or punishment for her protected political speech on matters of public concern, (Compl. ¶ 8.)

A pre-enforcement challenge may be brought based on the "*threatened* enforcement of a law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (emphasis added). An "actual arrest, prosecution, or other enforcement action is not a prerequisite to

challenging the law." *Id.* "Where threatened action by government is concerned," a plaintiff is not required "to expose himself to liability before bringing suit to challenge the basis for the threat – for example, the constitutionality of a law threatened to be enforced." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) (emphasis omitted); *see also Susan B. Anthony List*, 573 U.S. at 165 ("We take the threatened Commission proceedings into account because administrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review.").

That Earls faces a threat of enforcement is not open to serious debate. The Commission has now initiated not one, but two, formal investigations of her core political speech on matters of public concern within a six-month period, even though the Commission rarely initiates formal investigations of complaints. *See supra* note 1 (470 complaints but only 16 investigations); *Susan B. Anthony List*, 573 U.S. at 166–67 ("history of past enforcement" is "good evidence" of a genuine threat of enforcement). The second investigation, moreover, follows a "verbal warning" to Earls to mind her political speech. *See Steffel*, 415 U.S. at 459 (threat of enforcement not imaginary or speculative when twice "warned" to stop constitutionally protected handbilling).

Earls need not wait to vindicate her First Amendment rights until the Commission authorizes the "initiation of a disciplinary proceeding," Commission Rule 12(a), by issuing a Statement of Charges against her, *id.* at 12(b), or until it issues a "[l]etter of caution," N.C. Gen. Stat. § 7A-374.2(6), or recommends to the Supreme Court a "public reprimand," *id.* § 7A-374.2(7), "censure," *id.* § 7A-374.2(1), "suspension," *id.* § 7A-374.2(9), or "removal" from office and disqualification "from holding further judicial office," *id.* § 7A-

17

374.2(8). The Commission has never represented that it will *not* proceed with a disciplinary proceeding or recommend more formal punishment. And to be sure, if Earls were to wait until a formal Statement of Charges, the Commission inevitably would argue – more credibly at that point – that her claim was too late under *Younger*. *See Telco*, 885 F.2d at 1229 (declining to adopt a rule under which "any opportunity for federal adjudication of federal rights will be lost").

In any event, First Amendment retaliation does not require actual punishment, like censure or removal, but only governmental action that is "sufficiently chilling" to "deter a person of ordinary firmness from the exercise of First Amendment rights." *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011) (cleaned up). The Commission dismisses Earls' allegations, (*see* Compl. ¶¶ 80–81), of the *actual chilling effect* this series of investigations has had on her by emphasizing that the standard is an "objective" one, intimating – unpersuasively – that Earls is not a person of "ordinary firmness." But it hardly comes as a surprise that a reasonable Supreme Court Justice who has received a "verbal warning" concerning her political speech and been subjected to two formal investigations within six months – which have "interrupted her ability to do her work as a Justice" and required her to engage in "invasive and expensive investigations for months," (*id*. ¶¶ 81, 86) – is now carefully censoring her own speech to avoid inviting yet another inquiry. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–68 (1963) (observing that "[p]eople do not lightly disregard public officers' thinly veiled threats . . . against them if they do not come around").

Ignoring both the warning and the serial nature of the investigations at issue, the Commission argues that a "mere" investigation of speech cannot chill any speech, (MTD Br. at 21–22), relying heavily on *Laird v. Tatum*, 408 U.S. 1 (1972). But in *Laird*, the plaintiffs claimed their speech was chilled, not by any direct action by the government against them, but by the "existence and operation of the intelligence gathering and distributing system." 408 U.S. at 3. In a "narrow" conclusion based on the "record" presented, *id.* at 15, the Court held that a plaintiff could not state a First Amendment violation for "the *mere existence, without more*, of a governmental investigative and data-gathering activity," *id.* at 10 (emphasis added). Here, by contrast, Earls is not seeking to bar the Commission from information gathering. The Commission may conduct a "preliminary investigation" on its own "for the purpose of verifying the credibility of or ascertaining additional facts necessary to evaluate allegations in a complaint." Commission Rule 10(b). Presumably, the Commission has already done that. The comments here were printed in a public periodical and are not disputed.

Instead, Earls objects to the launching of a "formal investigation" under Commission Rule 10(c) that requires her, once again, to retain counsel, to submit to a lengthy and probing interview by Commission staff, and to devote a substantial amount of time to defending herself. These burdens force Earls to take time from the role to which she was elected, (Compl. ¶ 69), and impose "a substantial emotional toll as she has tried to negotiate the Commission's capricious line on what judges can and cannot say about important public issues affecting the justice system," (*id.* ¶ 81).

19

In addition, Earls seeks to avoid what seems certain to turn into formal charges and a disciplinary proceeding since her public statements are not a matter of dispute and five commissioners have already voted, based on those same facts, to "reopen" the complaint against her and to launch a formal investigation, rather than voting to dismiss the complaint under Commission Rule 9(b). That proceeding will be even more intrusive, time-consuming, and expensive, as it requires a formal Answer, opportunities for discovery, and a hearing with witnesses. Commission Rules 13, 16, 19 & 20. That sort of "intrusive" investigation proceeding is enough to have a chilling effect on anyone's exercise of First Amendment rights. *See, e.g.*, *Susan B. Anthony List*, 573 U.S. at 165 (candidate targeted by a false statement complaint may be "forced to divert significant time and resources to hire legal counsel and respond to discovery requests," imposing "burdens" on "electoral speech"); *Clark v. Libr. of Cong.*, 750 F.2d 89, 92–95 (D.C. Cir. 1984) (a "significantly intrusive" FBI investigation into a plaintiff's political beliefs and personal life was enough to generate a "chilling effect"); *White v. Lee*, 227 F.3d 1214, 1228, 1237-38, 1242 (9th Cir. 2000) (eight-month investigation into plaintiffs' protected speech and beliefs was "extraordinarily intrusive and chilling").[2]

