# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:23-cv-00734-WO-JEP

| | |
|---|---|
| ANITA S. EARLS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| NORTH CAROLINA JUDICIAL | ) |
| STANDARDS COMMISSION, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## SUPPLEMENTAL DECLARATION OF ANITA S. EARLS

ANITA S. EARLS, declares as follows:

1. This Declaration supplements my earlier Declaration in support of the Motion for Preliminary Injunction in this action. As with the earlier Declaration, the testimony contained in this Supplemental Declaration is tendered by me in conformity with Rule of Professional Conduct 3.7(a)(1), and is believed by me to relate solely to uncontested facts. It is based on my personal knowledge.

2. This Supplemental Declaration is directed at the Commission's contention that I am unable to "show that the Commission's confidential investigation is sufficient to chill the speech of a person of ordinary firmness in [this] context," and its implication that I am somehow lacking "ordinary firmness." (Commission Br. in Opp. to Mot. for Prelim. Inj. 9.)

3. In my earlier Declaration I described how the series of investigations conducted by the Commission, coupled with its "verbal warning" to me "to be mindful of

[my] public comments" (*see* Compl., Ex. A) – a procedure not provided for in the Commission's Rules – had led to specific circumstances of chilling my speech. (Declaration at ¶¶ 17-18, 20-21.) Those circumstances are real and they are continuing.

4. In my roles both as a Supreme Court Justice and a candidate for reelection to that position, I engage in a substantial amount of public speaking and publication.

5. Since the Commission's investigations into me, I have been constrained at all times to subject my public speech to internal scrutiny and self-censorship in a manner which I never previously did.

6. To take one example, the initial outline of my essay on "The Role of State Constitutional Rights" for the *Yale Law Review Forum* (a copy of which, along with the editor's initial comments is attached hereto as Ex. A), proposed a discussion of the "internal deliberation processes on the development of state constitutional doctrines." In response, the editor encouraged me "to consider focusing largely on North Carolina's internal deliberation processes." (*Id.*) My intent was not to discuss any particular case or provide any information beyond what I have previously seen discussed at other professional continuing legal education seminars on appellate practice or learned from presentations at national forums. For example, some state supreme courts circulate drafts of opinions prior to oral arguments; other courts discuss cases together as a court before oral arguments. In some courts, cases are assigned for opinion writing by the chief justice. It has been discussed at professional seminars that certain deliberation processes can foster greater unanimity as a court. As a result of the Commission's investigations, however, I eliminated that subject entirely from my draft article.

2

7. With respect to another publication, *Slate* Magazine, an online magazine that covers, among other things, federal and state courts, I received a solicitation on April 28, 2023, to write an article concerning a series of dissents that I had written in cases in which the new conservative-majority North Carolina Supreme Court had reversed a number of our recent decisions. The *Slate* writer who reached out to me indicated that publication in a national magazine would provide the reasoning in my dissents with a broader audience than simply publishing them in official reporters.

8. I initially responded positively to *Slate* on that same day and inquired about the timing and length of the potential article. After further consideration, however, I wrote back on April 30, 2023 to decline the invitation. I apologized that I had not been initially more careful to think through whether I could write for a general audience about the decisions of the North Carolina Supreme Court in light of the judicial standards complaint then pending against me. I decided under those circumstances that I needed to be particularly cautious about speaking publicly and declined to publish.

9. When the *Slate* writer inquired whether I would be willing to write about my dealings with the Commission or potentially speak about the subject on a *Slate* legal podcast, "Amicus," I declined for the same reasons.

10. More recently, during the pendency of the second investigation, I had to engage in self-censorship during a question-and-answer period at a speaking engagement at the annual meeting of the Greensboro Bar Association on September 21, 2023.

11. After giving my prepared remarks highlighting the work of the Equal Access to Justice Commission, during the course of the Q&A, I was asked a question by

3

an audience member, a retired judge, concerning my views on the proposal then contained in legislation to end the automatic right of appeal to the North Carolina Supreme Court based on a dissent in the Court of Appeals. Because that issue had been one of the topics of the original dismissed Commission investigation, now reopened, I decided that I could not respond to that question and told the audience that I could not do so because of the investigation I was currently facing with the Commission.

