IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
No. 1:23-cv-00734-WO-JEP

| | |
|---|---|
| ANITA S. EARLS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) **PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| NORTH CAROLINA JUDICIAL STANDARDS COMMISSION *et al.*, | ) ) ) |
| Defendants. | ) ) |

## INTRODUCTION

Plaintiff Anita S. Earls ("Earls") seeks a *preliminary* injunction to stop Defendants (collectively, "Commission") from further efforts to investigate, punish, and otherwise prevent her from exercising her core First Amendment right to speak and inform voters about matters of public concern. The purpose of this preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (citation omitted). In that way, the proposed injunction fulfills its "traditional office," which "is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment." *Id.* (citation omitted). By granting the preliminary injunction, the Court will remove the threat of the Commission's ongoing investigation and potential punishment until the merits of this action can be fully considered by the Court.

# ARGUMENT

## I. Justice Earls Is Likely to Succeed on the Merits.

### A. *Younger* Abstention Is Inappropriate.

Relying on its Motion to Dismiss Brief, (*see* MTD Br. at 10–21, ECF No. 21), the Commission contends that Earls is unlikely to succeed on the merits because "*Younger* abstention requires the Court to dismiss this case," (PI Opp'n at 7, ECF No. 22). Earls explains in Response to that Motion why *Younger* abstention is inappropriate: (1) the Commission's investigation fits none of the three *Younger* categories; (2) the investigation is at a preliminary stage; and (3) "extraordinary circumstances" – including the Commission's issuance of an anti-speech warning and effort to reopen a dismissed investigation – merit declining *Younger* abstention. (MTD Opp'n at 8–16, ECF No. 27.) The presence of extraordinary circumstances is confirmed by the testimony of former Commission Chair Wanda G. Bryant, who declares that issuance of a "warning" to a judge after dismissal of an investigation would "be highly irregular and contrary to both the Rules and practice of the Commission, particularly if the 'warning' sought to circumscribe the judge's political speech," (Bryant Decl. ¶ 29, ECF No. 28-1), and that "[a]ny purported 'reopening' of an investigation previously dismissed by an investigative panel would be highly irregular and contrary to both the Rules and practice of the Commission," (*id.* ¶ 27).

### B. Justice Earls Has Shown a Likely First Amendment Violation.

#### 1. The Commission's Actions Implicate the First Amendment.

The Commission is wrong to claim that Earls lacks evidence that "the Commission's actions – here, initiating a confidential investigation – adversely affected her speech

2

Case 1:23-cv-00734-WO-JEP   Document 29   Filed 10/20/23   Page 2 of 13

rights." (PI Opp'n at 8.) As explained more fully in Earls' Motion to Dismiss Response, (*see* MTD Opp'n at 16–22), pre-enforcement review is appropriate when, as here, "the threatened enforcement [is] sufficiently imminent," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). The Commission has already told Earls that it has voted to "reopen" a dismissed investigation of her "based on an interview" she gave entitled *North Carolina Justice Anita Earls Opens Up About Diversity*. (August 2023 Notice ¶ 2, ECF No. 1-1.) Further, Earls presents ample evidence that the Commission's actions here are "likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011) (cleaned up).

Earls has already had to "divert significant time and resources" to the Commission's investigation, *Susan B. Anthony List*, 573 U.S. at 165, and she has given examples how the Commission's actions have chilled her speech, (*see* Earls Decl. ¶¶ 19–24, ECF No. 3-1). Earls also submits a Supplemental Declaration further explaining how the Commission's actions have caused her to be "constrained at all times to subject my public speech to internal scrutiny and self-censorship." (Supp. Earls Decl. ¶ 5, ECF No. 28-2.) Earls limited her planned contribution to the *Yale Law Review Forum*, (*id*. ¶ 6), declined to write an article for *Slate* expanding on the reasoning in her recent dissents, (*id*. ¶ 7), and engaged in self-censorship during a speaking engagement at the annual meeting of the Greensboro Bar Association, (*id*. ¶ 10; *see also* Seymour Decl. ¶¶ 4–5, ECF No. 28-3). This self-censorship has also "occurred at a Democratic Party event, at the law school class [Earls] teach[es] at the University of North Carolina, at a meeting with the Governor's Pages who came to learn about our court, and even at church." (Supp. Earls Decl. ¶ 12.) And it will limit what

3

she can say during her upcoming "keynote address at the Critical Legal Collective Inaugural Convening, a three-day conference at Duke Law School and its Center on Law, Race & Policy." (*Id.* ¶ 13.)

