IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ANITA S. EARLS,                    )
                                   )
          Plaintiff,               )
                                   )
     v.                            )         1:23-cv-734
                                   )
NORTH CAROLINA JUDICIAL            )
STANDARDS COMMISSION, et al.,      )
                                   )
          Defendants.              )


**<u>AMENDED MEMORANDUM OPINION AND ORDER</u>**

**OSTEEN, JR., District Judge**

    Before this court is a Motion for Preliminary Injunction,
(Doc. 3), filed by Plaintiff, Justice Anita S. Earls. Plaintiff
alleges that the Defendant North Carolina Judicial Standards
Commission's investigation into comments Plaintiff made about
her North Carolina Supreme Court colleagues unconstitutionally
infringes upon her First Amendment rights. Plaintiff asserts
that her speech has been chilled in several instances when she
declined opportunities to speak on topics of diversity and
equity since the Commission's investigation commenced.

    Defendants, the North Carolina Judicial Standards
Commission and its members, argue that the <u>Younger</u> doctrine
applies, and this court should abstain from interfering with the

---

\* Amended to correct typographical error in footnote 14
  on page 34.

investigation. Defendants argue in the alternative that the investigation is narrowly tailored to serve the compelling state interest of maintaining public confidence in the integrity and impartiality of the judiciary.

This court finds, for purposes of this motion only at present, that Younger abstention applies at least to preclude entry of the preliminary injunction. In the alternative, this court finds the motion should be denied because the Commission likely satisfies strict scrutiny.

I.    **FACTUAL BACKGROUND**

Justice Anita S. Earls ("Plaintiff") was elected to serve as an Associate Justice of the North Carolina Supreme Court in 2018. (Mem. of L. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Br.") (Doc. 4) at 2.)[1] She will seek reelection in 2026. (Id.) The North Carolina Judicial Standards Commission ("the Commission") is a non-partisan arm of the State of North Carolina tasked with investigating and resolving inquiries concerning the conduct of judges and justices in North Carolina. N.C. Gen. Stat. § 7A-374.1. These inquiries are based on potential violations of the North Carolina Code of Judicial

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

- 2 -

Conduct ("the Code"). N.C. Gen. Stat. § 7A-376(a). The Commission also routinely issues advisory opinions explaining the Code and how judges can conform to it. See N.C. Gen. Stat. § 7A-377(c); see also Rules of the N.C. Jud. Standards Comm'n, Rule 8. Most of these advisory opinions are issued confidentially to the judge who requested them, but some are published and available for review by any judge. See Rules of the N.C. Jud. Standards Comm'n, Rule 6(a), Rule 8(a)(3).

The Commission consists of:

(1) Two Court of Appeals judges, each appointed by the Chief Justice of the Supreme Court;

(2) Two superior court judges, each appointed by the Chief Justice of the Supreme Court;

(3) Two district court judges, each appointed by the Chief Justice of the Supreme Court;

(4) Four judges appointed by the North Carolina General Assembly (one district court and one superior court judge recommended by the President Pro Tempore of the Senate, and one district court and one superior court judge recommended by the Speaker of the House of Representatives); and

(5) Four citizens "who are not judges, active or retired, two appointed by the Governor, and two appointed by

- 3 -

the General Assembly . . ., one upon recommendation of
the President Pro Tempore of the Senate and one upon
recommendation of the Speaker of the House of
Representatives."

N.C. Gen. Stat. § 7A-375; 2023 N.C. Sess. Laws 2023-134
16.20.(a).

The Commission is not authorized to take action for
violations of the Code beyond issuing a confidential letter of
caution to a judge found by the Commission to be in violation of
the Code. N.C. Gen. Stat. § 7A-377(a3). However, the Commission
can recommend that the North Carolina Supreme Court issue more
serious public action, ranging from reprimands and censures to
suspension or removal from the bench. §§ 7A-377(a5); 7A-376(a).
Commission investigations are entirely confidential, unless that
confidentiality is waived by the judge who is subject to
investigation. § 7A-377(a1). Unless confidentiality is waived,
the fact that a judge was investigated by the Commission, and
subsequently found to be in violation of the Code, would only be
made public if the North Carolina Supreme Court determined that
a public form of discipline was appropriate. §§ 7A-377(a5),
(a6). Plaintiff waived her right to confidentiality in pursuit
of filing this action.

## A. **Plaintiff's Statements at Issue**

Plaintiff addressed potential implicit bias and a lack of diversity in the North Carolina appellate courts in a Law360 interview published this past June ("the Interview"). (See Ex. B, ("Interview") (Doc. 1-2).) In the Interview, Plaintiff made a variety of comments about the North Carolina Supreme Court's administrative operations relating to diversity. (See id. at 2–3.) She noted the lack of any Black law clerks to the Supreme Court justices, and the current Chief Justice's decisions to do away with implicit bias training for judges and dissolve a committee previously established to examine equity and diversity issues in the North Carolina courts. (See id.) In the same Interview, Plaintiff also stated her opinion that litigants predominantly select white male advocates to argue before the Supreme Court on their behalf because the Supreme Court itself is predominantly white and male, and that she often feels treated differently on account of her race, gender, or political party. (Id. at 3, 5.) These and other comments similarly related to the courts' operations do not appear to be

the subject of the Commission's investigation.[2] (See Ex. A, ("Aug. Letter") (Doc. 1-1) at 2 ("The Commission voted to reopen this investigation based on an interview you since gave to the media in which you appear to allege that your Supreme Court

_____

[2] Two amicus briefs have been filed with and reviewed by this court. (Docs. 24-1, 26-1.) Both briefs address at length matters of implicit bias and related comments made by Plaintiff that do not appear to be identified as concerns in the Commission's investigation, so the analysis with respect to those comments is not helpful. (See generally id.) The amicus brief filed by Civil Rights organizations, (Doc. 26-1), does briefly address the comment primarily at issue here, alleging allegiance to ideology over the institution, arguing "it is clear that the comment concerns the administrative decision to disband the [Commission on Fairness and Equity], not the justices' decisions on the cases before them." (Doc. 26-1 at 21.) While an investigation or discovery may lead to facts which support that conclusion, at this point there are no facts in the record to support it. During oral argument, counsel for both sides were asked about the meaning of Plaintiff's statement that some of her colleagues' "allegiance is to the ideology, not to the institution." Neither proffered a potential meaning consistent with that set forth in the amicus briefs. Even if the statement is construed as limited to criticism of disbanding the Commission on Fairness and Equity, (see Doc. 26-1 at 6), or some other administrative act, Canon 2 requires a judge to "respect and comply with the law," "conduct himself/herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary," and "not allow the judge's family, social or other relationships to influence the judge's judicial conduct or judgment." N.C. Code of Jud. Conduct, Canon 2. Plaintiff and other justices have interpreted the Canons to recognize the impropriety of creating a perception that judicial duties do not take priority over personal commitments. See In re Smith, 372 N.C. 123, 127–28, 827 S.E.2d 516, 519 (N.C. 2019) (The respondent sometimes openly "announce[d] that she was adjourning court early for personal appointments" which "created a perception that her judicial duties did not take precedence over her personal commitments.").

colleagues are acting out of racial, gender, and/or political bias in some of their decision-making.").)

Alongside these comments and criticisms, Plaintiff's Interview contains certain statements that may reasonably be understood as criticisms directed toward her colleagues on the bench and their political affiliations. Specifically, Plaintiff stated that "[t]he new members of our court very much see themselves as a conservative bloc. They talk about themselves as 'the conservatives.' Their allegiance is to the ideology, not to the institution." (Interview (Doc. 1-2) at 3 (emphasis added).) Neither Plaintiff nor the Commission has offered any explanation of the meaning behind Plaintiff's statements by affidavit or pleading. The parties offered thoughts during oral argument, but at this stage of the proceedings the intended meaning is not certain. It appears to this court, particularly when considering the larger context of other statements made in the Interview and the Interview's topics, that Plaintiff's statements at issue could be reasonably interpreted as an accusation that Plaintiff's "conservative bloc" colleagues unethically

prioritize their conservative political principles in some
decisions, either administrative, judicial, or both.[3]

## B. Commission Investigation

In August 2023, the Commission issued Plaintiff a letter
informing her that she is subject to an investigation for her
potential violation of Canons 2A and 3A(1) on the basis of the
statements she made in the Interview. (Aug. Letter (Doc. 1-1) at
2.) The Commission informed Plaintiff of its belief that her
comments in the Interview "appear to allege that your Supreme
Court colleagues are acting out of racial, gender, and/or
political bias in their decision-making." (Id. at 2.) The
Commission further informed Plaintiff that "a judge should not
publicly suggest that another judge before whom litigants are
appearing is making decisions based on some improper basis,
unless the criticizing judge knows this to be the case." (Id.)
According to the Commission, Plaintiff's statements may have
violated the Code because "publicly alleging that another judge
makes decisions based on a motivation not allowed under the
Canons without some quantum of definitive proof runs contrary to
a judge's duty to promote public confidence in the impartiality

_____

[3] The Code requires that "[t]he judicial duties of a judge
take precedence over all the judge's other activities," N.C.
Code of Jud. Conduct Canon 3, and judicial duties include both
administrative and judicial decisions.