---

[2] The other cases the Commission cites are no help to it. *See Ohio Civil Rights Comm'n*, 477 U.S. at 628 (abstaining from pending administrative proceeding and rejecting argument that "mere exercise of jurisdiction" over religious school, by "investigation" or an administrative hearing, violated Free Exercise Clause and Establishment Clauses of First Amendment); *Pierce v. Texas Dep't of Criminal Justice*, 37 F.3d 1146, 1150 (5th Cir. 1994) (employer's investigation of employee was not an "adverse employment action"); *Benningfield v. City of Houston*, 157 F.3d 369, 376 (5th Cir. 1998) (same).

The Commission also incorporates, (*see* MTD Br. at 22 n.3), three arguments from its preliminary injunction briefing about why "concern about the potential of future discipline" cannot have chilled Earls' speech, (PI Opp'n at 10). Each lacks merit.

First, the Commission argues that even if it does initiate disciplinary proceedings, that cannot chill any speech because the Commission "lacks the power to discipline a judge." (PI Opp'n at 10 (citing *In re Nowell*, 237 S.E.2d 246, 252 (N.C. 1977)).) But a disciplinary hearing is not an informal invitation to discuss one's speech with a panel of other judges. It is a disciplinary hearing with the potential for serious professional consequences, eminently capable of chilling the speech of someone of ordinary firmness. As the North Carolina Supreme Court recognized in *Nowell*, the "impact which adverse findings by the Commission" may "reasonably be expected to have upon the individual" are themselves sufficiently "severe" that "fundamental fairness entitles the judge to a hearing" before the Commission that "meets the basic requirements of due process." 237 S.E.2d at 251.

Second, the Commission argues that "the likelihood of even a recommendation for discipline is speculative." (PI Opp'n at 11.) That a judge could prevail in an inquiry before the Commission, however, does not defeat a First Amendment claim. *See Ohio Civil Rights Comm'n*, 477 U.S. at 626 n.1 (rejecting ripeness challenge where "the administrative body may rule completely or partially in appellees' favor" and citing two earlier Supreme Court cases in which the plaintiffs "may have prevailed had they in fact been prosecuted"). And in response to this lawsuit, the Commission has not retreated from its position that it can police judicial speech on matters of public concern.

21

Third, the Commission contends that "even disciplinary action" by the Supreme Court might not "implicate the First Amendment." (PI Opp'n at 11.) Of course, the Commission implicitly concedes, as it must, that suspension or removal would implicate the First Amendment. (*Id.*) But it argues that a "disciplinary censure" would not. To support this argument, the Commission overreads the Supreme Court's decision in *Houston Community Colleges System v. Wilson*, 595 U.S. 468 (2022). In *Wilson*, the Court held that a censure of an elected official "by other members of the same body" could not support a First Amendment retaliation claim. *Id.* at 482. The Supreme Court reasoned that the censure by one's colleagues was "itself a form of speech" and that "just as surely" as the First Amendment guaranteed an elected official "the right to speak freely on questions of government policy," the First Amendment "cannot be used as a weapon to silence other representatives seeking to do the same." *Id.* Unlike *Wilson*, the North Carolina disciplinary regime for judges is not limited to a "purely verbal censure," *id*. at 475, which can then be met with counterspeech by the censured member "exercising their free speech rights when the criticism comes," *id*. at 478. In this case, therefore, continuing speech and counterspeech can lead to escalating penalties, culminating in removal from office, N.C. Gen. Stat. § 7A-376(c), based on the recommendation and imprimatur of a Commission as to which the censured judge is not a "member[]," 595 U.S. at 480 (citing judicial discipline cases). The Supreme Court also emphasized that its case was a "narrow one." *Id.* at 482. This case does not fit that narrow mold.

## B. Justice Earls States a § 1983 Claim.

The Commission argues that Earls cannot state a § 1983 claim without stating the elements of the "most analogous tort as of 1871." *Thompson v. Clark*, 142 S. Ct. 1332, 1337 (2022) (cleaned up). The Commission analogizes this claim to malicious prosecution and says Earls cannot bring such a claim because malicious prosecution requires "acquittal or discharge of the accused" and the Commission's investigation has not "reached any kind of disposition." (MTD Br. at 19–20.) In other words, the Commission contends that no § 1983 claim is available until *after* the Commission's process reaches the end, and only if Earls is acquitted by that process.

The Commission has it backwards. To be sure, § 1983 creates a "species of tort liability" when "plaintiffs seek damages." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305 (1986). But Earls is not seeking damages. She seeks declaratory and injunctive relief to prevent irreparable harm through the deprivation of her First Amendment rights that cannot be measured in damages or recovered in tort. She need not endure the full Commission process to assert a § 1983 claim. If that were the case, no litigant could ever challenge unconstitutional enforcement efforts in federal court.

## CONCLUSION

The Court should deny the Commission's Motion to Dismiss.

This the 20th day of October, 2023.

By:    /s/ Pressly M. Millen
Pressly M. Millen
State Bar No. 16178
Raymond M. Bennett
State Bar No. 36341
Samuel B. Hartzell

23

State Bar No. 49256

OF COUNSEL:

WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601
(919) 755-2100

Attorneys for Plaintiff
Anita S. Earls

## CERTIFICATION OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), I hereby certify that this memorandum, including headings and footnotes, contains fewer than 6,250 based on the word count feature of Microsoft Word, and therefore complies with the Rule.

Dated: October 10, 2023                    <u>/s/ Pressly M. Millen</u>