12. In short, I find myself constantly engaging in self-censorship. This has occurred at a Democratic Party event, at the law school class I teach at the University of North Carolina, at a meeting with the Governor's Pages who came to learn about our court, and even at church. I am extremely careful addressing public audiences or even privately answering questions about partisanship, and especially race and the judiciary, in ways that I never did before the series of investigations into my speech.

13. As a final example, on November 11, 2023, I am scheduled to deliver the keynote address at the Critical Legal Collective Inaugural Convening, a three-day conference at Duke Law School and its Center on Law, Race & Policy. In considering what I can and cannot say at that conference, I will necessarily have to take into account the fact of the Commission's investigations into my speech.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 20th of October, 2023, at Durham, North Carolina.

*Anita S. Earls*
Anita S. Earls

4

Case 1:23-cv-00734-WO-JEP   Document 28-2   Filed 10/20/23   Page 5 of 9

# EXHIBIT A

The Role of State Constitutional Rights                    Anita S. Earls

Yale Law Forum Essay                                       March 23, 2023

I ran for election to my current role emphasizing, in part, the importance of state constitutions as a source of protection for civil and human rights. This proposition probably would seem strange to a civil rights lawyer from an earlier era, when federal constitutional jurisprudence was seen as the only hope for effective protection against state-sanctioned racial discrimination and, indeed, the best avenue to vindicate the rights of women, LGBTQ individuals, and people with disabilities. Looking to state constitutional law after decades of federal civil rights litigation felt similar to the shift I made from arguing against the concept of a racial gerrymandering claim in the *Shaw v. Hunt* litigation, to winning the largest racial gerrymandering case ever brought in *North Carolina v. Covington*. But what may have started as a new strategy for a new era has, on closer look, become a conviction that democracy and the rule of law do indeed benefit from the local connection that state constitutions provide.

The thesis of this essay is that the development of state constitutional rights jurisprudence is valuable in and of itself, regardless of any short-term strategic gains or losses that might be obtained. My perspective on this question has shifted in light of the experience of recent cases, from a more expedient approach to an appreciation of the importance of having judges weigh in on these issues who are arguably closer to the citizens impacted by their rulings. The expedient approach I had as an advocate, namely, if the current composition of the United States Supreme Court makes the protection and advancement of individual rights unlikely, it is incumbent on lawyers to try state court remedies, appeared to have little force in states with appellate judges aligned philosophically with the U.S. Supreme Court. The broader approach applies everywhere and in every political climate.

I envision starting with a brief discussion defending the concept of rights to begin with. Of course, this is a huge topic, but it seems to me to be useful to explain why I continue to believe that conceptualizing individual civil and human rights and seeking to pursue protection of those rights through legal institutions is important. And I have that view after experiencing an abrupt about-face in the composition of the Court I sit on, which illustrates how fleeting state court pronouncements may be. If I find I can't say anything meaningful in a succinct manner, I will not take this on, but I am intrigued by arguments that rights jurisprudence is counterproductive and does not ultimately resolve disputes about how to balance competing interests in society. And certainly, there could be skepticism about the value of a rights-based legal framework in light of the *Dobbs* decision, and others, from the U.S. Supreme Court that fundamentally alter our understanding of what rights are established by the U.S. Constitution.

> **Commented [A1]:** We are very excited about this thesis. After considering your proposal, we've tried to distill the thesis at a lower level of generality, focused squarely on North Carolina as a case study. In our call, we would welcome hearing from you whether this accurately captures your intentions for the piece:
>
> Various state courts differ in the extent to which they protect constitutional rights over and above those protected by the Federal Constitution. The experience of the North Carolina Supreme Court suggests that this phenomenon can be explained at least in part on three discrete grounds: (1) the closeness of the Justices to the people; (2) the procedures by which state courts of last resort deliberate, assign cases, and assign opinion writing duties; and (3) the procedures by which states amend their constitutions. This explanation demonstrates that the development of state constitutional-rights jurisprudence is valuable in and of itself.