This lost speech is no ordinary contribution to public discourse. Earls has the opportunity to speak in all these forums because she has a uniquely valuable perspective on the North Carolina judiciary. Thus, the "state's interest in suppressing [a judge's] criticisms is much weaker" in the case of an elected judicial official. *Scott v. Flowers*, 910 F.2d 201, 211 (5th Cir. 1990). Yet the Commission's actions have silenced Earls and deprived the public – including the North Carolina voters – of her contributions to the marketplace of ideas. The Commission is wrong to say this loss does not "implicate the First Amendment." (PI Opp'n at 8.)

### 2. The Commission's Investigation Cannot Survive Strict Scrutiny.

The Commission does not dispute that "First Amendment protection for Plaintiff's speech is 'at its zenith'" or that "the Commission's actions therefore must be subjected to strict scrutiny." (PI Opp'n at 12.) The Commission thus bears the "very difficult burden," *Scott*, 910 F.2d at 212, of showing that this is "one of the rare cases in which a speech restriction withstands strict scrutiny," *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015).[1]

---

[1] The Commission's extensive reliance on *Williams-Yulee* for the proposition that its regulation of political speech can satisfy strict scrutiny, (*see* PI Opp'n at 7, 13, 15, 23), is particularly inapt since *Williams-Yulee* allowed only a restriction on judicial candidates' "personal solicitation of campaign funds," 575 U.S. at 441 – termed by the Court as only "a narrow slice of speech," *id.* at 452 – while explicitly holding that judicial candidates remained "free to discuss any issue with any person at any time," *id.* at 452.

4

The Commission tries to carry this burden by shifting the debate into an abstract discussion of judicial commissions and canons of conduct. This case and motion are not about those things; they are about the concrete, repeated actions the Commission has taken against Earls. The Commission's burden is to explain why those *actions* are "narrowly tailored to serve a compelling interest." *Williams-Yulee*, 575 U.S. at 444.

The Commission's asserted interest is in maintaining public confidence in judicial integrity. (PI Opp'n at 12.) This interest, the Commission says, is served by a rule that permits a judge "to publicly criticize another judge's decision-making process" but not to make an "*unsubstantiated* public allegation that a judge is 'acting out of racial, gender, and/or political bias,' or any other improper basis, in that process." (*Id*. at 14.) The Commission claims that its investigation is "precisely tailored" to "determine whether that conduct occurred here." (*Id*.)

This argument suffers from two related flaws. First, the Commission's actions against Earls do not further its asserted interest in protecting the "decision-making process." Earls never suggested in the Law360 Interview that any judge acted out of racial, gender, or political bias in any decision. The Commission does not actually dispute this point; it says that "some" of Earls' remarks "might be read to accuse Supreme Court colleagues of acting on the basis of certain racial, gender, or partisan biases," but the only action it references is "interruptions by colleagues during oral argument." (*Id*. at 5) There is thus a "dramatic mismatch" between the Commission's asserted interest and the steps it took allegedly to further that interest. *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2386 (2021). (*See also* Bryant Decl. ¶ 30 ("At no point does that interview

5

discuss any 'decision' in any case (or category of decisions) of any member of the Supreme Court.").)[2]

Second, the Commission emphasizes that its actions are intended to root out "unsubstantiated" allegations, but it fails to identify a single factual allegation that it believes deserves investigation or to explain how that investigation furthers its asserted interest in maintaining public confidence in judicial integrity. The Commission does not explain, for example, how the public interest is served by questioning Earls about the factual basis for her assertion that, when she is treated differently, "sometimes it's hard to separate out: Is this race or is this gender or is this because of my political views?" (PI Opp'n at 5 (quoting Interview at 4, ECF No. 1-2).) The only possible purpose for this inquiry is to discourage Earls from continuing to express her views or share her experience.