- 8 -

of the judiciary." (Id. at 3 (emphasis added).) The Commission's letter informed Plaintiff that at any time during the investigation, she is "entitled to a reasonable opportunity to present any relevant information regarding this matter," including "any documents, statements, or other information." (Id.)

A Commission investigation can be opened in one of two ways: "[any] citizen of the State may file a written complaint . . . concerning the qualifications or conduct of any justice or judge . . . and thereupon the Commission shall make such investigation as it deems necessary. The Commission may also make an investigation on its own motion."[4] N.C. Gen. Stat. § 7A-377(a). If the Commission determines during its investigation that "a letter of caution is appropriate, it shall issue to the judge a [confidential] letter of caution in lieu of any further proceeding in the matter."[5] N.C. Gen. Stat. § 7A-377(a3). On the other hand, the Commission may determine during its investigation that a judge's conduct warrants "disciplinary

---

[4] In this case, it appears that the Commission voted to open an investigation into Plaintiff of its own volition. (See Doc. 1-1 at 2.)

[5] A letter of caution is appropriate "upon a determination that any judge has engaged in conduct that violates the North Carolina Code of Judicial Conduct as adopted by the Supreme Court but that is not of such a nature as would warrant a recommendation of public reprimand, censure, suspension, or removal." N.C. Gen. Stat. § 7A-376(a).

proceedings," in which case "the notice and statement of charges filed by the Commission, along with the answer and all other pleadings, remain confidential. Disciplinary hearings ordered by the Commission are confidential, and recommendations of the Commission to the Supreme Court, along with the record filed in support of such recommendations are confidential." N.C. Gen. Stat. § 7A-377(a5).

Once a disciplinary hearing has been conducted, "[a]t least five members of the Commission must concur in any recommendation to issue a public reprimand, censure, suspend, or remove any judge." N.C. Gen. Stat. § 7A-377(a5). Importantly, "[n]o justice or judge shall be recommended for public reprimand, censure, suspension, or removal unless [she] has been given a hearing affording due process of law." N.C. Gen. Stat. 7A-377(a). This disciplinary recommendation is then referred to the North Carolina Supreme Court, before whom the judge "is also entitled to present a brief and to argue [her] case, in person and through counsel." N.C. Gen. Stat. § 7A-377(a5).

The North Carolina Supreme Court reviews the Commission's findings of fact and conclusions of law.[6] See, e.g., In re Badgett, 362 N.C. 202, 207, 657 S.E.2d 346, 349 (2008) ("[I]n reviewing the Commissions' recommendations, this Court must first determine if the Commission's findings of fact are adequately supported by clear and convincing evidence, and in turn, whether those findings support its conclusions of law.").

---

[6] In a declaration filed on behalf of Plaintiff, Judge Wanda Bryant, former judge on the North Carolina Court of Appeals and former chair of the Commission, asserts that "by statute, the Commission's powers are 'limited to reviewing judicial conduct, not matters of law,'" therefore "the Commission is prohibited from considering, for example, constitutional challenges to its authority." (Doc. 28-1 ¶ 17.) She does not cite authority for this assertion other than the plain language of N.C. Gen. Stat. § 7A-377(a). Despite this assertion, it is clear to this court, based upon the North Carolina Supreme Court's review of Commission investigations, that the Commission routinely makes "conclusions of law" and, when the issue is raised by a respondent judge, considers the constitutionality of, inter alia, its authority. See, e.g., Matter of Edens, 290 N.C. 299, 305, 226 S.E.2d 5, 9 (1976); In re Nowell, 293 N.C. 235, 242, 237 S.E.2d 246, 251 (1977); In re Hardy, 294 N.C. 90, 94, 240 S.E.2d 367, 371 (1978); In re Greene, 328 N.C. 639, 648, 403 S.E.2d 257, 262 (1991); In re Hayes, 353 N.C. 511, 514, 546 S.E.2d 376, 378 (2001); In re Hayes, 356 N.C. 389, 400-01, 584 S.E.2d 260, 267-68 (2002). It appears to this court that, considered in context, this statutory language is likely intended to clarify that the Commission's duty is to investigate judges themselves, not review judicial decisions made or opinions published by judges. See N.C. Gen. Stat. § 7A-377(a) ("The Commission shall not make an investigation . . . when the motion or complaint is based substantially on a legal ruling by a district of superior court judge and the legal ruling has not yet been reviewed and rule on by either the North Carolina Court of Appeals or the North Carolina Supreme Court. The Commission is limited to reviewing judicial conduct, not matters of law.").

In its review, it "acts as a court of original jurisdiction rather than as an appellate court." In re Pool, 377 N.C. 442, 451, 858 S.E.2d 771, 776 (2021). In this capacity, the North Carolina Supreme Court "is not bound by the Commission's recommendations;" rather, it "must independently determine what, if any, disciplinary measures to impose on [the] respondent [judge]." Pool, 377 N.C. at 451, 858 S.E.2d at 777. "In reviewing the Commission's recommendations, [the North Carolina Supreme] Court must first determine if the Commission's findings of fact are adequately supported by clear and convincing evidence, and in turn, whether those findings support its conclusions of law." Id. "The Supreme Court may approve [the Commission's] recommendation, remand for further proceedings, or reject the recommendation."[7] N.C. Gen. Stat. § 7A-377(a5); see also In re Hartsfield, 365 N.C. 418, 428—29, 722 S.E.2d 496, 503 (2012). "A majority of the members of the Supreme Court must

_____

[7] "Upon recommendation of the Commission, the Supreme Court may issue a public reprimand, censure, suspend, or remove any judge for willful misconduct in office, willful and persistent failure to perform the judge's duties, habitual intemperance, conviction of a crime involving moral turpitude, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute." N.C. Gen. Stat. § 7A-376(b).

- 12 -

concur in any order of public reprimand, censure, suspension, or removal."[8] N.C. Gen. Stat. § 7A-377(a5).

"Upon issuance of a public reprimand, censure, suspension, or removal by the Supreme Court, the notice and statement of charges filed by the Commission along with the answer and all other pleadings, and recommendations of the Commission to the Supreme Court along with the record filed in support of such recommendations, are no longer confidential." N.C. Gen. Stat. § 7A-377(a6). However, "[a]ll other documents and information relating to the complaint, investigation, and disciplinary . . . proceeding shall remain confidential." Rules of the N.C. Jud. Standards Comm'n, Rule 6(b)(1).

### C. **Plaintiff Alleges Her Speech Has Been Chilled**

Plaintiff provides several examples of ways in which her speech has been chilled, through self-censorship, since the Commission notified her of its investigation in August. Specifically, she states that she:

(1) Declined to write an article for Slate expanding on the reasoning in her recent dissents;

---

[8] "A justice of the Supreme Court . . . is disqualified from acting in any case in which [she] is a respondent." N.C. Gen. Stat. § 7A-377(a5).

(2)  Limited her planned contribution to the <u>Yale Law Review</u>
     <u>Forum</u> by deciding not to discuss the issue of the racial
     and gender composition of state courts;

(3)  Engaged in self-censorship during a speaking engagement
     at the annual meeting of the Greensboro Bar Association;

(4)  Refrained from speaking publicly at a meeting of the
     Equal Access to Justice Commission concerning a proposal
     to extend a court rule that broadens the pool of
     advocates available to indigent litigants;

(5)  Declined to provide her personal views on the merits of
     the aforementioned proposal when asked to do so in a
     private conversation with a person with a professional
     stake in the matter; and

(6)  Censored herself at a Democratic Party event, in the
     class she teaches at the University of North Carolina
     School of Law, at a meeting with the North Carolina
     Governor's Pages, and at church.