> **Commented [A2]:** To the extent it would advance your vision for the Essay, we encourage you to begin, instead, with background on the recent history of the North Carolina Supreme Court and its unique role in shaping federal jurisprudence and public perceptions around the interpretation of state constitutional law. Given the shorter length of these Essays, you might consider omitting discussion of justifications of rights frameworks or address it in a substantive footnote. Expanding your attention to North Carolina at the top would effectively distinguish this Essay from others in the Collection, none of which appear likely to focus on the experience of a particular court.

I also need to ground this essay in a thorough literature review of the topic generally, which I have not yet had the time to complete. I certainly do not want to be making an obvious point that has already been exhaustively covered elsewhere.

**Commented [A3]:** This will be useful in the drafting phase, but you might consider not including an extensive literature review in the Essay itself, given the short length of the Essays in this collection relative to other YLJ content.

With a shorthand but hopefully clear understanding of why rights jurisprudence is valuable, the next fundamental premise of my thesis that should be explored is why state supreme court justices can be considered closer to, or at least somehow tied in a different manner to, the citizens of a democracy than are U.S. Supreme Court Justices, including whether that differs based on which judicial selection method is used.

I then want to compare some of the salient features of how state constitutions evolve differently from the federal constitution, and how that impacts the role they should have in protecting rights. This would involve looking at particular state constitutional provisions that are different from the federal constitution and comparing states that amend and/or rewrite their constitutions frequently with those that have fewer opportunities for amendment or tougher procedural hurdles to amendment. I want to hypothesize why North Carolina constitutional jurisprudence has expanded beyond federal doctrines in areas such as voting rights and juvenile life without parole sentencing. Understanding those developments might shed light on how state constitutional rights may expand in the future.

**Commented [A4]:** We encourage you to make North Carolina your primary focus with some limited treatment of inter-state comparisons. A more comprehensive inter-state comparison may be beyond the scope that the *Forum* format allows. We encourage you to consider flagging comparisons to one or two other states that help flesh out the unique features of North Carolina's constitution.

**Commented [A5]:** Per the first comment on page one, this appears to be an incredibly rich area of inquiry that we encourage you to consider centering as the focus of the Essay.

A further contrast to make among state courts is the impact of different internal deliberation processes on the development of state constitutional doctrines. This is perhaps least explored in academic literature, and again I am guessing without yet having done the research, but I think that state supreme courts are even less transparent that the U.S. Supreme Court about their internal deliberative processes and I think some of the significant differences can impact how the law develops. Here I am thinking of differences such as how the California Supreme Court assigns opinions to be written by Justices prior to voting on a case, and the Justice must anticipate how her colleagues will view the case and draft an opinion that can garner a majority. In that Court, dissents are rare. In other Courts, cases are assigned randomly and opinions drafted and cases discussed by the Court as a whole before oral argument. In my Court, cases are picked to be authored after oral argument and initial voting has occurred. When the process is more adversarial internally, there is less institutional incentive to reach consensus. There might be structural reforms that could enhance the role of state courts in protecting constitutional rights.

**Commented [A6]:** We are quite excited about your proposed treatment of this issue. We agree that it is among the heretofore least explored elements you outline in this proposal. We would encourage you to consider focusing largely on North Carolina's internal deliberation processes, with some consideration—to the extent it is helpful—of a few other states' processes. A comprehensive discussion of this topic may require significant empirical work that would be beyond the scope of an Essay. By focusing on North Carolina and offering a detailed assessment of how its processes might shape its constitutional doctrine, your Essay would identify this as an area deserving of greater empirical attention in future scholarship.

Finally I want to suggest that just as international civil and human rights frameworks are informed by the various constitutions of nations around the world, our justice system can benefit from the wealth of opportunities throughout the states to examine how fundamental rights are interpreted and upheld in different states. I think this happens when advocates are willing to go the extra mile in their briefing

to point out how other states address constitutional rights and when academics create a climate that encourages jurists to look not only back in time to historical understandings of what constitutional guarantees mean but also across the country to how other courts interpret those guarantees.

I would hope to keep this essay grounded in specific examples and with a perspective of how this impacts people's lives, communities as a whole, and ultimately the strength of our democracy.