---

[2] Indeed, the Commission's assertions about comments concerning "allegiance . . . to ideology," (PI Opp'n at 5), and its desire to investigate Earls' speech for those comments is particularly problematic since those comments are simply a summary of debates conducted between the justices in their recent written opinions. *Compare Harper v. Hall*, 867 S.E.2d 554, 560 (N.C. 2022) (Newby, C.J., dissenting) ("In seeking to hide its partisan bias, the majority [including Earls] states that 'redistricting plans shall adhere to traditional neutral districting criteria and not subordinate them to partisan criteria.'"), *and Harper v. Hall*, 874 S.E.2d 902, 904–05 (N.C. 2022) (Barringer, J., dissenting) ("the majority's decision [including Earls'] today appears to reflect deeper partisan biases that have no place in a judiciary dedicated to the impartial administration of justice and the rule of law"), *with Holmes v. Moore*, 886 S.E.2d 120, 145 (N.C. 2023) (Morgan, J., joined by Earls, J., dissenting) ("my three distinguished colleagues . . . have not been reticent about the notion of introducing partisan politics into this Court's opinions," and now "joined by two more justices who subscribe to the trio's identical politically saturated legal philosophies . . . the five justices which constitute the majority here have emboldened themselves to infuse partisan politics brazenly into the outcome of the present case" in an "abrupt departure from this Court's institutionalized stature"). The prospect of investigating and potentially disciplining a judge for restating in the press a proposition found in a written opinion is self-evidently outside anything that could survive strict scrutiny.

6

Earls' discussion in the Interview about the "lack of diversity on the state's appellate bench and among advocates who argue before her court," (Interview at 1), is the type of high-value public discourse that increases public confidence in the judiciary. *See, e.g.*, *Scott*, 910 F.2d at 213. It is also consistent with Canon 4, "which explicitly permits a judge to engage in activities concerning legal, economic, educational, or governmental system, or the administration of justice." (Bryant Decl. ¶ 23.) The Commission's efforts to investigate Earls for giving that Interview have the opposite effect: they inhibit public debate and undermine the perception of our court system. *See, e.g.*, *Bridges v. California*, 314 U.S. 252, 270 (1941).

### 3. Justice Earls Is Likely to Succeed on Her Vagueness Claim.

The Commission told Earls that her speech "potentially violates Canon 2A of the Code of Judicial Conduct which requires a judge to conduct herself 'at all times in a manner which promotes public confidence in the integrity and impartiality of the judiciary.'" (August 2023 Notice ¶ 2.) As applied to Earls' speech, that Canon is unconstitutionally vague because it "fails to give a person of ordinary intelligence adequate notice of what conduct is prohibited [and] lacks sufficient standards to prevent arbitrary and discriminatory enforcement." *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023) (cleaned up). "These twin concerns of inadequate notice and arbitrary or discriminatory enforcement are especially pronounced when a regulation implicates speech because ambiguity inevitably leads citizens to steer far wider of the unlawful zone than if the boundaries were clearly marked, thereby chilling protected speech." *Edgar v. Haines*, 2 F.4th 298, 316 (4th Cir. 2021) (cleaned up).

The Commission's actions here illustrate the point. While Earls believes that speaking about diversity in the judiciary *increases* confidence in its integrity and impartiality, the members of the Commission who "voted to reopen this investigation" in response to that speech apparently hold the opposite view. (August 2023 Notice ¶ 2.) The Commission's attempt to police that boundary, however, were rejected in a seminal case on judicial discipline overstepping First Amendment bounds. *See Scott*, 910 F.2d at 213 (holding that the interests of promotion of an efficient and impartial judiciary "are ill served by casting a cloak of secrecy around the operations of the courts").

The severity of the vagueness problem is also underscored by the Commission's contentions that any "uncertain[ty] about how Canon 2A, or any other Canon, might apply to particular public comments or in particular contexts" can be remedied through the issuance of "advisory opinions" that provide "a safe harbor against investigation or any sanction." (PI Opp'n at 17–18). The Fourth Circuit, in *Telco Communications, Inc. v. Carbaugh*, 885 F.2d 1225 (4th Cir. 1989) (Wilkinson, J.), rejected a similar review regime – in that case for charitable solicitations – on the grounds that it represented "an unconstitutional prior restraint," *id*. at 1233. In so ruling, the court held that "[p]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights," *id*. (alteration in original) (quoting *Nebraska Press Ass'n. v. Stuart,* 427 U.S. 539, 559 (1976)), because, while a sanctions threat "chills speech," a "prior restraint freezes it at least for the time," *id*. (cleaned up).

The *Telco* court ruled that the state failed to carry the "heavy presumption against [the restraint's] constitutional validity." 885 F.2d at 1233 (quoting *Bantam Books, Inc. v.*

8

*Sullivan*, 372 U.S. 58, 70 (1963)). The Fourth Circuit would not accept that the state could negotiate the "thin line between reviewing a script for misrepresentations" – the cognate here would be the Commission's reviewing a proposed statement on a matter of public interest to determine whether it is "substantiated" – and "reviewing it for content." *Id*. The vagueness infirmities identified by the Fourth Circuit are also present here:

- the statute "provides no guidelines for [Office of Consumer Affairs] review and thus permits OCA officials to recast solicitation scripts so as to reflect their judgment";

- without such guidelines, "unpopular or controversial organizations may be subject to stricter scrutiny"; and

- the statutory regime "might dissuade some organizations from soliciting in Virginia . . . and discourage others from submitting scripts which, although accurate, may risk the displeasure of state officials."