(Ex. 1 ("Pl.'s Decl.") (Doc. 3-1) at 7; (Pl.'s Reply in Supp. of
Mot. for Prelim. Inj. ("Pl.'s Reply") (Doc. 29) at 3–4.)
Plaintiff also alleges that her chilled speech and resulting
self-censorship due to the Commission's investigation will limit
what she can say during her upcoming keynote address at the
Critical Legal Collective Inaugural Convening, a conference at

- 14 -

Duke Law School's Center on Law, Race & Policy. (Ex. 2 ("Supp. Pl.'s Decl.") (Doc. 28-2) ¶ 13.)

## II.  **PROCEDURAL HISTORY**

The Commission notified Plaintiff of its investigation on August 15, 2023. (Aug. Letter (Doc. 1-1) at 2.) Plaintiff filed her Complaint, (Compl. for Declaratory Jud. and Inj. Relief) ("Compl." (Doc. 1)), her Motion for Preliminary Injunction, (Mot. for Prelim. Inj.) ("Pl.'s Mot.") (Doc. 3)), and a brief in support, (Pl.'s Br. (Doc. 4)), on August 29, 2023. The Commission filed a Motion to Dismiss Plaintiff's Complaint, (Mot. to Dismiss (Doc. 20)), a brief in support, (Br. in Supp. of Mot. to Dismiss ("Def.'s Br.") (Doc. 21)), and a response to Plaintiff's motion for preliminary injunction, (Br. in Opp. to Pl.'s Mot. for Prelim. Inj. ("Def.'s Resp.") (Doc. 22)), on October 6, 2023. Plaintiff replied, (Pl.'s Reply in Supp. of Mot. for Prelim. Inj. ("Pl.'s Reply") (Doc. 29)), responded to the Commission's motion to dismiss, (Pl.'s Resp. in Opp. to Def.'s Mot. to Dismiss ("Pl.'s Resp.") (Doc. 27)), and the Commission replied, (Reply in Supp. of Mot. to Dismiss ("Def.'s Reply") (Doc. 31)). Plaintiff's motion for preliminary injunction is now ripe for review.

## III. **<u>YOUNGER ABSTENTION</u>**

"The <u>Younger</u> abstention doctrine is an exception to the general rule that federal courts must decide cases within their jurisdiction." <u>Dawkins v. Staley</u>, No. 1:22-CV-299, 2023 WL 1069745, at *3 (M.D.N.C. Jan. 27, 2023) (citing <u>Younger v. Harris</u>, 401 U.S. 37 (1971); <u>Huffman v. Pursue, Ltd.</u>, 420 U.S. 592, 603–04 (1975)). "Federalism, a fundamental principle under our Constitution, requires that federal courts respect the sovereignty of their state counterparts" in certain circumstances. <u>Air Evac EMS, Inc. v. McVey</u>, 37 F.4th 89, 93 (4th Cir. 2022). Abstention under <u>Younger</u> is warranted when there is "(1) 'an ongoing state judicial proceeding, which (2) implicates important state interests, and (3) . . . provide[s] an adequate opportunity to raise [federal] challenges.'" <u>Sprint Commc'ns., Inc. v. Jacobs</u>, 571 U.S. 69, 81 (2013).

"The <u>Younger</u> inquiry proceeds in two steps." <u>Dawkins</u>, 2023 WL 1069745, at *3 (citing <u>Sprint</u>, 571 U.S. at 73; <u>Air Evac</u>, 37 F.4th at 96, n.2). The first step is determining whether the underlying state proceeding at issue is one of three types: (1) an "ongoing state criminal prosecution[];" (2) "certain 'civil enforcement proceedings' . . . 'akin to a criminal prosecution' in 'important respects;'" and (3) "pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the

- 16 -

state courts' ability to perform their judicial functions.'"
Sprint, 571 U.S. at 73, 78 (citation omitted) (internal
quotation marks omitted)). If the underlying state proceeding
fits into one of these three categories, the second step
requires that a federal court abstain under Younger "if there is
(1) an ongoing state judicial proceeding, instituted prior to
any substantial progress in the federal proceeding; that (2)
implicates important, substantial, or vital state interests; and
(3) provides an adequate opportunity for the plaintiff to raise
the federal constitutional claim advanced in the federal
lawsuit." Moore v. City of Asheville, 396 F.3d 385, 390 (4th
Cir. 2005) (quoting Nivens v. Gilchrist, 319 F.3d 151, 153 (4th
Cir. 2003).

### A. Civil Enforcement Proceeding Akin to a Criminal Prosecution

Supreme Court decisions "applying Younger to instances of
civil enforcement have generally concerned state proceedings
'akin to a criminal prosecution' in 'important respects.'"
Sprint, 571 U.S. at 79 (citing Huffman, 420 U.S. at 604;
Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S.
423, 432 (1982).) "Such enforcement actions are
characteristically initiated to sanction the federal plaintiff,
i.e., the party challenging the state action, for some wrongful
act. . . . In cases of this genre, a state actor is routinely a

party to the state proceeding and often initiates the action. . . . Investigations are commonly involved, often culminating in the filing of a formal complaint or charges." Id. at 79–80.

In Middlesex, which dealt with state-initiated disciplinary proceedings against an attorney for alleged violations of state ethics rules, the Supreme Court found that Younger abstention prevented interference with the state ethics committee's "pending investigation" because "an investigation and formal complaint preceded the hearing, an agency of the State's Supreme Court initiated the hearing, and the purpose of the hearing was to determine whether the lawyer should be disciplined for his failure to meet the State's standard of professional conduct." Sprint, 571 U.S. at 81. These factors,[9] according to the Court, indicated that the ethics committee's proceeding was "akin to a criminal prosecution" in important respects such that Younger barred the federal court's interference. Id.; see also Middlesex, 457 U.S. at 433—34.

Though a Commission proceeding is "neither criminal nor civil in nature," but is instead "an inquiry into the conduct of a judicial officer, the purpose of which is not primarily to

---

[9] In Sprint, the Court clarified that the Middlesex factors are "not dispositive," but are instead "additional factors appropriately considered" before invoking Younger in the "quasi-criminal context." Sprint, 571 U.S. at 81.

punish any individual but to maintain due and proper administration of justice in our State's courts, public confidence in its judicial system, and the honor and integrity of its judges," Matter of Crutchfield, 289 N.C. 597, 602, 223 S.E.2d 822, 825 (1975), this court does not find that the third Younger category, "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions," Sprint, 571 U.S. at 73, is applicable here. United States Supreme Court jurisprudence indicates that this category is intended to encapsulate proceedings through which the state "vindicates the regular operation of its judicial system," see Juidice v. Vail, 430 U.S. 327, 335 (1977) (applying Younger abstention to the state court's contempt process; Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 11–13 (1987) (applying Younger abstention to when "it is impossible to be certain that the governing Texas statutes and procedural rules" actually raise the constitutional claims at issue), while the "civil enforcement proceeding akin to a criminal prosecution in important respects" category is applicable to disciplinary proceedings against lawyers and judges like the proceeding here. See Middlesex, 457 U.S. 423 (1982). See also Brooks v. New Hampshire Supreme Court, 80 F.3d 633 (1st Cir. 1996); Spargo v. New York State Comm'n on Jud.

Conduct, 351 F.3d 65 (2d Cir. 2003); Coruzzi v. New Jersey, 705 F.2d 688 (3d Cir. 1983); Rickhoof v. Willing, 457 F. App'x 355 (5th Cir. 2012); Squire v. Coughlan, 469 F.3d 551 (6th Cir. 2006); Pincham v. Illinois Jud. Inquiry Bd., 872 F.2d 1341 (7th Cir. 1989); Gillette v. North Dakota Disciplinary Bd. Counsel, 610 F.3d 1045 (8th Cir. 2010); Hirsh v. Justices of Supreme Court of California, 67 F.3d 708 (9th Cir. 1995); Landrith v. Hazlett, 170 F. App'x 29 (10th Cir. 2006); Butler v. Ala. Jud. Inquiry Comm'n, 261 F.3d 1154 (11th Cir. 2001); Eisenberg v. W. Va. Off. of Disciplinary Counsel, "OLDC," 856 F. App'x 314 (D.C. Cir. 2021).