*Id*. None of the assurances offered by Virginia for the constitutionality of its regime persuaded the court that "bureaucratic review of solicitation scripts is not rife with the potential for abuse." *Id*. Instead, the regulator's authority "provide[d] him substantial leverage" over the content of the speech reviewed. *Id*. The court was also unpersuaded by the state's contention that the regulator could only request alteration to the scripts, because "the practical effect of such a 'request' is likely to go beyond persuasion." *Id*.

The same vagueness problems present in *Telco* doom the Commission's attempts to voluntarily regulate speech here. To begin, unlike charitable solicitations (speech though it is), Earls' speech is "core political speech" for which the First Amendment's protection is "at its zenith." *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 186–87 (1999). And there no guidelines provided in the Canons for when speech crosses some line and

impermissibly undermines public confidence in the integrity and impartiality of the judiciary. Even worse, the guidance the Commission does provide is in the form of "informal advisory opinions," issued in secret to inquiring judges on a one-off basis. *See* Commission Rule 8(b) ("[a] judge subject to the jurisdiction of the Commission may seek a confidential informal advisory opinion").

That fact that the process is confidential opens the prospect that the guidance provided to different judges may be contradictory and, as concerned the court in *Telco*, might lead to "stricter scrutiny" of "unpopular or controversial" judges. *See* 885 F.2d at 1233. All in all, the Commission's informal advisory opinions, far from being a First Amendment panacea, are likely to "dissuade" judges from speaking altogether so that they do not "risk the displeasure" of the Commission. In Earls' case, the Commission's first investigation culminated in an *ultra vires* "warning" to "be mindful of [her] public comments," (August 2023 Notice ¶ 1), even though the Commission found no violation. And now she faces yet another investigation of her speech because the Commission is apparently unsatisfied that she heeded that warning.

## II. Justice Earls Has Established Irreparable Harm.

All agree that "the unconstitutional abridgement of protected speech is irreparable harm." (PI Opp'n at 20.) Earls' showing above (in Part I.B) of a likely First Amendment violation thus establishes irreparable harm. And that showing is far from "vague." (PI Opp'n at 21.) Across two declarations, Earls details how the Commission's actions have already chilled her speech and continue to limit her contributions to public debate. (*See* Earls Decl. ¶¶ 19–24; Supp. Earls Decl. ¶¶ 3–13.)

While these First Amendment violations are significant, the Commission is wrong to argue that the Court must consider whether they are "great and immediate.'" (PI Opp'n at 21 (quoting *Younger*, 401 U.S. at 46).) That higher bar is an *exception* to *Younger* abstention; it applies only if the state court proceeding "falls under the three types of proceedings that warrant *Younger* abstention" and the "*Middlesex* factors" are satisfied. *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 96 (4th Cir. 2022). That exception does not alter the standard for issuing an injunction when, as here, there is no pending action fitting any of the three *Younger* categories and abstention would be unjustified in any event.

### III. Justice Earls Has Established That the Balance of Equities and Public Interest Favor the Protection of Her First Amendment Rights.

Earls' showing of a likely constitutional violation establishes the final two injunction factors, since "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional" and "the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc) (cleaned up). In arguing otherwise, the Commission repeats its arguments under *Younger* and on the merits but offers no independent basis to deny a preliminary injunction. (PI Opp'n at 22–23.)

## CONCLUSION

The Court should grant the Motion for Preliminary Injunction.

This the 20th day of October, 2023.

By: /s/ Pressly M. Millen
Pressly M. Millen
State Bar No. 16178
Raymond M. Bennett
State Bar No. 36341
Samuel B. Hartzell
State Bar No. 49256

OF COUNSEL:

WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601
(919) 755-2100

Attorneys for Plaintiff
Anita S. Earls

## CERTIFICATION OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), I hereby certify that this memorandum, including headings and footnotes, contains fewer than 3,125 based on the word count feature of Microsoft Word, and therefore complies with the Rule.

Dated: October 20, 2023                                         /s/ Pressly M. Millen