Here, the State proceeding is clearly not a state criminal prosecution. The Commission's investigation into Plaintiff's speech is an ongoing state civil enforcement proceeding that is akin to a criminal prosecution in the ways described above. The Commission's investigation was undertaken to determine whether Plaintiff's Interview statements violated the Code, which could lead to Plaintiff being sanctioned. The State of North Carolina initiated the action by way of the Commission, and the proceeding currently consists of an investigation to determine whether Plaintiff's statements violated the Code and, if so, what action if any is necessary.

**B. Important State Interests**

The state proceeding also involves the "vital state interest in safeguarding public confidence in the fairness and integrity of the nation's elected judges." Williams-Yulee v. Florida Bar, 575 U.S. 433, 445 (2015) (internal quotations omitted). "The importance of the state interest may be demonstrated by the fact that the noncriminal proceedings bear a close relationship to proceedings criminal in nature." Middlesex, 457 U.S. at 432. Accordingly, the Commission's investigation, like the proceedings at issue in Middlesex, is an ongoing state judicial proceeding involving an important state interest, specifically, enforcing the Code and maintaining the integrity of the judiciary, for purposes of Younger abstention.

**C. Adequate Opportunity to Raise Constitutional Challenges**

Even if a federal plaintiff seeks to enjoin an ongoing state judicial proceeding involving important state interests, Younger abstention is only appropriate if "the constitutional claims of [the federal plaintiff] can be determined in the state proceedings and . . . there is no showing of bad faith, harassment, or some other extraordinary circumstance that would make abstention inappropriate." Middlesex, 457 U.S. at 435. When evaluating whether an ongoing state judicial proceeding is entitled to Younger abstention, "[m]inimal respect for the state

- 21 -

processes, . . . precludes any presumption that the state courts will not safeguard federal constitutional rights." Middlesex, 457 U.S. at 431. Accordingly, "[w]here vital state interests are involved, a federal court should abstain 'unless state law clearly bars the interposition of the constitutional claims'" a federal plaintiff seeks to raise. Id. at 432 (quoting Moore v. Sims, 442 U.S. 415, 426 (1979). Thus, the "pertinent inquiry is whether the state proceedings afford an adequate opportunity to raise the constitutional claims . . . ." Moore, 442 U.S. at 430.

Plaintiff has not demonstrated that "state law clearly bars the interposition of [her] constitutional claims" such that Younger abstention is inappropriate here. Moore, 442 U.S. at 426. Rather, the parties do not seriously dispute that "the Commission's proceeding offers Plaintiff adequate opportunity to raise her First Amendment challenges." (Def.'s Br. (Doc. 21) at 11; see also N.C. Gen. Stat. § 7A-377(a) (The Commission may issue process to compel the attendance of witnesses and the production of evidence, to administer oaths, and to punish for contempt. No justice or judge shall be recommended for public reprimand, censure, suspension, or removal unless he has been given a hearing affording due process of law.").) Further, if the Commission eventually determines Plaintiff's speech warrants more than a private censure, any disciplinary measure

- 22 -

implemented against Plaintiff by the North Carolina Supreme Court is subject to direct review by the Supreme Court of the United States. See, e.g., Nevada Comm'n on Ethics v. Carrigan, 564 U.S. 117 (2011) (holding that "[t]he Nevada Ethics in Government Law is not unconstitutionally overbroad."); Williams-Yulee, 575 U.S. at 455 ("[B]ecause Canon 7C(1) is narrowly tailored to serve a compelling government interest, the First Amendment poses no obstacle to its enforcement in this case."). This ensures that Plaintiff's First Amendment challenges to the investigation and to Canon 2A can be addressed without the involvement of this court.

In the alternative, Plaintiff argues that extraordinary circumstances exist which require this court to ignore the Younger abstention mandate. Plaintiff asserts that the Commission has subjected her to "two rarely invoked formal

ethics investigations,"[10] (Pl.'s Resp. (Doc. 27) at 1), and that

"the alleged procedural irregularities here are rife," (id. at

15). These alleged irregularities include the fact that the

Commission has "twice within six months made formal

investigations into [Plaintiff] regarding her speech," "has

singled [her] out," and "took the unprecedented step of

providing her with a 'verbal warning' to be careful about her

speech" at the close of its first investigation. (Id. at 15.)

    "[T]he path to extraordinary circumstances is exceedingly

narrow." Air Evac, 37 F.4th at 100. "While [the Fourt Circuit

has] not provided a definitive or exhaustive set of criteria as

to what constitutes an extraordinary circumstance, [its] prior

decisions suggest there must be actual impediments to the

---

[10] In March 2023, the Commission investigated Plaintiff for certain public comments "concerning matters being currently deliberated in conference by the Supreme Court." (Ex. C ("March Letter") (Doc. 1-3) at 2.) The complaint against Plaintiff that led to that investigation was ultimately dismissed, and Plaintiff was given a "verbal reminder to be mindful of [her] public comments in light of the language of Canon 2A." (August Letter (Doc. 1-1) at 2.) Rather than a formally-issued private letter of caution, the sole disciplinary measure the Commission is permitted to issue, this "verbal warning" consisted only of the Commission voting to "ask[] [Plaintiff's] counsel to remind [Plaintiff] 'of the language in Canon 2(A).'" (Pinkham Decl. (Doc. 23) ¶ 23; August Letter (Doc. 1-1) at 1.) This circumstance does not indicate extraordinary circumstances or bad faith. Even if not a Code violation, an allegation that Plaintiff disclosed conference deliberations is sufficiently problematic that a resulting investigation is not facially baseless. The basis and substance of the investigations is more telling than their repetition.

- 24 -

state's ability to address the federal issues." Id. Such "extraordinary circumstances" in Fourth Circuit jurisprudence have primarily consisted of "explicit" Congressional intent "manifested in a federal statute that provided a 'clear exception to the principles of comity.'" Id. at 99–100 (quoting Richmond, Fredericksburg & Potomac R. Co. v. Forst, 4 F.3d 244, 251 (4th Cir. 1993)). Plaintiff only presents unsupported, conclusory allegations that the Commission is not following procedure, and those allegations do not demonstrate a likelihood of any irregularity in the Commission's actions. Plaintiff relies on the declaration of Judge Wanda Bryant, (Ex. 1 ("Bryant Decl.") (Doc. 28-1), former judge of the North Carolina Court of Appeals and former Chair of the North Carolina Judicial Standards Commission. (See Doc. 29 at 2.) Judge Bryant's allegations regarding the "warning" by counsel for the Commission, (Bryant Decl. (Doc. 28-1) ¶ 29), and the purported "re-opening" of the investigation, (id. ¶ 26-27), are not persuasive at this juncture. Judge Bryant does state that complaints about commentary on the administration of justice would be "summarily dismissed as not falling into any category warranting discipline under the Code." (Id. ¶ 23). However, Judge Bryant does not explicitly address Plaintiff's comment about her colleagues, their ideology, and the potential

- 25 -

implication that they elevate their political ideology over the institution of the judiciary. Accordingly, Plaintiff's allegations are not sufficient to meet the "exceedingly narrow" exception to the Younger doctrine for extraordinary circumstances, and the Younger doctrine requires that this court abstain from interfering with the Commission's proceeding at this stage.[11]

## IV.   PRELIMINARY INJUNCTION

Alternatively, if Younger abstention does not apply, this court would deny Plaintiff's motion for a preliminary injunction on the merits. "A plaintiff seeking a preliminary injunction must establish" four prongs: "that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "Courts considering whether to impose preliminary injunctions must separately consider each Winter factor." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir.

---

[11] This finding should be viewed as it appears "likely" that Younger applies, sufficient to support a finding that Plaintiff has not established a likelihood of success on the merits. Younger will be addressed fully in a ruling on the motion to dismiss.

2017). A preliminary injunction "is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." Id. The moving party bears the burden of "clearly establish[ing] entitlement to the relief sought." Id.

Here, Plaintiff does not meet her burden of establishing that all four Winter factors favor a preliminary injunction. [12]

## A. Likelihood of Irreparable Harm

A plaintiff seeking a preliminary injunction must "make a clear showing that [she] is likely to be irreparably harmed absent preliminary relief." Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 347 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010). "The plaintiff must demonstrate a likelihood of irreparable harm without a preliminary injunction; a mere possibility of harm will not suffice." Williams v. Rigg, 458 F. Supp. 3d 468, 474 (W.D. Va. 2020).

---

[12] Because this court is denying the motion for preliminary injunction on the issue of whether Plaintiff has established a likelihood of success on the merits, this court is not addressing the remaining Winter factors. However, this court finds here that if Plaintiff demonstrates a potential First Amendment violation, that is sufficient to establish a likelihood of irreparable harm. The balancing of the equities is a closer question, given Plaintiff's interest and the State's interests as will be identified herein. This court would likely find the State's interest in conducting its investigation outweighs Plaintiff's interest in enjoining the investigation.

Here, Plaintiff alleges that, since she received notice of the investigation, whenever she considers speaking, "whether in public, private, or even judicial opinions — she must consider the possibility that the Commission will seek to punish her for exercising her First Amendment Rights." (Pl.'s Br. (Doc. 4) at 20–21.) "Across two declarations," Plaintiff provides several examples of ways in which "the Commission's actions have already chilled her speech and continue to limit her contributions to public debate." (Pl.'s Reply (Doc. 29) at 10; see infra Section I.C.) Therefore, Plaintiff has alleged that the Commission's investigation infringes on her First Amendment rights, which is legally sufficient to demonstrate a likelihood of irreparable harm if a preliminary injunction is not issued.

**B. Likelihood of Success on the Merits**

A plaintiff seeking a preliminary injunction "need not establish a 'certainty of success,' but must make a clear showing that he is likely to succeed." Di Biase, 872 F.3d at 230 (citation omitted). "[T]he burden placed upon Plaintiff[] to show that each requirement of a preliminary injunction is met is high. Consequently, merely 'providing sufficient factual allegations to meet the [Fed. R. Civ. P.] 12(b)(6) standard of Twombly and Iqbal' does not show a likelihood of success on the

merits." J.O.P. v. U.S. Dep't of Homeland Sec., 338 F.R.D. 33, 60 (D. Md. 2020) (citation omitted).

For purposes of a preliminary injunction within the context of the First Amendment, the moving party bears the initial burden of "making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." Thalheimer v. City of San Diego, 645 F.3d 1109, 1116 (9th Cir. 2011) (overruled on other grounds by Bd. of Trs. Of Glazing Health and Welfare Tr. v. Chambers, 941 F.3d 1195 (9th Cir. 2019); see also Speech First, Inc. v. Sands, 69 F.4th 184, 190-91 (4th Cir. 2023) (citing Winter, 555 U.S. at 20) ("The moving party also bears the burden of demonstrating that it is likely to succeed on the merits."); We The Patriots USA, Inc. v. Hochul, 17 F.4th 266, 281 (2d Cir. 2021).

Here, Plaintiff raises two distinct First Amendment challenges to the Commission's investigation. First, she argues that Canon 2A is unconstitutionally vague as applied to her statements in the Interview. (Compl. (Doc. 1) ¶ 85; Pl.'s Br. (Doc. 4) at 16-19.) Second, Plaintiff argues that the Commission's investigation unconstitutionally abridges her core political speech and does not survive the applicable strict

scrutiny analysis. (Compl. (Doc. 1) ¶ 86; Pl.'s Br. (Doc. 4) at 12-16.)

### 1. As-Applied Vagueness Challenge

A challenged law or restriction is not void for vagueness as long as it "(1) establishes minimal guidelines to govern law enforcement, and (2) gives reasonable notice of the proscribed conduct." Recht v. Morrisey, 32 F.4th 398, 415 (4th Cir. 2022) (citation omitted).

As an initial matter, Plaintiff argues that "[s]eeking to investigate and potentially punish a judge for speech allegedly in violation of Canon 2(A) that might undermine 'public confidence' in the 'integrity and impartiality of the judiciary' is hopelessly vague." (Pl.'s Br. (Doc. 4) at 16.) Plaintiff explains that, under the "vague disciplinary rule" of Canon 2(A), "a judge seeking to speak out on some perceived problem within the judiciary is asked to assess whether a comment will be viewed as failing to 'promote public confidence,' . . . an essentially standardless formulation in this circumstance." (Id. at 17.)

Examining the plain language of Canon 2A, this court does not find its mandate to be as "standardless" as Plaintiff asserts. Canon 2A states: "A judge should respect and comply with the law and should conduct himself/herself at all times in

a manner that promotes public confidence in the integrity and impartiality of the judiciary." N.C. Code of Jud. Conduct, Canon 2A. A judge or judicial candidate running for office assumes not only the responsibility of administering the law but also the responsibility of understanding the ethical rules that apply. See N.C. Code of Jud. Conduct, Scope and Effective Date of Compliance ("The provisions of Canon 7 of this Code shall apply to judges and candidates for judicial office. The other provisions of this Code shall become effective as to a judge upon the administration of the judge's oath to the office of judge[.]"). These Canons were adopted by the North Carolina Supreme Court and do not appear, at least on their face, difficult for a trained lawyer or jurist to interpret, particularly in light of the fact that the North Carolina Supreme Court has published opinions explaining the application of the Canons in disciplinary proceedings. See, e.g., In re Badgett, 362 N.C. 202 (2008) (applying Canons 1, 2A, 2B, 3A(2), 3A(3), 3A(4), and 3D); In re Daisy, 359 N.C. 622 (2005) (applying Canons 1, 2A, and 3A(3)); In re Belk, 364 N.C. 114 (2010) (applying Canons 1, 2A, 3A(3), and 5C(2)).

Plaintiff argues that, as applied to her speech in the Interview, Canon 2A is unconstitutionally vague because "it 'fails to give a person of ordinary intelligence adequate notice

- 31 -

of what conduct is prohibited,'" (Pl.'s Reply (Doc. 29) at 7

(quoting Carolina Youth Action Project v. Wilson, 60 F.4th 770,

781 (4th Cir. 2023))), and "'require those persons who are

subject to the rule to steer far wider of the unlawful zone,

than if the boundaries of the forbidden areas were clearly

marked,'" (Pl.'s Br. (Doc. 4) at 18 (quoting Hirschkop v. Snead,

594 F.2d 356, 371 (4th Cir. 1979))). By contrast, the Commission

argues that Plaintiff has

> more than "reasonable notice" on this topic. The very
> Court on which Plaintiff serves reprimanded a fellow
> judge under Canon 2A for, among other things, openly
> criticizing another judge and accusing the judge of
> making decisions based on racial bias. See In re Inquiry
> Concerning a Judge, No. 17-143, 372 N.C. at 130-31
> (Earls, J.). The Court issued a public reprimand without
> expressing any First Amendment concerns, concluding that
> the disciplined judge "failed to conduct herself in a
> manner that promotes public confidence in the integrity
> of the judiciary, in violation of Canon 2A . . . ." Id.
> at 123, 135. That decision provides at least "minimal
> guidelines" on how Canon 2A will or will not be applied
> to a judges' criticism of their colleagues on similar
> grounds.

(Def.'s Resp. (Doc. 22) at 17.) As the Commission asserts, the

fact that Plaintiff herself has interpreted and applied Canon 2A

to another judge's speech, without raising any vagueness or

other First Amendment concerns, indicates that Canon 2A

establishes minimal guidelines for enforcement and gives

reasonable notice of the conduct it proscribes. In addition to

the opinion noted above, there are other cases involving

application of the Code to speech.[13] See In re Badgett, 362 N.C. 202, 657 S.E.2d 346 (2008) (rude and condescending speech); In re Stephenson, 354 N.C. 201, 552 S.E.2d 137 (2001) (solicitations for political support from the bench); In re Hill, 359 N.C. 308, 609 S.E.2d 211 (2005) (injudicious and unprofessional remarks).

Additionally, this court agrees with the Commission that "[a]ny as-applied vagueness challenge to Canon 2A is premature for the simple reason that, contrary to Plaintiff's suggestion, the Commission has not applied any canons to Plaintiff's speech." (Def.'s Resp. (Doc. 22) at 16.) Rather, "[t]he Commission is conducting a confidential investigation to determine whether Canon 2A applies to Plaintiff's conduct and, if so, the appropriate response." (Id.; see also Def.'s Br. (Doc. 21) at 22—23.) On this basis, Plaintiff's vagueness challenge is not yet ripe because the Commission has not yet

---

[13] Plaintiff recognizes that "judicial conduct" as used in all of the applicable Canons includes speech, (see Compl. (Doc. 1) ¶ 3; Pl.'s Decl. (Doc. 3-1) ¶ 12), particularly speech that improperly creates a perception that judicial duties do not take priority over personal commitments. See In re Smith, 372 N.C. 123, 127–28, 827 S.E.2d 516, 519 (N.C. 2019) (The respondent sometimes openly "announce[d] that she was adjourning court early for personal appointments" which "created a perception that her judicial duties did not take precedence over her personal commitments.").

- 33 -

determined whether Canon 2A applies or whether Canon 2A is vague as applied to Plaintiff.[14]

Plaintiff further argues that Canon 2A "impermissibly delegates basic policy matters to . . . officials charged with its enforcement for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary or discriminatory application." (Pl.'s Br. (Doc. 4) at 17 (quoting Hirschkop, 594 F.2d at 370-71).) Plaintiff does not provide any evidence to support this allegation, and it is purely speculative. First, Plaintiff points to no historical facts to suggest the Commission, made up of judges and non-judges alike, has acted on an ad hoc, subjective, arbitrary, or discriminatory basis in the past. Second, Plaintiff has served as a Justice of the North Carolina Supreme Court for four years and has imposed discipline in the past without making any such suggestion. See In re Smith, 372 N.C. 123, 827 S.E.2d 516 (2019) (Earls, J.). Accordingly, this court does not find that Plaintiff has established a

---

    *14 The application of Canon 2A to Plaintiff's speech may
implicate two discrete issues. The first is whether Plaintiff's
speech as to her colleagues is problematic with respect to the
comments, without regard to the truth or falsity of the
comments. The second consideration is whether the comments, if
false or without merit, adversely reflect on Plaintiff and by
extension the North Carolina Supreme Court. Regardless, the rule
does not appear vague as applied here, though this court does
recognize that different interpretations of the statement and
its meanings could give rise to differing analyses under Canon
2A.

likelihood of success on the merits of her as-applied vagueness claim.

## 2. Application of Strict Scrutiny

"'[R]egulations that discriminate against speech based on its content are presumptively invalid' and are usually subject to strict scrutiny. Fusaro v. Cogan, 930 F.3d 241, 248 (4th Cir. 2019) (quoting Stuart v. Camnitz, 774 F.3d 238, 244 (4th Cir. 2014)). Under strict scrutiny review, "such regulations must be 'necessary to serve a compelling state interest' and 'narrowly drawn to achieve that end.'" Id. (quoting Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 118 (1991). "'Laws that burden political speech' are also generally subject to strict scrutiny." Id. at 248-49 (quoting Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 564 U.S. 721, 734 (2011)).

Plaintiff argues that discussing "lack of diversity on the state's appellate bench and among advocates who argue before her court . . . is the type of high-value public discourse that increases public confidence in the judiciary." (Pl.'s Reply (Doc. 29) at 7.) However, those statements regarding a lack of diversity are not the subject of the Commission's investigation, and Plaintiff's Interview went beyond discourse about diversity and equity to state that her "conservative bloc" colleagues

- 35 -

treat her differently for one of three reasons (her race, her gender, or her political party), and that those same colleagues have an allegiance "to the ideology, not the institution." (Interview (Doc. 1-2 at 3.) Plaintiff argues that all of her statements have unwavering First Amendment protection as core political speech, and that protection outweighs any interest the Commission may have in protecting the integrity of the judiciary. (Pl.'s Br. (Doc. 4) at 12.)

The Commission argues that a state's interest in "protecting the integrity of the judiciary" and "maintaining the public's confidence in an impartial judiciary" is compelling, and that Canon 2A is directly aimed at furthering this interest. (Def.'s Resp. (Doc. 22) at 13) (quoting Williams-Yulee, 575 U.S. at 445).) Further, the Commission argues that its investigation, which has yet to and may never result in any sort of discipline for Plaintiff, is narrowly tailored to serve that compelling interest. (Id. at 15.) This is because the "nonpartisan Commission — comprising judges, lawyers, and laypersons — [is tasked to] initiate, upon complaint, a confidential investigation to 'determin[e] [whether] any judge has engaged in conduct that violates [the] Canons. . . . Such an investigation, where the judge is afforded a statutory right to participate,

- 36 -

retain counsel, and to offer testimony and documentary evidence, is highly protective of protected speech.'" (Id. at 13–14.)

### a.   Core Political Speech

Plaintiff asserts that the content of her interview is "core political speech concerning important public policy questions regarding the justice system and the administration of the courts." (Pl.'s Br. (Doc. 4) at 4, 12) Plaintiff argues that her criticisms of the judicial system warrant special First Amendment protections, and asserts that "[t]o the extent that her statements might be considered to somehow undermine 'public confidence' in the courts, it would only be by removing 'the cloak of secrecy around the operations of the courts,' which can hardly be considered an 'impropriety' as described in Canon 2." (Id. at 15.)

"Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" Buckley v. Valeo, 424 U.S. 1, 14 (1976). "[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the

free discussion of governmental affairs." <u>Mills v. Alabama</u>, 384 U.S. 214, 218 (1966). Such "core political speech"[15] is entitled to strict scrutiny review. <u>Meyer v. Grant</u>, 486 U.S. 414, 420 (1988); <u>see also</u> <u>VoteAmerica v. Raffensperger</u>, 609 F. Supp. 3d 1341, 1354 (N.D. Ga. 2022) ("In short, the Supreme Court's First Amendment jurisprudence defines core political speech as the discussion of public issues and the exchange of ideas for bringing about political and social change and reserves the highest level of protection for such speech. <u>See</u> <u>McIntyre</u> [v. <u>Ohio</u>, 514 U.S. 334, 346 (1995)]. Thus, a law that burdens core political speech is subject to strict scrutiny and will be upheld 'only if it is narrowly tailored to serve an overriding state interest.' <u>Id.</u> at 347.").

---

[15] "Core political speech is 'interactive communication concerning political change,' [<u>Meyer</u>, 486 U.S. at 422], and includes, among other things, 'speech uttered during a campaign for political office,' [<u>Eu v. San Francisco Cty. Democratic Cent. Comm.</u>, 489 U.S. 214, 223 (1989)], 'discussion of public issues and debate on the qualifications of candidates,' [<u>Buckley</u>, 424 U.S. at 14], 'advocacy of political reform,' [<u>Meyer</u>, 486 U.S. at 422], . . . [and] 'persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues,' <u>Schaumburg v. Citizens for a Better Env't</u>, [444 U.S. 620, 632 (1980)] . . . . Such political expressions are crucial to self-government and are afforded broad protection in order to safeguard 'the ability of the citizenry to make informed choices among candidates for office' and 'assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' <u>Roth v. United States</u>, [354 U.S. 476, 484 (1957)]." <u>Republican Party of Pennsylvania v. Cortés</u>, 218 F. Supp. 3d 396, 414–15 (E.D. Pa. 2016).

Further, "the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office.'" Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 339 (2010). In North Carolina, judges are elected to office. N.C. Gen. Stat. § 7A-140. The Supreme Court recognizes the First Amendment rights of candidates for judicial office. See Republican Party of Minnesota v. White, 536 U.S. 765, 788 (2002) ("If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process . . . the First Amendment rights that attach to their roles.").

The Supreme Court has also recognized that a state may impose appropriate restrictions on the political speech of judges and judicial candidates. "Judges are not politicians, even when they come to the bench by way of the ballot. And a State's decision to elect its judiciary does not compel it to treat judicial candidates like campaigners for political office. A State may assure its people that judges will apply the law without fear or favor . . . ." Williams-Yulee, 575 U.S. at 437–38.

Plaintiff, as a candidate for judicial office, desires to exercise her constitutional right to engage in core political speech. See Scott v. Flowers, 910 F.2d 201 (5th Cir. 1990);

- 39 -

*White*, 536 U.S. 765. On the other hand, the Commission has a "vital state interest in safeguarding public confidence in the fairness and integrity of the nation's elected judges," and the First Amendment permits restrictions on judges' and judicial candidates' speech intended to maintain this interest.[16] *Williams-Yulee*, 575 U.S. at 445 (citation omitted). However, "[a] State may restrict the speech of a judicial candidate only if the restriction is narrowly tailored to serve a compelling interest." *Id.* at 444.

Accordingly, judges in North Carolina are regulated by the Code, which was established "in furtherance" of "[a]n independent and honorable judiciary," which is "indispensable to justice in our society." N.C. Code of Jud. Conduct, Preamble. The Code applies to political activity, and Canon 7 of the Code states as follows:

> The provisions of Canon 7 are designed to strike a balance between two important but competing considerations: (1) the need for an impartial and independent judiciary and (2) in light of the continued requirement that judicial candidates run in public elections as mandated by the Constitution and laws of North Carolina, the right of judicial candidates to engage in constitutionally protected political activity.

---

[16] *See* *infra* Section IV.B.2.b.

N.C. Code of Jud. Conduct, Canon 7. Canon 7 specifically allows a candidate for judicial office to "engage in any other constitutionally protected political activity." Canon 7B(6).

Although the parties agree at this stage that Plaintiff's speech is core political speech, (Pl.'s Br. (Doc. 4) at 4; (Def.'s Br. (Doc. 21) at 5, 17), not every statement is core political speech simply because the speaker is a candidate for elected office. Rather, the speech itself must focus on "public issues" or "political and social changes" to be a part of that category. Valeo, 424 U.S. at 14. Plaintiff has thus far offered no explanation as to what her statements meant, either in court, out of court, or by affidavit or declaration. Defendants have not completed their investigation into the meaning of the statements and whether they violate Canon 2A and, during argument on the motion for preliminary injunction, expressed uncertainty as to the meaning of Plaintiff's statements. The lack of an ability of any party to explain, with any degree of certainty, the meaning of the statements, intended or otherwise, or to present evidence on that point, illustrates the necessity of further investigation, or development of the facts, in order to determine a likelihood of success on the merits of Plaintiff's claim in this court.

Nevertheless, even assuming _arguendo_ that Plaintiff's statements constitute core political speech, the statements may reasonably be interpreted to suggest one or more justices place their ideology above the institution of the North Carolina Supreme Court, possibly in violation of Canon 2A. Plaintiff is quoted as stating that "[t]he new members of our court very much see themselves as a conservative bloc. They talk about themselves as 'the conservatives.' Their allegiance is to the ideology, not to the institution." (Interview (Doc. 1-2) at 3) (emphasis added).) Plaintiff argues this is core political speech because it concerns the administration of the courts and of justice, which is a matter of legitimate public concern. While that interpretation of Plaintiff's statements may be plausible, Plaintiff's statement is also plausibly understood to suggest that a bloc of justices on the North Carolina Supreme Court place their political ideology above the institution of the North Carolina Supreme Court, at least implying that certain justices may apply the law or carry out the work of the Court with "favor" to their ideology, and the State has an interest in such an allegation as it may reflect upon the integrity of the judiciary. See Williams-Yulee, 575 U.S. at 437–38.

Core political speech is not regulated by reference to the truthfulness of a statement, because even false statements can

be afforded First Amendment protection. See United States v.
Alvarez, 567 U.S. 709, 722 (2012). Nevertheless, "false
statements impugning the integrity of a judge erode public
confidence without serving to publicize problems that
justifiably deserve attention." Standing Comm. on Discipline of
U.S. Dist. Court for Cent. Dist. of Cal. v. Yagman, 55 F.3d
1430, 1437–38 (9th Cir. 1995) (emphasis omitted). Furthermore,
the freedom of speech protected by the First Amendment does not
include the freedom to "disregard [] traditional limitations,"
including defamation. RAV v. City of St. Paul, 505 U.S. 377, 383
(1992).

A justice's speech carries certain weight due to the
authority of, and respect commanded by, the office of North
Carolina Supreme Court Justice. Public criticism by a justice of
other justices is different from the same statement by media
outlets or citizens in general. While public criticism of other
judges by a judge may in some circumstances be fair political
speech, an allegation that certain judges may elevate political
or other personal ideology over the institution of the North
Carolina Supreme Court may diminish the authority and integrity
of that Court as a whole.

### b.  Compelling State Interest

Assuming the statements do constitute core political speech, Plaintiff contends that Scott, 910 F.2d 201, and White, 536 U.S. 765, establish that her statements are protected, and any effort by the Commission to investigate or regulate her statements impermissibly infringes on her constitutional rights. (Pl.'s Br. (Doc. 4) at 12—14.) This court agrees with Plaintiff that Scott and White compel broad protection for core political speech. However, states may regulate judicial elections differently than political elections "because the role of judges differs from the role of politicians." Williams-Yulee, 575 U.S. at 446. A state may restrict the speech of a judicial candidate only if the restriction "further[s] a compelling interest and [is] narrowly tailored to that end." South Carolina Freedom Caucus v. Jordan, No. 23-cv-795, 2023 WL 4010391, at *10 (D.S.C. June 13, 2023). While it is a rare case in which a state demonstrates that a speech restriction is narrowly tailored to serve a compelling interest, there is a "vital state interest in safeguarding public confidence in the fairness and integrity of the nation's elected judges." Williams-Yulee, 575 U.S. at 433 (citation omitted) (internal quotation marks omitted).

## c.  __Narrowly Tailored__

The State of North Carolina has created what it contends is a narrowly tailored response to complaints of Code violations, including concerns relating to the public speech of judges as the least restrictive alternative to regulate public comments by a judge that may disparage the integrity and impartiality of the judiciary. (Def.'s Resp. (Doc. 22) at 8.)

The State established the Commission "for the investigation and resolution of inquiries concerning the . . . conduct of any judge or justice of the General Court of Justice." N.C. Gen. Stat. § 7A-374.1. In so doing, the Commission

> perform[s] four essential functions related to evaluating allegations of judicial misconduct or disability:
>
> (1)  receiving and reviewing complaints or information concerning alleged judicial misconduct or disability;
> (2)  conducting investigations in appropriate cases;
> (3)  if a minor violation of the Code of Judicial Conduct is found to have occurred, taking confidential remedial action to prevent a recurrence of the issue;
> (4)  if necessary, based on the nature of the misconduct or disability, conducting disciplinary or disability proceedings to hear evidence and make recommendations to the North Carolina Supreme Court for disposition of the matter. The Commission's recommendation is advisory and not binding on the North Carolina Supreme Court, which exercises its own independent review of the evidence and determines whether public discipline or removal from office is warranted based on clear and convincing evidence of misconduct, or whether

- 45 -

suspension or removal based on permanent incapacity
is necessary.

(Ex. A ("N.C. Jud. Standards Comm'n Ann. Rep.") (Doc. 23-1) at
6.) "[A]ll papers filed with the Commission and all proceedings
before the Commission are confidential" pursuant to N.C. Gen.
Stat. § 7A-377. (Id. at 7.) However, "[c]onfidentiality as to
certain records . . . ends if our Supreme Court orders public
discipline of the judge. In those circumstances, the statement
of charges, pleadings and recommendations of the Commission to
our Supreme Court, as well as the record filed in support of the
Commission's recommendations, are no longer considered
confidential. The Commission's investigative files, however,
remain confidential." (Id.)

The Commission is authorized to issue a "private letter of
caution" to a judge in response to conduct which is a violation
of the Code, "but that is not of such a nature as would warrant
a recommendation of public reprimand, censure, suspension, or
removal . . . ." N.C. Gen. Stat. § 7A-376(a). If the Commission
believes that any form of discipline other than a private letter
of caution is appropriate for, inter alia, "conduct prejudicial
to the administration of justice that brings the judicial office
into disrepute," it must make a recommendation of its
determination of the appropriate action to the North Carolina
Supreme Court. N.C. Gen. Stat. § 7A-376(b). Defendant contends

- 46 -

that this process, from investigation to a dismissal or a formal hearing and recommendation of discipline, is narrowly tailored to serve the state's compelling interest in maintaining the integrity of the judiciary.

It appears to this court that the Commission's process of confidentially investigating complaints, either dismissing complaints, conducting confidential investigations, or bringing formal charges, conducting a hearing at which an accused judge has the right to present evidence, and then either dismissing the complaint, issuing a private letter of caution, or recommending that the North Carolina Supreme Court evaluate the matter and issue an appropriate consequence, is narrowly tailored to serve the State's interest in maintaining the integrity and the appearance of integrity of the judiciary. A judge subjects herself to the Code and its Canons upon taking office, and the disciplinary process for handling alleged violations of the Code is done confidentially in a way that does not affect the judge's public image or daily responsibilities in the early stages of an investigation or if a complaint is dismissed. Only if the investigation eventually requires action by the North Carolina Supreme Court does the public learn of a judge's alleged violation of the Code. The process's confidentiality until that point, and the confidentiality of the

Commission's investigative records even after that point, is narrowly tailored. The State's compelling interest would not be served by an impaired system which would permit a judge to say anything on any subject whatsoever without fear of disciplinary reprimand by a body designated to maintain a code of ethics for judges in the State, as would be the case if any judge investigated for speech were able to enjoin the Commission's confidential investigative process as Plaintiff seeks to do here.

Plaintiff contends that the existence of an investigation alone is sufficient to establish constitutional injury by chilling her speech. However, "not every [government] restriction is sufficient to chill the exercise of First Amendment rights." DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir. 1995). In fact,

> [a] First Amendment claim premised on chilling speech . . . is cognizable only when the asserted chill "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005); see also Laird v. Tatum, 408 U.S. 1, 13–14 [(1972)]. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Laird, 408 U.S. at 13–14[]. Such allegations, standing alone, cannot demonstrate an injury in fact.

Speech First, 69 F.4th at 192.

The inquiry as to whether the Commission's investigation would be likely to deter a person of ordinary firmness from speaking "is an objective one — we determine whether a similarly situated person of 'ordinary firmness' reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." The Baltimore Sun Co. v. Ehrlich, 437 F.3d 410, 416 (4th Cir. 2006) (citing Constantine, 411 F.3d at 500; ACLU of Maryland, Inc. v. Wicomico Cnty., 999 F.2d 780, 786 (4th Cir. 1993)) (holding that a political reporter of ordinary firmness would not be chilled by a local politician refusing to answer the reporter's questions or respond to comments based on the reporter's past reporting).

Although there may be some uncertainty as to the applicable standard of evaluating whether an adverse action is sufficiently material to give rise to an actionable First Amendment claim, see Houston Community Coll. Sys. v. Wilson, 595 U.S. 468, 477–78 (2022), this court does not find the actions of the Commission in this case sufficient to chill the speech of a person of ordinary firmness in Plaintiff's position.[17] First, whether a candidate or not, a judge or justice must consider the Code's

---

[17] In Wilson, the Court recognized differing approaches to the "chilling" analysis without specifically endorsing one. See 595 U.S. at 477—78. This court reaches the same result both under the Fourth Circuit's "chilling" analysis in light of Wilson and under the Wilson analysis directly.

Canons when acting or speaking in all walks of life. See N.C.
Code of Jud. Conduct, Canon 2 ("A judge should avoid impropriety
in all the judge's activities." (emphasis added)). Second,
Plaintiff is an elected official, subject to challenges and
criticisms on a variety of issues and in a number of settings.
Accordingly,

> in this country, we expect elected officials to shoulder
> a degree of criticism about their public service from
> their constituents and their peers — and to continue
> exercising their free speech rights when the criticism
> comes. As this Court has put it, "[w]hatever differences
> may exist about interpretations of the First Amendment,
> there is practically universal agreement" that it was
> adopted in part to "protect the free discussion of
> governmental affairs." Mills v. Alabama, [384 U.S. 214,
> 218 (1966)]. When individuals "consent to be a candidate
> for a public office conferred by the election of the
> people," they necessarily "pu[t] [their] character in
> issue, so far as it may respect [their] fitness and
> qualifications for the office." White v. Nicholls, 3
> How. 266, 290, 11 L.Ed. 591 (1845).

> . . . [T]he only adverse action at issue before us is
> itself a form of speech from Mr. Wilson's colleagues
> that concerns the conduct of public office. The First
> Amendment surely promises an elected representative like
> Mr. Wilson the right to speak freely on questions of
> government policy. But just as surely, it cannot be used
> as a weapon to silence other representatives seeking to
> do the same. The right to "examin[e] public characters
> and measures" through "free communication" may be no
> less than the "guardian of every other right." Madison's
> Report on the Virginia Resolutions (Jan. 7, 1800), in 17
> Papers of James Madison 345 (D. Mattern, J. Stagg, J.
> Cross, & S. Perdue eds. 1991). And the role that elected
> officials play in that process "'makes it all the more
> imperative that they be allowed to freely express
> themselves.'" Republican Party of Minn. v. White, [536
> U.S. 765, 781 (2002)].

Wilson, 595 U.S. at 478.

Whatever interpretation is finally applied to Plaintiff's comments about her colleagues placing their ideology above the institution, that statement carries a reasonable interpretation that is critical of those justices, perhaps in the political sense and perhaps in an ethical sense. If Plaintiff has in fact offered criticism of the ideology of other justices, then it is not plausible that Plaintiff would criticize other justices and in turn not expect critical responses from others who may have a different view or who may be concerned about ethical issues regarding sitting judges or justices. The First Amendment "may not be used as a weapon to silence other representatives seeking to do the same." Id.

Plaintiff has an established constitutional right to "state [her] views on disputed legal issues outside the context of adjudication" which makes it "imperative that [she] be allowed freely to express [herself] on matters of current public importance." (Pl.'s Br. (Doc. 4) at 13 (citing White, 536 U.S. at 779, 781–82).) However, a State has a right to "assure its people that judges will apply the law without fear or favor" and to safeguard "public confidence in the fairness and integrity of the nation's elected judges." Williams-Yulee, 575 U.S. at 438,

445. The Commission is North Carolina's chosen manner of safeguarding that public confidence.

With respect to the present investigation, this court finds the possibility of any material adverse action too speculative to support a finding of a likelihood of success on the merits. The Commission itself can either dismiss or recommend a private letter of caution, an action that likely constitutes an immaterial adverse action insufficient to give rise to an actionable First Amendment claim. See Wilson, 595 U.S. at 477–79. On the record as presently constituted, only the North Carolina Supreme Court has the authority to issue forms of discipline that might be deemed material. Plaintiff's argument that her speech is chilled assumes the Commission and the North Carolina Supreme Court are likely to take an adverse, and unconstitutional, action against Plaintiff. While the potential for an adverse outcome can be enough to support a First Amendment claim, Plaintiff has not shown a likelihood that any potential discipline would be material or unconstitutional. A plausible claim is not sufficient for this court to order the issuance of an injunction.[18]

---

[18] Plaintiff advances two arguments that this court does not find compelling. First, Plaintiff points to the political exchanges occurring in recent written opinions, suggesting her comments "are simply a summary of debates conducted between the
(footnote continued)

## V. __CONCLUSION__

At oral argument, Plaintiff contended that White and Scott support her claim for injunctive relief. Those two cases support a finding that Plaintiff has plausibly pled a First Amendment claim under § 1983. However, Williams-Yulee recognizes that political speech as applied to judges running for election is unique, and the state's interest in preserving the public's perception is substantial. Wilson makes clear that there are situations where a reaction or reprimand from peers during the electoral process is appropriate, and some responses are "immaterial" in a First Amendment analysis. Here, because of these competing interests, the multiple ways in which Plaintiff's statements may be understood, and the Commission's role in investigating her statements' potential violation of the

---

justices in their recent written opinions." (Pl.'s Reply (Doc. 29) at 6 n.2.) In written opinions, both majority and dissenting judges and justices have an opportunity to explain their reasoning, allowing the reader to evaluate the relative merits or demerits of partisan claims. Here, Plaintiff has offered no explanation of her statement nor any specific support for the statements, and this failure may itself reflect adversely on Plaintiff or the judiciary. Furthermore, whatever the merits or demerits of including partisan criticism in judicial opinions, this court is only addressing the statements at issue in this case, not whether other statements are proper or improper.

Second, Plaintiff argues that "Earls never suggested . . . that any judge acted out of racial, gender, or political bias in any decision" in the Interview. (Id. at 5.) That is perhaps true, or perhaps not. There is no evidence on that point as Plaintiff has not explained her comments and the comments are susceptible to different interpretations.

Code, Plaintiff has failed to establish a likelihood of success on the merits and, if <u>Younger</u> abstention does not apply to this action, Plaintiff's motion for a preliminary injunction is denied on the merits.

For the foregoing reasons, **IT IS THEREFORE ORDERED** that Plaintiff's motion for preliminary injunction is **DENIED.**

This the 22nd day of November, 2023.

_____
United States District Judge